## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Case No. 02-10429 (JKF) |
| KAISER ALUMINUM CORPORATION, | : | |
| et al., | : | |
| | : | |
| Debtors. | : | |
| | : | |
| PUBLIC UTILITY NO. 1 OF CLARK | : | |
| COUNTY d/b/a Clark Public Utilities, | : | |
| | : | Civil Action No. 06-247 (JJF) |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| KAISER ALUMINUM & CHEMICAL | : | |
| CORPORATION, et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

## BRIEF OF APPELLANT

DUANE MORRIS
Frederick B. Rosner, Esq.
(ID No. 3995)
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
Tel.: (302) 657-4900
Fax: (302) 657-4901

BRACEWELL & GIULIANI LLP
George H. Williams, Esq.
2000 K Street, N.W., Suite 500
Washington, DC 20006
Tel.: (202) 828-5800
Fax: (202) 223-1225

BRACEWELL & GIULIANI LLP
William A. Wood, III, Esq.
(Texas Bar ID 21916050)
Warren W. Harris, Esq.
(Texas Bar ID 09108080)
Tracy C. Temple, Esq.
(Texas Bar ID 00793446)
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
Tel.: (713) 223-2300
Fax: (713) 221-1212

*Counsel to Public Utility District No. 1 of Clark County*
*d/b/a Clark Public Utilities*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ........................................................................... 1

STATEMENT OF THE ISSUES ON APPEAL AND STANDARD OF REVIEW ...................... 1

    Issues on Appeal ...................................................................................... 1

    Standard of Review ................................................................................. 1

STATEMENT OF THE CASE ................................................................................ 2

    A.    Nature of the Case and Course of Proceedings ........................................ 2

    B.    Factual Background ........................................................................ 5

        1.    Clark enters a remarketing agreement with Kaiser .................................. 5

        2.    A FERC proceeding is established to determine whether unjust and unreasonable rates were charged in the Pacific Northwest ........................ 6

        3.    Kaiser files for bankruptcy, which prevents Clark from pursuing the unjust and unreasonable rate claim and the unauthorized sale claim before FERC ........................................................................................ 8

        4.    The bankruptcy court repeatedly denies Clark's requests for relief from the bankruptcy stay ........................................................................ 9

        5.    The bankruptcy court denies Clark's motion to withdraw the reference and grants summary judgment on Clark's claims against Kaiser on the basis of res judicata ........................................................................... 10

SUMMARY OF THE ARGUMENT ....................................................................... 11

ARGUMENT ................................................................................................. 12

I.    The Bankruptcy Court Erred in Finding That It Had Jurisdiction Over Clark's Claims Because Exclusive Jurisdiction of the Claims Lies With FERC ....................................... 12

    A.    FERC's jurisdiction ........................................................................ 13

    B.    FERC has exclusive jurisdiction over justness and reasonableness of rates ........................................................................................... 14

    C.    FERC has exclusive jurisdiction over authority to make wholesale power sales ................................................................................ 15

D.      Because FERC has exclusive jurisdiction over Clark's claims, the
        bankruptcy court must yield to FERC .................................................................17

II.    The Bankruptcy Court Erred in Granting Summary Judgment Because Clark's
       Claims are Not Barred by Res Judicata.................................................................18

       A.      Res judicata principles as applied to FERC proceedings.....................................18

       B.      The elements of res judicata are not satisfied .......................................................20

               1.      The unauthorized sale claim is not barred.................................................20

                       (a)      The unauthorized sale claim is a different cause of action...........21

                       (b)      The unauthorized sale claim was not brought and could not
                                have been brought in the FERC proceeding.................................25

               2.      The unjust and unreasonable rate claim is not barred ..............................27

                       (a)      The FERC decision is on appeal..................................................27

                       (b)      FERC did not make a finding on the merits .................................27

       C.      Application of res judicata to Clark's claims is inequitable.................................28

       D.      FERC should decide in the first instance whether res judicata applies ..............32

CONCLUSION.......................................................................................................................33

# TABLE OF AUTHORITIES

*Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*,
    145 B.R. 404, 409 (D. Del. 1992) ......................................................................................29

*Algonquin Gas Transmission Co.*, 64 F.E.R.C. ¶ 63,014 (1993) ...........................................19, 32

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
    197 F.3d 76 (3d Cir. 1999) ..................................................................................................1

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ...................................................................2

*Borough of Lansdale v. Philadelphia Elec. Co.*, 517 F. Supp. 218 (E.D. Pa. 1981) ....................23

*Burtch v. Ganz (In re Mushroom Transp. Co., Inc.)*, 382 F.3d 325 (3d Cir. 2004).........................2

*Cal. Dept. of Water Res. v Calpine Corp. (In re Calpine Corp.)*,
    337 B.R. 27 (S.D.N.Y. 2006), *appeal docketed*, No. 06-0480-bk
     (2d Cir. Feb. 1, 2006) ................................................................12, 13, 14, 15, 16, 17, 18

*Cal. ex rel. Lockyer et al. v. Dynegy, Inc.*,
    375 F.3d 831 (9th Cir.), *amended by* 387 F.3d 966 (9th Cir. 2004) ..................................15

*Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006 (9th Cir. 2004) .......................................................16

*Carolina Power & Light Co.*, 87 FERC ¶ 61,083 (1999) ......................................................22, 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................................2

*Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987),
    19, 21, 25, 29, 32

*Costner v. URS Consultants, Inc.*, 153 F.3d 667 (8th Cir. 1998) ..................................................29

*El Paso*, 105 F.E.R.C. ¶ 61,131 (2003) .......................................................................................23

*FPC v. United Gas Pipeline Co.*, 386 U.S. 237 (1967) ................................................................21

*Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205 (1964) ...........................................13, 17

*Foerst v. Clowser (In re Clowser)*, 39 B.R. 883 (Bankr. E.D. Va. 1984).....................................31

*Groton v. Conn. Light & Power Co.*, 456 F. Supp. 360 (D. Conn. 1978) .....................................16

*In re W. Elecs., Inc.*, 852 F.2d 79 (3d Cir. 1988).........................................................................31

**Page**

*Lake Murray Docks, Inc. v. South Carolina Elec. & Gas Co.*,
  57 F.E.R.C. ¶ 61,320 (1991) ...........................................................................21, 23, 24

*McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506 (3d Cir. 1997) ...............................31

*Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988) .......................12, 14

*Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986) ...............................14

*New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982)) ...........................16

*Pacificorp*, 60 F.E.R.C. ¶ 61,292 (1992) ...................................................................23

*Panhandle Eastern Pipe Line Co.*, 38 F.E.R.C. ¶ 63,030 (1987) .................................20

*Pub. Utils. Comm'n of Cal. v. FERC*, 2006 U.S. App. LEXIS 19476 (9th Cir. Aug. 2,
  2006) ....................................................................................................................15, 22

*Puget Sound Energ, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at
  Wholesale Into Electric Energy and/or Capacity Markets in the Pacific
  Northwest, Including Parties to the Western Systems Power Pool Agreement*,
  96 F.E.R.C. ¶ 63,044 (2001) .................................................................................7, 27, 29

*Puget Sound Energy, Inc.*, 103 F.E.R.C. ¶ 61,348...................................................23

*Raven Media Inv., LLC v. DirectTV Latin Am., LLC (In re DirectTV Latin Am., LLC)*,
  2004 U.S. Dist. LEXIS 2425, 42 Bank. Ct. Dec. 169 (D. Del. Feb. 4, 2004) ................1, 2

*Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721 (8th Cir. 2004) ...............................29

*Sabratek Corp. v. Lasalle Bank, N.A. (In re Sabratek Corp.)*,
  257 B.R. 732 (Bankr. D. Del. 2000) .......................................................................29

*Staten Island Rapid Transit Operating Auth. v. ICC*, 718 F.2d 533 (2d Cir. 1983).....................29

*Transmission Agency of N. Cal. (TANC) v. Sierra Pac. Power Co.*,
  295 F.3d 918 (9th Cir. 2002) ................................................................................15

*Trunkline LNG Co. v. FERC*, 921 F.2d 313 (D.C. Cir. 1990) .......................................32

*U.S. v. Radio Corp. of Am.*, 358 U.S. 334 (1959)....................................................19

*U.S. v. Utah Constr. & Mining Co.*, 384 U.S. 394 (1966)...........................................30

*Utah Power & Light Co.*, 27 F.E.R.C. ¶ 61,258 (1984) .........................................19, 32

**Page**

*W. Mass. Elec. Co. v. FERC*, 165 F.3d 922 (D.C. Cir. 1999)........................................................16

*Williams Natural Gas Co.*, 83 F.E.R.C. ¶ 63,015 (1998) ................................................20, 27, 29

**Statutes**

Federal Power Act, 16 U.S.C. §§ 824a, 824d(c) (2004)..........................................................16, 22

Federal Power Act, 16 U.S.C. § 824d(a) (2004)...........................................................................21

Federal Power Act, 16 U.S.C. § 825(h) (2004) .............................................................................22

28 U.S.C. § 158(a) ..........................................................................................................................1

**Rule**

Fed. R. Civ. P. 56(c) .......................................................................................................................2

**Miscellaneous**

Am. Jur. 2d Admin. Law § 382 (1994)...........................................................................................26

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Practice & Proc. § 4475 at 473-74 (2d ed. 2002) .........................................................................19, 32

Restatement (Second) of Judgments § 26(1) (1982) ......................................................19, 24

Restatement (Second) of Judgments § 28(a) (1982)..............................................................29

Restatement (Second) of Judgments § 83 cmt. b (1982) ........................................................19

Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities files its Brief of Appellant. Appellant Public Utility District No. 1 of Clark County d/b/a Clark Public Utilities will be referred to as Clark. Appellee Kaiser Aluminum and Chemical Corporation will be referred to as Kaiser.

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this appeal under 28 U.S.C. § 158(a). 28 U.S.C. § 158(a); *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

## STATEMENT OF THE ISSUES ON APPEAL AND STANDARD OF REVIEW

*.Issues on Appeal.*

The issues on appeal in this case include the following:

1.      Whether the bankruptcy court erred in finding it has jurisdiction over Clark's claims against Kaiser when the claims arise under the Federal Power Act and are subject to the exclusive jurisdiction of the Federal Energy Regulatory Commission (FERC)?

2.      Whether the bankruptcy court erred in granting summary judgment against Clark on grounds of res judicata based on the FERC proceeding when the FERC proceeding only addressed one of Clark's two claims, the decision is still on appeal, and Clark was barred from participating in that proceeding by the automatic stay of Kaiser's bankruptcy case?

*.Standard of Review.*

In reviewing an order of the bankruptcy court, this Court applies a clearly erroneous standard of review to the bankruptcy court's findings of fact. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999); *Raven Media Inv., LLC v. DirectV Latin Am., LLC* (*In re DirectV Latin Am., LLC*), 2004 U.S. Dist. LEXIS 2425, at *6 42 Bank. Ct. Dec. 169 (D. Del. Feb. 4, 2004). The Court applies a plenary standard to the

bankruptcy court's legal conclusions.  *Id.*  If there are mixed questions of law and fact, the Court accepts the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercises 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'"  *Raven Media Inv., LLC*, 2004 U.S. Dist. LEXIS 2425, at *6 (citing *Mellon Bank, N.A. v. Metro Communications, Inc*., 945 F.2d 635, 642 (3d Cir. 1991)).  In reviewing bankruptcy court decisions, district courts further take into consideration the fact that the United States Court of Appeals for the Third Circuit effectively reviews bankruptcy court opinions on a de novo basis.  *Id.* at *7-8.

The standards applicable to summary judgments are well settled.  A court may only grant a motion for summary judgment when there is no issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party has the burden to show that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has carried its burden, the burden then shifts to the non-movant to show that there is a genuine issue of material fact for trial and the summary judgment should not be granted.  *Id.*

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but only to determine if there is a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986).  The Court must make all factual inferences in favor of a party opposing the motion for summary judgment.  *Burtch v. Ganz (In re Mushroom Transp. Co., Inc.)*, 382 F.3d 325, 335 (3d Cir. 2004).

## STATEMENT OF THE CASE

**A.    *Nature of the Case and Course of Proceedings.***

On February 12, 2002, Kaiser filed its voluntary petition for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware.  (Docket No. 1).  On January

30, 2003, Clark asserted two proofs of claim in the bankruptcy proceeding.  (Docket No. 8017, Exs. 10 & 11).  The proofs of claim relate to Clark's purchase of Kaiser's surplus electricity for the months of August and September 2001.  (Docket No. 8017, Ex. 10 at 2, Ex. 11 at 2).  Clark asserted: (1) that Kaiser charged unjust and unreasonable rates for the electricity; and (2) that Kaiser had made an unauthorized sale of electricity—both in violation of the Federal Power Act, 16 U.S.C. §§ 201, 205.  (Docket No. 8017 Ex. 10 at 4, Ex. 11 at 4-5).

On October 10, 2005, Kaiser filed a Verified Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for an Order Disallowing Claims Filed by Clark Public Utilities.  (Docket No. 7480).  Kaiser asserted that Clark's claims were barred by res judicata based on a prior FERC proceeding.  (Docket No. 7480 at 8; Docket No. 7662 at 4).  On October 24, 2005, Clark filed a Motion to Withdraw the Reference, asserting that FERC should be the entity to decide Clark's claims of violations of the Federal Power Act.  (Docket No. 7572 at 2 & Docket Nos. 7583 & 7584 at 6, 8, 12-17).

On October 25, 2005, Clark filed its Response to the Verified Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for an Order Disallowing Claims Filed by Clark Public Utilities, setting forth the reasons that res judicata did not bar its claims.  (Docket No. 7593; *see also* Docket No. 7693).  On November 7, 2005, Kaiser filed a Reply to Clark Public Utilities' Response to Verified Motion for an Order Disallowing Claims. (Docket No. 7662).

On November 14, 2005, the bankruptcy court held a hearing on the motion to disallow claims.  (Docket No. 7747).  At the hearing the bankruptcy court requested that Kaiser file a motion for summary judgment on the two proofs of claim, specifically addressing the application of res judicata.  (Docket No. 7747 at 29, 33).  The court also denied Clark's motion to withdraw

the reference, (Docket No. 7747 at 29, 36), and later entered an order based on that ruling.[1] (Docket No. 7804).

On December 2, 2005, Kaiser filed its Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for Summary Judgment Regarding Its Verified Motion for an Order Disallowing Claims Filed by Clark Public Utilities.  (Docket No. 7841).  Clark timely filed its Response and Objection to the Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for Summary Judgment Regarding Its Verified Motion for an Order Disallowing Claims Filed by Clark Public Utilities.  (Docket No. 8016).  Kaiser filed a Reply to Clark Public Utilities' Response to Motion for Summary Judgment Regarding Verified Motion for an Order Disallowing Claims.  (Docket No. 8043).  Two hearings were held on the motion for summary judgment.  (Docket Nos. 8181 & 8444).

On March 7, 2006, the bankruptcy court entered an Order (I) Granting Motion of Debtor and Debtor in Possession Kaiser Aluminum & Chemical Corporation for Summary Judgment Regarding Its Verified Motion for an Order Disallowing Claims Filed by Clark Public Utilities and (II) Disallowing Claims Filed by Clark Public Utilities.  (Docket No. 8371).  In the order, the bankruptcy court again held that it had jurisdiction over Clark's proofs of claim.  (Docket No. 8371).  On March 16, 2006, Clark filed its Notice of Appeal of the bankruptcy court's orders. (Docket No. 8415).

---

[1] Clark sought review of the order denying the motion to withdraw the reference from this Court in No. 05-00836; *Public Utility District No. 1 of Clark County v. Kaiser Aluminum and Chemical Corp.*, In the United States District Court for the District of Delaware.  This Court denied the motion to withdraw the reference with leave to renew.  (Docket No. 25 in 05-00836). The Court also stated that if Clark appealed an adverse ruling of the bankruptcy court, the Court would then choose either to decide the pending motion to withdraw the reference or allow an appeal of the bankruptcy court's decision.  (*Id.*).

**B.**    *Factual Background.*

Clark is a customer-owned municipal corporation operating under the laws of the state of Washington.  (Docket No. 8018 at 1).  As part of its operations, Clark provides electricity to approximately 170,000 customers throughout Clark County, Washington.  (*Id.*).

Since 1981, Clark had purchased its electricity from the Bonneville Power Administration (BPA) under a long-term contract.  (Docket No. 8018 at 1).  That contract expired on June 30, 2001.  (*Id.*).  Due to market uncertainties and administrative changes within BPA, Clark could not obtain another contract with BPA until October 1, 2001.  (Docket No. 8018 at 2).  This left Clark with a gap of two months (August and September 2001) for its supply of electricity.[2]  (*Id.*).  Thus, in early 2001, Clark began searching for another supply of electricity for the two-month gap.  (*Id.*).  Due to soaring prices and market volatility caused by the California energy crisis, Clark had to fill the gap as quickly as possible.  (*Id.*).

1.    *Clark enters a remarketing agreement with Kaiser.*

On February 2, 2001, Clark entered into a remarketing letter agreement with Kaiser. (Docket No. 8018 at 2; *see also* Docket No. 8017, Ex. 1).  Kaiser had excess power under an existing take-or-pay contract it had executed with BPA and was willing to remarket that power to Clark.  (*See* Docket No. 7842 at 6).  Under the remarketing letter agreement, Clark committed to purchase from Kaiser 140 Megawatts of power for the period August 1, 2002 through September 30, 2001, at the rate of $325 per Megawatt hour.  (Docket 8018 at 2).  Clark was obligated to pay $64,080,603 on March 28, 2001 for the two months of power.  (*Id.*).

In order to remarket its power under its agreement with BPA, Kaiser had to provide notice to BPA of the remarketing terms.  Under Section 18(b)(2) of the BPA/Kaiser contract,

---

[2]    Clark had contracted for power from another source for the month of July 2001. (Docket No. 8018 at 2).

5

Kaiser had the right to remarket excess power it did not use by finding its own purchaser of the excess power or by requesting that BPA find a purchaser. (Docket No. 8018 at 2; *see also* Docket No. 8017, Ex. 1 at 1). If BPA accepted the purchaser found by Kaiser, then the electricity would be delivered under the terms and conditions set forth by Kaiser in the letter remarketing agreement. (Docket No. 8017, Ex. 1 at 1). BPA agreed to allow Kaiser to remarket the excess power to Clark under the terms set forth by Kaiser. (Docket No. 8017, Ex. 3 at 1).

To complete the transaction, BPA entered into two confirmation agreements: one with Clark and one with Kaiser. (Docket No. 8018 at 2; *see also* Docket No. 8017, Exs. 3 & 4). The confirmation agreements confirmed the terms agreed to by Kaiser and Clark in the remarketing letter agreement. (*Id.*). The confirmation agreements also showed that, of the $64,080,603 purchase price for the electricity, Kaiser would receive $59,842,404, with the balance to be retained by BPA to cover the costs to Kaiser of the remarked power. (Docket No. 8018 at 2; Docket No. 8017, Ex. 4 at 1). Thus, Clark paid Kaiser $64,080,603 for power that cost Kaiser only $4,200,000.

> 2.    *A FERC proceeding is established to determine whether unjust and unreasonable rates were charged in the Pacific Northwest.*

In July 2001, responding to well publicized market failures and related manipulations in California and the Pacific Northwest, FERC established a generic proceeding "to explore whether there may have been unjust and unreasonable charges for spot market sales in the Pacific Northwest from December 25, 2000 through June 20, 2001, and the calculation of any refunds associated with such charges." (Docket No. 8017, Ex. 5 at 1). This became known as the Puget Sound Proceeding. FERC set the matter before an administrative law judge for preliminary evidentiary proceedings to establish the extent of potential refunds. (Docket No. 8017, Ex. 5 at 20).

On August 7, 2001, Clark intervened in the Puget Sound Proceeding and alleged that Kaiser had charged Clark unjust and unreasonable rates for the power Clark purchased from Kaiser under the remarketing agreement in violation of the Federal Power Act. (Docket No. 8018 at 3). Clark sought a refund from Kaiser in an amount equal to the excess price charged by Kaiser over just and reasonable electricity rates. (*Id.*). On August 21, 2001, FERC granted Clark's motion to intervene. (Docket No. 8018 at 3; *see also* Docket No. 8017, Ex. 11 [Order granting intervention at 3]). In the order granting intervention, FERC noted that "this proceeding is about price. . . . " (Docket No. 8017, Ex. 11 [Order granting intervention at 2]).

On August 23, 2001, FERC issued an order setting forth the issues to be tried in the proceeding. (Docket No. 8017, Ex. 6). Those issues dealt with the definition of spot markets in the Pacific Northwest, whether unjust and unreasonable prices may have been charged during the relevant time frame, and whether refunds were lawful or appropriate. (*Id.*). None of the issues included whether sellers may have sold electricity without authority in violation of the Federal Power Act. (*See id.*).

During August and September 2001, very limited discovery was conducted, an abbreviated hearing was held, and post-hearing briefs were filed.[3] *Puget Sound Energ, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement,* 96 F.E.R.C. ¶ 63,044 at 65,300-301 (2001). On September 24, 2001, the ALJ issued a decision finding that there were no unjust and unreasonable rates charged in the Pacific

---

[3] Clark asserted that it was due refunds for the differential between the amount Clark paid Kaiser for the power versus the amount determined by FERC to be just and reasonable. Kaiser responded by asserting that it had not made a sale to Clark. The ALJ did not address Kaiser's claim (neither ultimately did the Commission).

Northwest for the relevant time frame. *Id.* Clark, along with several other parties, filed briefing before the full FERC commission challenging the ALJ's decision.

3.      *Kaiser files for bankruptcy, which prevents Clark from pursuing the unjust and unreasonable rate claim and the unauthorized sale claim before FERC.*

On February 12, 2002, Kaiser filed its petition for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code. (Docket No. 1). At the time Kaiser filed its bankruptcy petition, Clark's challenge to the ALJ's findings in the Puget Sound Proceeding was still pending before the entire FERC commission. (*See* Docket No. 8017, Ex. 9 [order on clarification at 4-5]). The automatic stay went into effect.

On June 14, 2002, Clark sought relief from the automatic stay from the bankruptcy court. (Docket No. 644).[4] Clark sought relief from the stay in order to pursue two separate claims. First, Clark sought relief so that it could participate in the continuation of the Puget Sound Proceeding. (Docket No. 644 at 7). In that proceeding, FERC was considering not only the ALJ's recommendations, but also a request to reopen the evidentiary record. (Docket No. 644 at 5). Second, Clark sought relief so that it could file a claim with FERC against Kaiser for the unauthorized sale of electricity. (Docket No. 644 at 7). Clark sought to assert this claim against Kaiser as soon as it learned that Kaiser was not an authorized seller. (Docket No. 8018 at 5).

On July 23, 2002, the bankruptcy court denied Clark's motion for relief from stay in its entirety, without prejudice to reassert the motion. (Docket No. 8017, Ex. 7). With regard to the Puget Sound Proceeding, the court concluded that the motion was premature because FERC had not yet reopened the evidentiary record. (Docket No. 886 at 92). With regard to the unauthorized sale claim, the court stated as follows:

---

[4] Two items were inadvertently omitted from Clark's Designation of Items to Be Included in the Record on Appeal. Those two items are Docket Nos. 644 and 886. Clark will file a Motion to Supplement Record on Appeal to include those two items.

> "you've got a pure and simple money damage claim.  If the Debtor acted without authority and you can prove it and show how you were damaged as a result, I think you've got a bankruptcy claim.  I don't see why you need relief from stay to file a lawsuit for that purpose.  You can file a claim."

(Docket No. 886 at 93).  Thus, the bankruptcy court did not permit Clark to pursue its unauthorized sale claim with FERC.

    4.    *The bankruptcy court repeatedly denies Clark's requests for relief from the bankruptcy stay.*

On December 19, 2002, FERC issued an order reopening the evidentiary record in the Puget Sound Proceeding.  (Docket No. 8017, Ex. 8).  On January 7, 2003, Clark again sought relief from the stay so that it could participate in the reopened record in the Puget Sound Proceeding.  (Docket No. 8018 at 4).  The bankruptcy court denied Clark's motion but allowed Clark to seek clarification from FERC as to whether the order applied to Clark's claims.  (*Id.*).  FERC issued an order clarifying that it would be appropriate for Clark to participate in the re-opened evidentiary proceeding.  (*Id.*).  The bankruptcy court then allowed Clark to participate, but strictly limited the nature and scope of Clark's participation and required Clark to submit its draft pleading to Kaiser for pre-filing review.  (*Id.*; *see also* Docket No. 2000 at 2-4).  Clark was permitted to do very limited discovery, and was limited in the new proposed findings of fact and conclusions of law that it could submit to FERC.  (*See* Docket No. 2000 at 3).

On June 25, 2003, the Commission at FERC issued a decision terminating the Puget Sound Proceeding.  (Docket No. 8017, Ex. 12).  The Commission did not adopt the ALJ's findings.  (*See id.*).  Instead, it ruled that, "even if prices were unjust and unreasonable, the directing of refunds in this proceeding would not result in an equitable resolution of the matter. Accordingly, we will not require refunds and terminate this matter without further proceedings." (Docket No. 8017, Ex. 12 at 18).

On July 18, 2003, Clark again sought relief from the automatic stay in the bankruptcy court in order to file a motion for rehearing, a prerequisite to taking an appeal of the FERC decision.  (Docket No. 2598).  The bankruptcy court denied Clark relief from the stay thereby precluding Clark from appealing the agency decision.  (Docket No. 2616).  Other parties to the Puget Sound Proceeding, however, did appeal the agency's decision and that appeal is currently pending in the United States Court of Appeals for the Ninth Circuit.  (*See* Docket No. 8017 at 14-15).

5.    *The bankruptcy court denies Clark's motion to withdraw the reference and grants summary judgment on Clark's claims against Kaiser on the basis of res judicata.*

On October 24, 2005, Clark filed a Motion to Withdraw the Reference asserting that the proper entity to decide Clark's claims was FERC.  (Docket No. 7572; Docket Nos. 7583 & 7584 at 6, 8, 12-17).  The bankruptcy court denied the motion, finding that it had jurisdiction over the claims.  (Docket No. 7747 at 29, 36).

In December 2005, Kaiser filed its motion for summary judgment seeking disallowance of both of Clark's claims on the basis of res judicata.  (Docket No. 7841).  Kaiser argued that the Commission's decision in the Puget Sound Proceeding barred Clark from recovering for unjust and unreasonable rates and from asserting the unauthorized sale claim.  (*See* Docket No. 7842 at 3-5).  Clark responded that the Puget Sound Proceeding did not bar its claims against Kaiser under principles of res judicata because: (1) the unauthorized sale claim is a separate cause of action than that at issue in the Puget Sound Proceeding; (2) the unauthorized sale claim is not a claim that was brought or that could have been brought in the Puget Sound Proceeding; (3) the Commission's decision on the unjust and unreasonable rate claim was not a decision on the merits of whether the rate charged by Kaiser was unjust and unreasonable; and (4) the unjust and unreasonable rate issue is on appeal.  (Docket No. 8017 at 9, 13-15, 19-22).

At the hearing on the motion for summary judgment, the bankruptcy court held that traditional res judicata principles applied to the FERC ruling. (Docket No. 8444 at 7). The court further held that the unauthorized sale claim was barred because it was the same cause of action as that at issue in the FERC proceeding and that the unjust and unreasonable rate claim was subject to disallowance because it was, at best, a contingent claim while the appeal was pending. (*Id.*). The court found that Clark was barred from proceeding on both claims by the doctrine of res judicata. (*Id.*). This appeal followed.

## SUMMARY OF THE ARGUMENT

For five years now, Clark has attempted to assert its claims against Kaiser before FERC, the entity with exclusive jurisdiction over Clark's claims. Although Clark started the process in FERC, its attempts to fully litigate all of its claims against Kaiser were derailed when Kaiser filed its voluntary petition for bankruptcy relief. Clark diligently and repeatedly sought relief from the automatic stay implemented upon Kaiser's bankruptcy filing, and the bankruptcy court consistently denied Clark relief. In fact, the bankruptcy court expressly told Clark it had a "pure and simple" claim that had to be filed in the bankruptcy proceeding. When Clark did then file the claim in the bankruptcy proceeding, the bankruptcy court refused to allow Clark to proceed based on an erroneous and inequitable application of the principles of res judicata. It is fundamental to the doctrine of res judicata that the party against whom the defense is raised had the full and fair opportunity to litigate the claim in the prior proceeding. In this instance, the automatic stay of Kaiser's bankruptcy case was used to prevent Clark from participating in the prior proceedings or fully litigating its claims. To now bar Clark's claims is wholly inequitable and inconsistent with the application of the automatic stay and the doctrine of res judicata. The bankruptcy court's order should be reversed.

FERC is the entity with exclusive jurisdiction over Clark's claims and should be the

entity to fully adjudicate all of Clark's claims.  FERC has exclusive jurisdiction over claims that power was sold without proper authorization and over claims that unjust and unreasonable rates were charged for the sale of power.  The bankruptcy court erred in failing to yield to FERC's jurisdiction.

The bankruptcy court also erred in applying the doctrine of res judicata to bar Clark's claims.  Under the elements of administrative res judicata, the unauthorized sale claim is not barred because it was a different cause of action than that at issue in the Puget Sound Proceeding and because it was not a claim that was brought or could have been brought in the Puget Sound Proceeding.  The unjust and unreasonable rate claim is also not barred.  The Puget Sound Proceeding is currently on appeal and the Puget Sound Proceeding did not adjudicate the merits of Clark's claims.  Importantly, barring Clark's claims under principles of res judicata would effect an inequitable administration of the law.  FERC should be the entity that decides whether res judicata bars Clark's claims in the first instance.  The bankruptcy court's order should be reversed.

## <u>ARGUMENT</u>

### I.
### <u>The Bankruptcy Court Erred in Finding That It Had Jurisdiction Over Clark's Claims Because Exclusive Jurisdiction of the Claims Lies With FERC.</u>

The bankruptcy court erred by entering its order because it has no jurisdiction over the claims asserted by Clark.  The subject matter of the determinations made by the bankruptcy court in this case falls within the exclusive jurisdiction of FERC and when Congress grants a federal regulatory agency exclusive jurisdiction, the bankruptcy court is required to yield.  *See Cal. Dept. of Water Res. v Calpine Corp. (In re Calpine Corp.)*, 337 B.R. 27, 38 (S.D.N.Y. 2006), *appeal docketed*, No. 06-0480-bk (2d Cir. Feb. 1, 2006).

A.    *FERC's jurisdiction.*

The claims asserted by Clark are clearly within the exclusive jurisdiction of FERC and should not have been subject to the bankruptcy court's proceedings here.  While a standard contractual dispute may be litigated in district court, disputes over rates charged under interstate wholesale power contracts are subject to the exclusive jurisdiction of FERC.  *Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988); *In re Calpine Corp.*, 337 B.R. at 38.  Similarly, whether a transaction is a sale under the FPA requiring prior FERC authorization and the authorization of rates for the interstate sale of wholesale of power are both subject to the exclusive jurisdiction of FERC.  *See Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 216 (1964) (holding that the FPA makes the then-Federal Power Commission's power "plenary and extend[s] it to all wholesale sales in interstate commerce").  Accordingly, the bankruptcy court was required to yield to the exclusive jurisdiction of FERC and erred by requiring Clark to argue its claims in the bankruptcy proceeding and by entering its order.

The district court in the Southern District of New York recently held that the bankruptcy court must yield to the exclusive authority granted to FERC where there is a conflict between the federal regulatory regime and the bankruptcy court and the disputed issue lies within the exclusive jurisdiction of FERC.  *In re Calpine Corp.*, 337 B.R. at 34.  In *In re Calpine Corp.*, the district court determined that it lacked jurisdiction to authorize the rejection of several federally regulated executory contracts for the sale of power through bankruptcy proceedings because Congress granted exclusive jurisdiction over such contracts to FERC.  *Id.* at 29.  The court explained that "the fundamental and dispositive issue for the Court to consider is whether rejection of the Power Agreements directly interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts or otherwise constitutes a collateral attack on the filed rate."  *Id.* at 35-36.

13

The district court held that it lacked subject matter jurisdiction to authorize the rejection of the Power Agreements "because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts." *Id.* at 36.

> Because there is nothing in the Bankruptcy Code that limits FERC's jurisdiction, Calpine cannot achieve in Bankruptcy Court what neither it, nor any other party in this case, nor any other federally regulated energy company in the country could do without seeking FERC approval . . . .

*Id.*   The *In re Calpine* court noted that FERC's exclusive jurisdiction over interstate wholesale energy contracts spawned the "filed-rate doctrine", which states that "a utility's right to a reasonable rate under the FPA is the right to the rate which FERC files or fixes and, except for review of FERC orders, a court cannot provide a right to a different rate." *Id.* at 32.  FERC's exclusive jurisdiction and the filed-rate doctrine apply not only to the rates charged for the sale of power under such contracts, but to the terms and conditions of wholesale energy contracts. *Id.*

In this case, FERC has exclusive jurisdiction over Clark's claims against Kaiser. Accordingly, this Court should reverse the bankruptcy court's order and allow FERC to determine the issues raised in Kaiser's claims.

**B.    *FERC has exclusive jurisdiction over justness & reasonableness of rates.***

Claim number 3122 filed by Clark seeks a refund for unjust and unreasonable rates charged for the sale of power.  (Docket No. 8017, Ex. 11).  It is beyond dispute that FERC's jurisdiction over the justness and reasonableness of rates is exclusive.  The Supreme Court has held that "FERC has exclusive authority to determine the reasonableness of wholesale rates," and that "this principle binds both state and federal courts." *Miss. Power & Light Co.*, 487 U.S. at 371 (1988) (citing *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963-964 (1986)). The Court reiterated that neither state nor federal courts could impinge on this exclusive jurisdiction.  *Id.* at 375 ("The reasonableness of rates and agreements regulated by FERC may

not be collaterally attacked in state or federal courts.  The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order.").  No other entity can determine whether rates proposed for electric power sales are just and reasonable as required by the FPA; FERC alone must make this determination.

Clark asserts this claim in order to secure a reasonable rate—which it is entitled to by law.  The "right to a reasonable rate under the FPA is the right to the rate which FERC files or fixes and, except for review of FERC orders, a court cannot provide a right to a different rate." *In re Calpine Corp.*, 337 B.R. at 32.  Accordingly, this claim as asserted by Clark may only be determined by FERC.

**C.** **FERC has exclusive jurisdiction over authority to make wholesale power sales.**

Claim number 7245 filed by Clark seeks a ruling as to Kaiser's unauthorized sale of power under the FPA.  (Docket No. 8017, Ex. 10).  This claim is also subject to the exclusive jurisdiction of FERC.  FERC's exclusive jurisdiction extends not only to rates for wholesale power sales, but also to the sale itself.  *Cal. ex rel. Lockyer et al. v. Dynegy, Inc.*, 375 F.3d 831, 851 (9th Cir.) ("*Lockyer I*") ("…our cases specifying the nature and scope of exclusive FERC jurisdiction make clear that the interstate 'transmission' or 'sale' of wholesale energy pursuant to a federal tariff – not merely the 'rates' – falls within FERC's exclusive jurisdiction."), *amended by* 387 F.3d 966 (9th Cir. 2004); *see also Pub. Utils. Comm'n of Cal. v. FERC*, 2006 U.S. App. LEXIS 19476 (9th Cir. Aug. 2, 2006) ("FERC's authority to order refunds for filed rates that are later determined to be unjust, unreasonable, or discriminatory derives from §§ 205 and 206 of the Federal Power Act.  FERC also has remedial authority to require that entities violating the Federal Power Act pay restitution for profits gained as a result of a statutory or tariff violation.  This authority derives from § 309 of the Federal Power Act") (citations omitted); *Transmission Agency of N. Cal. (TANC) v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002) (quoting

*New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982)) ("part II of the Federal Power Act … delegates to the Federal Energy Commission 'exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce.'").

Part II of the Federal Power Act includes not only the requirement that rates for wholesale sales of power be just and reasonable, but also that public utilities must file rate schedules with FERC.  Federal Power Act § 205(c), 16 U.S.C. § 824d(c) (2004).  The FPA states in relevant part:

> Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

Federal Power Act § 205(c), 16 U.S.C. § 824d(c) (2004).

As such, to be lawful under the FPA, a contract for the wholesale sale of power must be filed with FERC for its approval prior to the transaction, and all rates for the transmission and sale of wholesale electricity thereunder must be published for public review.  *Cal. ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1011 (9th Cir. 2004) (*Lockyer II*) (citing the Federal Power Act); *see also In re Calpine Corp.*, 337 B.R. 27, 32 ("Although energy contracts are privately negotiated, the contracts must be filed with FERC and certified as 'just and reasonable' to be lawful under the FPA, . . ."); *Groton v. Conn. Light & Power Co.*, 456 F. Supp. 360, 364 (D. Conn. 1978) ("Section 205 of the Federal Power Act ("FPA") vests in [FERC] the authority to pass upon the reasonableness of the structure, terms and conditions pertaining to the sale and distribution of wholesale electric rates and charges."); *W. Mass. Elec. Co. v. FERC*, 165 F.3d 922, 927 (D.C.

Cir. 1999) ("[FPA § 205(c)] gives the Commission jurisdiction over any contract that 'relates to' rates and charges for the transmission of electric energy.").

FERC has been granted exclusive jurisdiction over both the rates and the non-rate terms and conditions of power sale contracts because entities intending to sell power must file those contracts with FERC. *In re Calpine Corp.*, 337 B.R. 27, 32 ("Although energy contracts are privately negotiated, the contracts must be filed with FERC and certified as 'just and reasonable' to be lawful under the FPA . . . ."). Only then are those entities authorized to make wholesale sales of power. *See Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 216 (1964) (holding that the FPA makes the then-Federal Power Commission's power "plenary and extend[s] it to all wholesale sales in interstate commerce").

**D.    *Because FERC has exclusive jurisdiction over Clark's claims, the bankruptcy court must yield to FERC.***

As in *In re Calpine Corp.*, the fundamental and dispositive issue in this case is whether the bankruptcy court's order directly interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts. *In re Calpine Corp.*, 337 B.R. at 36-37. If FERC has exclusive jurisdiction over Clark's claims against Kaiser, then the bankruptcy court must yield to FERC. *Id.*

Because the subject matter of both claims asserted by Clark is within the exclusive jurisdiction of FERC, the order entered by the bankruptcy court directly interferes with FERC's exclusive jurisdiction and regulatory authority. *See id.* Here, the bankruptcy court exceeded its authority by making determinations that were outside its jurisdiction. Specifically, the order eliminates FPA requirements that would have forced Kaiser to obtain prior approval of its FERC-jurisdictional sales and to sell power at FERC-determined just and reasonable rates.

17

Rather than entering its order, the bankruptcy court should have yielded to FERC's exclusive jurisdiction.

The bankruptcy court cannot interfere with FERC's exclusive jurisdiction in this manner. *Id.* at 33.  The bankruptcy court's order violates the clear assignment of jurisdiction over these matters to FERC and cannot be allowed to stand.  *Id.* at 39 ("This process would allow the bankruptcy court to sit in judgment of FERC's determination of the public interest, a prospect prohibited by established case law.").  Accordingly, the bankruptcy court's order must be reversed.

This Court should reverse the bankruptcy court's order, grant Clark's motion to withdraw the reference, order Clark's claims to be presented to FERC, and then, upon an adjudication by FERC of what, if anything, is owed by Kaiser to Clark, order the bankruptcy court to enforce that amount in Kaiser's bankruptcy as an adjudicated claim.

## II.
## The Bankruptcy Court Erred in Granting Summary Judgment Because Clark's Claims are Not Barred by Res Judicata.

The bankruptcy court also erred in applying the principles of res judicata to bar Clark's claims.  Kaiser failed to establish as a matter of law the elements of res judicata.  There are, at a minimum, fact issues with regard to the elements required to establish the res judicata bar.  Further, there are equitable considerations that preclude application of the doctrine to Clark's claims.  This Court should, therefore, reverse the bankruptcy court's order.

**A.**    ***Res judicata principles as applied to FERC proceedings.***

Historically, res judicata principles did not apply to agency decisions because of inadequacies in the procedures used in agency adjudication.  *See* RESTATEMENT (SECOND) OF JUDGMENTS § 83 cmt. b (1982).  In recent times, that rule has been modified.  *See id.*  As long as adequate procedures apply during the adjudication of an agency claim, res judicata principles

may apply.  *Id.*  There are, however, exceptions and limitations to this rule.

Both courts and commentators have recognized that res judicata principles are applied with a degree of flexibility to administrative agency decisions due to substantive and procedural differences that govern agency decisions.  *See, e.g.*, *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1080 n.5 (D.C. Cir. 1987) (en banc), *cert. denied*, 485 U.S. 913 (1988) ("as a general matter preclusions principles are to be applied more flexibly to administrative adjudications than to judicial proceedings."); 18B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FED. PRACTICE & PROC. § 4475 at 473-74 (2d ed. 2002) ("[A] measure of additional flexibility is recognized to defeat preclusion to accommodate the distinctive substantive and procedural policies that may govern agency adjudication.").  The flexible doctrine has been expressly recognized by FERC itself.  *See, e.g.*, *Utah Power & Light Co.*, 27 FERC ¶ 61,258 at 61,485-86 (1984); *see also Algonquin Gas Transmission Co.*, 64 FERC ¶ 63,014 at 65,054 (1993);.

Courts have refused to apply res judicata principles to agency decisions where the agency did not address a specific issue, whether because it was beyond its jurisdiction or because it was not part of the proceeding.  *See U.S. v. Radio Corp. of Am.*, 358 U.S. 334, 352 (1959) ("[T]he issue in controversy before the Commission was whether the exchange would serve the public interest, not whether § 1 of the Sherman Act had been violated.  Consequently, there could be no estoppel.  Res judicata principles are even more inapposite."); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (1982) (exception exists where plaintiff is unable to rely on a certain theory or to seek a certain remedy in the first action because of limitations on jurisdiction or authority).  Courts also refuse to give preclusive effect to a prior agency determination where to do so would result in an "'inequitable administration of the law.'"  *Clark-Cowlitz*, 826 F.2d at

1081 n.5 ("It is well settled that the determination of an issue of law should not be accorded preclusive effect if such effect would result in 'inequitable administration of the law.'").

**B.    *The elements of res judicata are not satisfied.***

For res judicata to apply to an administrative decision, three elements must be satisfied: (1) the prior proceeding involved the same cause of action as the current proceeding; (2) the same parties are involved in those proceedings; and (3) there is a final judgment on the merits in the previous action. *Williams Natural Gas Co.*, 83 F.E.R.C. ¶ 63,015 at 65,116 (1998). Because as a matter of law the elements of res judicata are not satisfied in this case, the bankruptcy court erred in granting Kaiser's motion for summary judgment.

Neither of Clark's claims against Kaiser are barred by the doctrine of res judicata. The unauthorized sale claim is not barred because it is a different cause of action than the unjust and unreasonable rate claim and because Clark did not assert that claim, and could not have asserted the claim, in the Puget Sound Proceeding. Likewise, the unjust and unreasonable rate claim is not barred because there is no final judgment—the Puget Sound Proceeding is currently on appeal in the Ninth Circuit. FERC also did not rule on the merits of Clark's unjust and unreasonable rate claim against Kaiser.

1.    *The unauthorized sale claim is not barred.*

The unauthorized sale claim is not barred under the doctrine of res judicata. The first and third elements of the res judicata test are not met. The unauthorized sale claim involves a different cause of action than that adjudicated in the Puget Sound Proceeding. There is also no final judgment on the merits of the unauthorized sale claim because it was never brought in the Puget Sound Proceeding nor could it have been brought. For these reasons, the bankruptcy court erred in granting summary judgment on the unauthorized sale claim.

(a)     The unauthorized sale claim is a different cause of action.

It is fundamental to principles of res judicata that claim preclusion will not apply unless there is an identity of the issues decided in the earlier action with those sought to be decided in the second action. *Clark-Cowlitz*, 826 F.2d at 1079. That is, there must be proof that the same cause of action was actually litigated in the first action that is sought to be litigated in the second action. *See Williams Natural Gas Co.*, 83 FERC at 65,116; *Panhandle Eastern Pipe Line Co.*, 38 FERC ¶ 63,030, 65,204 (1987).

In *Lake Murray Docks, Inc. v. South Carolina Elec. & Gas Co.*, 57 FERC ¶ 61,320 (1991), FERC set forth a test for determining whether a claim involved the same cause of action. FERC will consider the following factors: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. *Lake Murray Docks*, 57 F.E.R.C. at 62,037. Only one of these factors is satisfied; the remainder show that the unauthorized sale claim is a different cause of action.

First, the rights or interests established in the Puget Sound Proceeding would not be impaired or destroyed by prosecution of the unauthorized sale claim. The unjust and unreasonable rate claim from the Puget Sound Proceeding is premised on the notion that FERC is responsible, under Section 205(a) of the Federal Power Act, to ensure that rates charged for jurisdictional sales of power are "just and reasonable." 16 U.S.C. § 824d(a) (2004). That determination by FERC involves a host of competing considerations to assure that the rates are as low as possible to the buyer, yet provide a reasonable return to the seller. *FPC v. United Gas Pipeline Co.*, 386 U.S. 237, 243 (1967) ("[O]ne of [the FPC's] statutory duties is to determine

just and reasonable rates which will be sufficient to permit a company to recover its costs of service and a reasonable return on its investment.").

The unauthorized sale claim, on the other hand, works from an entirely different premise, *i.e.*, that the sale was not authorized in the first place. This claim derives from Section 201(a) of the Act, which declares that the business of selling electric energy is affected with a public interest and is subject to federal (FERC) jurisdiction. It also derives from Section 205(c), which requires jurisdictional sellers of power to file a schedule of rates for such sale with the Commission, and from Section 309, which authorizes the Commission to perform any acts necessary to carry out the provisions of the Act. 16 U.S.C. §§ 824a, 824d(c), 825h (2004). *See Pub. Utils. Comm'n of Cal. v. FERC*, 2006 U.S. App. LEXIS 19476 (9th Cir. Aug. 2, 2006) ("FERC's authority to order refunds for filed rates that are later determined to be unjust, unreasonable, or discriminatory derives from §§ 205 and 206 of the Federal Power Act. FERC also has remedial authority to require that entities violating the Federal Power Act pay restitution for profits gained as a result of a statutory or tariff violation. This authority derives from § 309 of the Federal Power Act") (citations omitted).

The remedy sought under the unauthorized sale claim is different than the unjust and unreasonable rate claim: FERC's remedy for an unauthorized sale is complete disgorgement of seller profits whereas the unjust and unreasonable rate claim involves balancing just and reasonable rates. Moreover, unauthorized sales involve a measure of FERC-process enforcement (to assure respect for the requirement to seek authorization) not involved in the just and reasonable action. In *Carolina Power & Light Co.*, 87 FERC ¶ 61,083 (1999), FERC expressly distinguished just and reasonable rate claims from unauthorized sale claims. CP&L had filed service agreements with FERC after the service had already commenced. FERC imposed a

22

disgorgement remedy for this violation of the prior notice rules. CP&L argued against the disgorgement remedy by relying on cases involving refunds imposed to correct the charging of unjust and unreasonable rates. FERC disagreed:

> [the cases cited by CP&L] involve refunds imposed after a finding that a company charged unjust and unreasonable rates. Here, we deal with a refund imposed because the company's rates were not on file in the first instance, thereby preventing any determination whether they were just and reasonable. . . . [T]he injury is . . . to the Commission' ability to enforce the prior notice requirement . . .."

87 FERC at 61,356.[5]

The only decision FERC made in Puget Sound was that, even if prices charged for spot market sales in the Pacific Northwest during the period at issue were unjust and unreasonable, an issue which FERC declined to decide, it was impossible to order refunds in a manner equitable to all the parties involved and, thus, FERC declined to do so. *Puget Sound Energy, Inc.*, 103 F.E.R.C. ¶ 61,348, at PP 35, 53 (2003). That has nothing to do with the issue of whether Kaiser had authority to make the sale in the first place. For FERC to consider whether to subject Kaiser, and only Kaiser, to a remedy of disgorgement for selling power to Clark without FERC authorization to do so, in no way violates any rights conferred by Puget Sound. *See Borough of Lansdale v. Philadelphia Elec. Co.*, 517 F. Supp. 218, 222 (E.D. Pa. 1981) ("Identity of causes of action does not exist where the subject matter and the ultimate issues are not the same.").

The bankruptcy court expressed concern that the unauthorized sale claim was simply a different theory of recovery for the same damages. (Docket No. 8181 at 20-21). It is not. As discussed above, the damages recoverable under the two causes of action are different. Even if

---

[5] *See also El Paso*, 105 FERC ¶ 61,131 at P 36 (2003) ("We do not consider failure to file jurisdictional agreements to be a de minimus violation of Section 205."); *Pacificorp*, 60 FERC ¶ 61,292 at 62,036 (1992) ("[T]he prior notice and filing requirement is intended to facilitate the Commission's responsibilities under Section 205 of the FPA to ensure that all rates and charges for jurisdictional service are just and reasonable and not unduly discriminatory.").

the unauthorized sale claim was simply another theory, it would still not be barred because of the limitations placed on the issues considered in the Puget Sound Proceeding.  *See* Restatement (Second) of Judgments § 26(c) (1982) (exception to splitting cause of action exists where plaintiff was unable to rely on a certain theory or seek a certain remedy because of limitations on the jurisdiction of the courts or restrictions on their authority to entertain multiple theories.).  In the Puget Sound Proceeding, the issues were limited by FERC to those relating to price— whether unjust and unreasonable rates were charged.  (Docket No. 8017, Ex. 6; *see also* Docket No. 8017, Ex. 11 [Order granting intervention at 2]).  Thus, Clark would still be able to assert its unauthorized sale claim in a separate proceeding.

Second, different evidence would be presented in the unauthorized sale claim.  Namely, the evidence would show that Kaiser made the sale without the required authorization.  This evidence was not presented in the Puget Sound Proceeding.

Third, the two suits involve infringement of different rights.  As discussed above, different sections of the Federal Power Act are at issue.  One claim, the unjust and unreasonable rate claim under Section 205(a) of the Act, involves the prices that were charged by Kaiser.  The other claim, the unauthorized sale claim, involves whether Kaiser even had authority to sell the power to Clark[6] under Sections 201(a), 205(c), and 309 of the Act.  There was infringement of different rights existing under the Federal Power Act.

---

[6]    Kaiser disputes that it actually sold power to Clark based on language in the Confirmation Agreement between Clark and BPA.  This argument is undercut by the Confirmation Agreement between Kaiser and BPA, which lists Kaiser as the seller of the electricity, (Docket No. 8017, Ex. 4), by the evidence showing that Kaiser dictated the terms and conditions of the sale to Clark, (*See* Docket No. 8017, Ex. 1, Ex. 3), and by the evidence that Kaiser stated it sold the power in its own securities filings with the SEC, (Docket No. 8017, Ex. 8 [transcript of January 15, 2003 hearing at 21]).  In any event, whether the transaction is a "sale" within FERC's jurisdiction is a matter committed to FERC to decide, not the bankruptcy court.  Thus, at best for Kaiser, there is a fact issue for FERC to decide with regard to whether it was a seller of the electricity.

The only element of the *Lake Murray Docks* test that is met is that Clark's two causes of action arise out of the same set of facts—the February 2001 sale of power by Kaiser to Clark. This factor, however, is only one of four factors. Consideration of all of the factors outlined in *Lake Murray Docks* establishes that the unauthorized sale claim is a different cause of action and is thus not barred.

> (b)    The unauthorized sale claim was not brought and could not have been brought in the FERC proceeding.

To succeed in barring a subsequent claim under res judicata, it must be shown that the claim was or could have been raised in the earlier proceeding. *Clark-Cowlitz*, 826 F.2d at 1079. Where a prior tribunal did not have an opportunity to address the claim, there can be no preclusion under res judicata. *Clark-Cowlitz*, 826 F.2d at 1079 ("In the case at hand, the Eleventh Circuit neither addressed nor had the opportunity to address the specific issue (or claim) before us. . . .").

It is undisputed that the unauthorized sale claim was not brought in the Puget Sound Proceeding. Thus, it is undisputed that there has been no adjudication on the merits of the unauthorized sale claim. Kaiser, however, argued that it is still barred by res judicata because it is allegedly a claim that could have been brought in the Puget Sound Proceeding. This argument fails for two reasons.

First, the issues in the Puget Sound Proceeding were limited to the unjust and unreasonable rate issue. (Docket No. 8017, Ex. 6). The Proceeding did not encompass whether various sellers were authorized to make sales under the Federal Power Act. (*See id.*). At the hearing on the motion for summary judgment, Kaiser claimed the unauthorized sale claim could have been brought under issue 2(f), which stated as follows:

> Did any such seller exercise market power, or violate any conditions or limitations of its market based tariffs or agreements entered into under the Western Systems Power Pool Agreement?

(Docket No. 8017, Ex. 6 at 2). This issue in no way addresses whether a seller of electricity had authority under the Federal Power Act to make the sale in the first place. It simply does not encompass the unauthorized sale claim. What FERC was examining in the Puget Sound Proceeding was whether entities with market-based rate tariffs complied with the terms of those tariffs. Kaiser does not have a market-based rate tariff. Clark's unauthorized sale claim challenges Kaiser's failure to have a market-based rate tariff, and so, raises an issue never addressed or intended to be addressed in the Puget Sound Proceeding.

Second, the unauthorized sale claim could not have been brought because the automatic bankruptcy stay precluded Clark from trying to even raise the issue in the Puget Sound Proceeding or in a separate proceeding before FERC. Clark sought to assert the unauthorized sale claim as soon as it became aware of the fact that Kaiser lacked market rate authority for its sale to Clark. (Docket No. 8018 at 5). This was after Kaiser had filed for bankruptcy.[7] (*Id.*). Because of the automatic stay, Clark on several occasions moved for relief from stay in the bankruptcy court so that it could assert its claim. (Docket No. 644, 2598, 8018 at 4). Kaiser vehemently opposed Clark's efforts and the bankruptcy court (repeatedly) denied Clark relief from the stay. (Docket Nos. 2616, 8017, Ex. 7, 8018 at 4). As a direct result of Kaiser's own actions, Clark could not have brought the unauthorized sale claim to FERC.

---

[7] Kaiser claimed in the bankruptcy court that Clark should have discovered the fact sooner—before Kaiser filed for bankruptcy—if it wanted to assert the claim. Of course, Clark had no way of knowing when Kaiser was going to file for bankruptcy. Further, Clark was not under any obligation to discover this fact prior to the bankruptcy filing. Clark discovered the lack of authority within a reasonable time of the sale and attempted to assert the claim in a timely manner. In any event, Kaiser's claim seeks to sidestep the whole point of the filing obligation. It is the obligation of the seller, not the buyer, to get FERC's approval prior to a FERC-jurisdictional sale. To impose some discovery burden on the buyer turns that obligation upside down.

Because the unauthorized sale claim was not brought and could not have been brought in the Puget Sound Proceeding or in FERC, Kaiser failed to establish as a matter of law that Clark's claim was barred by res judicata. At a minimum, Clark established that fact issues exist. The bankruptcy court's order granting summary judgment should, therefore, be reversed.

2.    *The unjust and unreasonable rate claim is not barred.*

With regard to the unjust and unreasonable rate claim, Kaiser has failed to establish as a matter of law the third element of the res judicata test. Kaiser did not establish that FERC rendered a final decision on the merits of Clark's claim.

(a)    The FERC decision is on appeal.

In *Williams Nat. Gas Co.*, a case relied on by Kaiser in its motion for summary judgment, FERC explained the concept of a final judgment required to give preclusive effect to a prior agency decision. FERC stated:

> The doctrines of res judicata and collateral estoppel apply only to final judgments. . . . Under Rule 708(d) of the Code of Federal Regulations, an initial decision becomes a final Commission decision ten days after exceptions are due. . . . Further, under administrative law, *a decision will only be given the effect of collateral estoppel when the agency has had the final word (i.e., a petition for rehearing denied or a rehearing completed) and when there has been no appeal to a court for review* and the time for such appeal has lapsed. 2 AM. JUR. 2D ADMIN. LAW § 382 (1994).

*Williams Nat. Gas Co.*, 83 FERC at 65,116 n.13 (emphasis added) (citations omitted).

Thus, *Williams Nat. Gas Co.* makes it clear that res judicata does not apply where an agency decision is pending on appeal. In this case, it is undisputed that the FERC decision in the Puget Sound Proceeding is currently pending on appeal in the Ninth Circuit. *See Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement*, No. 03-74139. As a result, res judicata cannot bar Clark's proof

of claim in Kaiser's bankruptcy proceeding because the third element of the res judicata test is not satisfied.

In the bankruptcy court, Kaiser argued that the pending appeal should not preclude application of res judicata to Clark's claim because Clark is not a party to the appeal. This argument is specious. It ignores the reason why Clark is not a party to the appeal: because the bankruptcy court refused to lift the bankruptcy stay (at Kaiser's behest) to allow Clark to pursue the appeal. Clark desired to appeal, and Kaiser successfully prevented that from happening. Kaiser's argument also ignores the bankruptcy court's ultimate determination that Clark would be a beneficiary to any relief that is granted in the appeal. (Docket No. 8181 at 37-38). The bankruptcy court erred as a matter of law in granting summary judgment on the unjust and unreasonable rate claim.

(b)    FERC did not make a finding on the merits.

Furthermore, res judicata cannot apply to bar Clark's claim because FERC did not make a finding on the merits of Clark's claim against Kaiser with regard to unreasonable and unjust rates. FERC instituted the generic Puget Sound Proceeding to determine whether sellers of electrical power in the Pacific Northwest charged buyers unjust and unreasonable rates for such power and to determine the just and reasonable rate (a so-called "ceiling price") for all spot market sales in the Pacific Northwest from December 2000 through June 2001. (Docket No. 8017, Ex. 5 at 1). When it intervened in the proceeding, Clark sought an order from FERC requiring Kaiser to pay Clark a refund in an amount equal to the excess price charged by Kaiser over just and reasonable electricity rates. (Docket No. 8017, Ex. 11 [order granting intervention at 3]; Docket No. 8018 at 3).

On September 24, 2001, the Administrative Law Judge (ALJ) issued a decision finding that there were no unjust and unreasonable rates charged in the Pacific Northwest for the relevant

28

time frame. 96 F.E.R.C. ¶ 63,044 (2001). The ALJ, however, did not make a specific proposed finding of fact as to Clark's claim against Kaiser. *See id.* Exceptions to the ALJ's decision were timely filed and then the entire Commission thereafter took up the matter.

On June 25, 2003, the Commission issued a decision terminating the Puget Sound Proceeding. (Docket No. 8017, Ex. 12). The Commission did not adopt the ALJ's findings. (*See id.*). Instead, it ruled that, "even if prices were unjust and unreasonable, the directing of refunds in this proceeding would not result in an equitable resolution of the matter. Accordingly, we will not require refunds and terminate this matter without further proceedings." (Docket No. 8017, Ex. 12 at 18). Like the ALJ decision, there is no specific finding in the Commission's decision as to the merits of Clark's claim against Kaiser in the June 25, 2003 proceeding.

Because there is no ruling on the merits of Clark's claim, res judicata should not bar the claim. *See Williams Nat. Gas Co.*, 83 FERC at 65,116.

**C.      *Application of res judicata to Clark's claims is inequitable.***

As the court explained in *Clark-Cowlitz*, the res judicata doctrine is not meant to produce inequitable results:  "It is well settled that the determination of an issue of law should not be accorded preclusive effect if such effect would result in 'inequitable administration of the law.'". *Clark-Cowlitz*, 826 F.2d at 1081 n.5 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 28(a) and *Staten Island Rapid Transit Operating Auth. v. ICC*, 718 F.2d 533, 542 (2d Cir. 1983)). Application of res judicata in this case would effect an inequitable administration of the law.

It is fundamental to the doctrine of res judicata that the party against whom the defense is raised had the opportunity to litigate the claim or defend its rights in the prior action.  "Res judicata normally only applies against parties who participated in the prior proceedings and 'had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect.'"  *Regions Bank v. J.R. Oil Co., LLC*, 387 F.3d 721, 731 (8th Cir. 2004) (quoting

*Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)); *Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 145 B.R. 404, 409 (D. Del. 1992) (quoting *Montana v. U,S.*, 440 U.S. 147, 153-54 (1979)).  It is essential when giving res judicata effect to administrative decisions that the parties had adequate opportunity to litigate the issues in the administrative proceeding.  *U.S. v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.").

If a party is not afforded a full and fair opportunity to bring its claim in the prior action, then no order from that previous action will serve to bar the claim and the application of res judicata is not appropriate.  *See Sabratek Corp. v. Lasalle Bank, N.A. (In re Sabratek Corp.)*, 257 B.R. 732, 737 (Bankr. D. Del. 2000) (holding that if the party against whom the defense of res judicata is raised is not afforded the opportunity to litigate their rights in the prior action, any decision in that action will not bar that party from later asserting their rights in a later action).

In this case, Clark was barred at every turn from asserting its unauthorized sale claim against Kaiser due to the bankruptcy stay resulting from Kaiser's bankruptcy.  Clark attempted to obtain relief from the stay but was repeatedly denied that relief by the bankruptcy court, at Kaiser's request.  (Docket Nos. 2616, 8017, Ex. 7, 8018 at 4).  The bankruptcy court even stated that Clark had a "pure and simple" damage claim that had to be asserted in the bankruptcy proceeding rather than FERC.  (Docket No. 886 at 93).  The bankruptcy court denied relief from the stay to allow Clark to bring its unauthorized sale claim before the FERC; instead directing Clark to file its claim in the bankruptcy court.  Similarly, the bankruptcy court refused to grant Clark relief from the stay to allow Clark to participate in the continuation of the Puget Sound

Proceeding.  Without the requested relief from the stay, Clark was foreclosed from defending its rights in any proceedings before the FERC.  To then bar Clark from asserting that claim in the bankruptcy case on the doctrine of res judicata is a contradiction and wholly inequitable.

The automatic stay exists for the purpose of granting the debtor a breathing spell from the pressures exerted by its creditors.  *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509 (3d Cir. 1997).  It is well established that the automatic stay is not an offensive weapon to be used against the debtor's creditors, but simply s defensive shield for the debtor.  *E.g. Foerst v. Clowser (In re Clowser)*, 39 B.R. 883, 886 (Bankr. E.D. Va. 1984) ("Although section 362 is a shield to protect the debtor to provide for a 'fresh start', the automatic stay was not intended by Congress to be used as a sword.").  In this instance, the automatic stay was used to prevent Clark from participating in or bringing litigation to defend its rights.  The fact that Clark was not able to pursue its claims before the FERC now acts as a bar to bringing those claims in the bankruptcy proceedings.  Such a result is wholly inequitable and inconsistent with the application of the automatic stay and/or the doctrine of res judicata.

Kaiser argued in its briefing that Clark should have appealed the bankruptcy court's refusals to lift the stay.  This argument is unpersuasive.  The denial of a motion to lift stay is often an interlocutory order from which parties cannot appeal.[8]  *See In re W. Elecs., Inc.*, 852 F.2d 79, 82 (3d Cir. 1988).  Clark was within its rights to wait for the claims objection process.  Even if Clark made the decision not to appeal the bankruptcy court's orders, such a decision does not alter the fact that it was Kaiser and the bankruptcy court's orders that blocked Clark from fully litigating its claims before FERC.  The bankruptcy court did not err in granting Kaiser's

---

[8]  In addition, an appeal would not have been an effective remedy to Clark because of the short deadlines at issue in the FERC proceeding.  For example, the bankruptcy court's refusal to lift the stay to allow Clark to appeal the FERC decision could not have been appealed and resolved prior to the deadline for taking an appeal of the FERC decision.

request to use the automatic stay as a shield to protect it from outside litigation during its breathing spell. The bankruptcy court only erred when it granted Kaiser's request to turn the automatic stay into a sword by applying the principles of res judicata to the same appeal and proceeding which Clark was barred from participating in because of the automatic stay. Kaiser waived its rights to rely on the principles of res judicata when it chose to enforce its right to rely on the automatic stay.

**D.**    ***FERC should decide in the first instance whether res judicata applies.***

The bankruptcy court's order granting summary judgment should also be reversed because FERC, not the bankruptcy court, should be the entity to decide the issue of whether res judicata precludes Clark's unauthorized sale claim. While FERC *may* apply the doctrine of res judicata if FERC determines that it is appropriate to do so, FERC is not bound to apply the doctrine.

As an administrative agency, FERC acts in the public interest. Therefore, FERC proceedings, including the Puget Sound Proceeding, involve more than simply the parties to the proceeding. FERC has the responsibility to do more than just adjudicate parties' interests. It must also consider the impact on the public interest when it considers whether to apply res judicata. No other entity or institution other than FERC can make this determination. *See, e.g.*, *Trunkline LNG Co. v. FERC*, 921 F.2d 313 (D.C. Cir. 1990) ("we think it plain, however, that the issue and claim preclusive effects of prior FERC proceedings are matters which FERC should consider in the first instance…."). For these reasons, FERC applies a more flexible approach to whether claims are barred by res judicata. *See, e.g.*, *Clark-Cowlitz*, 826 F.2d at 1080 n.5; *Algonquin Gas Transmission Co.*, 64 FERC ¶ 63,014, 65,054 (1993); *Utah Power & Light Co.*, 27 FERC ¶ 61,258 at 61,485-86 (1984); 18B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FED. PRACTICE & PROC. § 4475 at 473-74 (2d ed. 2002) ("[A] measure of

additional flexibility is recognized to defeat preclusion to accommodate the distinctive substantive and procedural policies that may govern agency adjudication.").

Whether res judicata would apply to the unauthorized sale claim is FERC's determination to make. Clark is not attempting to bring the claim in the bankruptcy court or the district court; rather, Clark simply wants to bring the claim in its rightful jurisdictional home—FERC. FERC should have the opportunity to decide whether Clark is able to bring the claim, based on the rationale it deems appropriate under the circumstances.

## CONCLUSION

For the reasons set forth above, Clark respectfully requests that this Court reverse the bankruptcy court's March 7, 2006 Order. Clark further requests that this Court grant its motion to withdraw the reference, order Clark's claims to be presented to FERC and order the bankruptcy court to act in a manner consistent with the outcome of Clark's FERC proceedings. In the alternative, Clark requests that the Court reverse the bankruptcy court's order and remand the case to the bankruptcy court for further proceedings, or provide any other relief that the Court deems fit.

Respectfully submitted this 30th day of August 2006.

DUANE MORRIS

/s/ Frederick B. Rosner
Frederick B. Rosner, Esq.
(ID No. 3995)
1100 North Market Street, Ste. 1200
Wilmington, DE 19801-1246
Tel: (302) 657-4900
Fax: (302) 657-4901

and

BRACEWELL & GIULIANI LLP
William A. Wood, III, Esq.
(Texas Bar ID 21916050)
Warren W. Harris, Esq.
(Texas Bar ID 09108080)
Tracy C. Temple, Esq.
(Texas Bar ID 00793446)
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
Tel**:** (713) 223-2300
Fax: (713) 221-1212

and

George H. Williams, Jr., Esq.
2000 K Street, N.W., Suite 500
Washington, DC 20006
Phone: (202) 828-5800
Fax: (202) 223-1225

Counsel *to Public Utility District No.1 of Clark County d/b/a Clark Public Utilities*

# Unpublished Opinions

LEXSEE 2006 U.S. APP. LEXIS 19476

PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Petitioner, PUBLIC UTILITIES COMMISSION OF NEVADA; ALLEGHENY ENERGY SUPPLY COMPANY, LLC, Petitioners-Intervenors, ENERGY PRODUCER COGENERATION ASSOCIATION OF CALIFORNIA AND ENERGY PRODUCERS AND USERS COALITION; AVISTA CORPORATION; PINNACLE WEST CAPITAL CORPORATION; CALIFORNIA ELECTRICITY OVERSIGHT BOARD; MIRANT CALIFORNIA; MIRANT DELTA LLC; MIRANT POTRERO LLC; MIRANT AMERICAS ENERGY MARKETING, LP; ENRON POWER MARKETING, INC.; SOUTHERN CALIFORNIA EDISON COMPANY; NORTHERN CALIF. TRANSMISSION AGENCY OF NORTHERN CALIFORNIA ("TANC"); MODESTO IRRIGATION DISTRICT (MID); M-S-R PUBLIC POWER AGENCY; CITY OF REDDING; CITY OF PALO ALTO; CITY OF SANTA CLARA; PORT OF SEATTLE WASHINGTON; PUBLIC SERVICE COMPANY OF COLORADO; PACIFIC GAS AND ELECTRIC COMPANY; CORAL POWER, L.L.C.; EXELON CORP.; CITY & COUNTY OF SAN FRANCISCO; OFFICE OF ATTORNEY GENERAL FOR THE STATE OF NEVADA, BUREAU OF CONSUMER PROTECTION; PORTLAND GENERAL ELECTRIC COMPNAY; AUTOMATED POWER EXCHANGE, INC.; ALLEGHENY ENERGY SUPPLY CO., LLC; PUGET SOUND ENERGY, Puget Sound Energy, Inc.; DYNEGY POWER MARKETING, INC.; EL SEGUNDO POWER LLC; LONG BEACH GENERATION LLC; CABRILLO POWER I LLC; CABRILLO POWER II LLC; PACIFICORP'S; PPL ENERGYPLUS, LLC; PPL MONTANA; PPL SOUTHWEST GENERATION HOLDINGS, LLC; RELIANT ENERGY POWER GENERATION, INC.; RELIANT ENERGY SERVICES, INC.; OERTHERN; PEOPLE OF THE STATE OF CALIFORNIA, ex rel. Bill Lockyer; WILLIAM ENERGY MARKETING & TRADING COMPANY; CALPINE CORPORATION; EL PASO MERCHANT ENERGY L.P.; SEMPRA ENERGY TRADING CORP.; AVISTA ENERGY, INC.; CITY OF LOS ANGELES; CITY OF LOS ANGELES DAPARTMENT OF WATER AND POWER; CALIFORNIA ELECTRICITY OVERSIGHT BOARD; IDACORP ENERGY L.P.; CITY OF PASADENA, Intervenors, and INTERNATIONAL PACIFIC ENTERPRISES, LTD., Intervenor, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Petitioner, IDA Corp. ENERGY, IDA Corp. Energy, L.P., Petitioner-Intervenor, SAN DIEGO GAS AND ELECTRIC COMPANY; DUKE ENERGY NORTH AMERICA, LLC, DUKE ENERGY TRADING AND MARKETING, LLC, (COLLECTIVELY, "DUKE ENERGY"); CALIFORNIA ASSEMBLY; SOUTHERN CALIFORNIA EDISON COMPANY; MIRANT AMERICAS ENERGY MARKETING, LP, MIRANT CA, LLC, MIRANT DELTA, LLC, AND MIRANT POTEREO, LLC (COLLECTIVELY, "MIRANT"; MIRANT CALIFORNIA, MIRANT DELTA, LLC IRAN; MIRANT POTRERO, LLC; PUGET SOUND ENERGY, Puget Sound Energy, Inc.; CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION; CALPINE CORPORATION; ENRON POWER MARKETING, INC.; CORAL POWER, L.L.C.; TRANSMISSION AGENCY OF NORTHERN CALIFORNIA; THE M-S-R PUBLIC POWER AGENCY; THE MODESTO IRRIGATION DISTRICT; CITY OF PALO ALTO; THE CITY OF SANTA CLARA; CITY OF REDDING; EL PASO MERCHANT ENERGY, L.P.; NORTHERN CALIFORNIA POWER AGENCY; CHILD PROTECTIVE SERVICES; CONSTELLATION ENERGY COMMODITIES GROUP, INC.; WILLIAMS ENERGY MARKETING & TRADING COMPANY; CITY AND COUNTY OF SAN FRANCISCO; PUBLIC SERVICE COMPANY OF NEW MEXICO; CALIFORNIA ELECTRICITY OVER-

2006 U.S. App. LEXIS 19476, *

SIGHT BOARD; PEOPLE OF THE STATE OF CALIFORNIA; PACIFIC GAS
AND ELECTRIC COMPANY; PPL ENERGY PLUS; PPL MONTANA; PPL
SOUTHWEST GENERATION HOLDINGS, LLC; SEMPRA ENERGY TRADING
CORP.; AVISTA ENERGY, INC.; CITY OF LOS ANGELES; CITY OF LOS AN-
GELES DEPARTMENT OF WATER AND POWER; MARCIA HABER KAMINE;
CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER; CITY OF
TACOMA; PORT OF SEATTLE; PINNACLE WEST COS.; PUBLIC SERVICE
COMPANY OF COLORADO; PORTLAND GENERAL ELECTRIC COMPANY;
DYNEGY POWER MARKETING, INC., EL SEGUNDO POWER LLC, LONG
BEACH GENERATION LLC, CABRILLO POWER I LLC, AND CABRILLO
POWER II LLC (COLLECTIVELY,"DYNEGY"); CITY OF SAN DIEGO;
PORTLAND GENERAL ELECTRIC COMPANY; CALIFORNIA ELECTRICITY
OVERSIGHT BOARD; PUBLIC UTILITIES COMMISSION OF NEVADA, Inter-
venors, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
CITY OF SAN DIEGO, Petitioner, CALIFORNIA PUBLIC UTILITIES COMMIS-
SION; CITY OF TACOMA; PORT OF SEATTLE; SOUTHERN CALIFORNIA
EDISON COMPANY; CALIFORNIA ELECTRICITY OVERSIGHT BOARD;
PEOPLE OF STATE OF CALIFORNIA, Petitioner-Intervenor, PINNACLE WEST
CAPITAL CORPORATION; ARIZONA PUBLIC SERVICE COMPANY; MOR-
GAN STANLEY CAPITAL GROUP, INC.; MERRILL LYNCH CAPITAL SER-
VICES, INC.; PUBLIC SERVICE COMPANY OF COLORADO; LONG BEACH
GENERATION LLC.; CABRILLO POWER I LLC; CABRILLO POWER II LLC.;
CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER; TRANS-
PORTATION AGENCY OF NORTHERN CALIFORNIA; THE METROPOLI-
TAN WATER DISTRICT OF SOUTHERN CALIFORNIA; THE M-S-R PUBLIC
POWER AGENCY; THE MODESTO IRRIGATION DISTRICT; CITY OF PALO
ALTO; CITY OF REDDING; CITY OF SANTA CLARA; CITY AND COUNTY
OF SAN FRANCISCO; PPL MONTANA, LLC; PPL SOUTHWEST GENERA-
TION HOLDINGS, LLC; EL PASO MERCHANT ENERGY L.P.; SEMPRA EN-
ERGY TRADING CORP.; AVISTA CORPORATION; AVISTA ENERGY, INC.;
PPL ENERGYPLUS, LLC; PORTLAND GENERAL ELECTRIC COMPANY; EL
SEGUNDO POWER LLC; LONG BEACH GENERATION LLC; CABRILLO
POWER I LLC; CABRILLO POWER II LLC; TRANSMISSION AGENCY OF
NORTHERN CALIFORNIA; PUBLIC SERVICE COMPANY OF NEW MEXICO;
ENERGY PLUS, LLC, ET AL; CALIFORNIA ELECTRICITY OVERSIGHT
BOARD; PUBLIC UTILITIES COMMISSION OF NEVADA, Intervenors, v. FED-
ERAL ENERGY REGULATORY COMMISSION, Respondent, NORTHERN
CALIFORNIA POWER AGENCY; PACIFIC GAS AND ELECTRIC COMPANY;
IDACORP ENERGY L.P.; PACIFICORP; MIRANT AMERICAS ENERGY
MARKETING, LP, MIRANT CALIFORNIA, LLC, MIRANT DELTA, LLC, AND
MIRANT POTRERO, LLC.; PUGET SOUND ENERGY; DYNEGY POWER
MARKETING, INC., EL SEGUNDO POWER LLC, LONG BEACH GENERA-
TION LLC, CABRILLO POWER I LLC, AND CABRILLO POWER II LLC
(COLLECTIVELY, "DYNEGY"); CORAL POWER, L.L.C.; CONSTELLATION
ENERGY COMMODITIES GROUP, INC.; THE SALT RIVER PROJECT AGRI-
CULTURAL IMPROVEMENT AND POWER DISTRICT; ENRON POWER
MARKETING INC., Respondents-Intervenors. POWEREX CORPORATION, Peti-
tioner, M-S-R PUBLIC POWER AGENCY; MODESTO IRRIGATION DISTRICT
(MID); CITY OF PALO ALTO; CITY OF REDDING; CITY OF SANTA CLARA;
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, Petition-
ers-Intervenors, AVISTA CORPORATION; CORAL POWER, L.L.C.; CON-
STELLATION ENERGY COMMODITIES GROUP, INC., Intervenors, v. FED-
ERAL ENERGY REGULATORY COMMISSION, Respondent, PACIFICORP, Re-
spondent-Intervenor. PACIFIC GAS AND ELECTRIC COMPANY, Petitioner,
SOUTHERN CALIFORNIA EDISON COMPANY; PORT OF SEATTLE WASH-

INGTON; CITY OF TACOMA, WASHINGTON; NEVADA POWER COMPANY;
SIERRA PACIFIC POWER COMPANY; CITY OF SEATTLE; AVISTA CORPO-
RATION; CORAL POWER, L.L.C.; CONSTELLATION ENERGY COMMODI-
TIES GROUP, INC.; PUBLIC UTILITIES COMMISSION OF NEVADA;
TRANSALTA ENERGY MARKETING (CALIFORNIA), INC., Intervenors, v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent, METRO-
POLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA; NORTHERN
CALIF. TRANSMISSION AGENCY OF NORTHERN CALIFORNIA ("TANC");
M-S-R PUBLIC POWER AGENCY; MODESTO IRRIGATION DISTRICT (MID);
CITY OF PALO ALTO; CITY OF REDDING, CALIFORNIA; CITY OF SANTA
CLARA; PACIFICORP, Respondents-Intervenors. CALIFORNIA ELECTRICITY
OVERSIGHT BOARD, Petitioner, PORT OF SEATTLE; CITY OF TACOMA;
PEOPLE OF THE STATE OF CALIFORNIA; CITY OF PASADENA; CITY OF
SAN DIEGO; CA STATE ASSEMBLY, Petitioners-Intervenors, v. FEDERAL EN-
ERGY REGULATORY COMMISSION, Respondent. CITY OF SAN DIEGO, Peti-
tioner, CORAL POWER, L.L.C.; CONSTELLATION ENERGY Petitioner, COM-
MODITIES GROUP, INC., Intervenors, and SOUTHERN CALIFORNIA EDISON
COMPANY; PORT OF SEATTLE; CITY OF TACOMA, Intervenors, v. FED-
ERAL ENERGY REGULATORY COMMISSION, Respondent, PACIFICORP, Re-
spondent-Intervenor. CITY OF OAKLAND, CALIFORNIA ACTING BY AND
THROUGH ITS BOARD OF PORT COMMISSIONERS, Petitioner, CORAL
POWER, L.L.C.; CONSTELLATION ENERGY COMMODITIES GROUP, INC.,
Intervenors, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
PACIFICORP, Respondent-Intervenor. SAN DIEGO GAS & ELECTRIC COM-
PANY, Petitioner, CALIFORNIA ATTORNEY GENERAL, Intervenor, CORAL
POWER, L.L.C.; CONSTELLATION ENERGY COMMODITIES GROUP, INC.,
Intervenors, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, PORTLAND GEN-
ERAL ELECTRIC COMPANY; DYNEGY POWER MARKETING INC.; EL SE-
GUNDO POWER; LONG BEACH GENERATION LLC; CABRILLO POWER;
CABRILLO POWER II LLC; MORGAN STANLEY CAPITAL GROUP, INC.;
AVISTA ENERGY; PUGET SOUND INVESTMENT GROUP; THE CITY OF
LOS ANGELES DEPARTMENT OF WATER AND POWER; SEMPRA ENERGY;
CALIFORNIA POWER AGENCY; MODESTO IRRIGATION DISTRICT (MID);
METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA; EL
PASO MERCHANT ENERGY L.P.; POWEREX CORPORATION; CORAL
POWER, L.L.C.; MIRANT AMERICAS ENERGY MARKETING, LP; MIRANT
CALIFORNIA, LLC; MIRANT DELTA, LLC IRAN; MIRANT POTRERO, LLC;
TRANSCANADA ENERGY LTD.; CITY OF TACOMA, Washington; PORT OF
SEATTLE, Washington, Intervenors, v. FEDERAL ENERGY REGULATORY
COMMISSION, Respondent. PACIFIC GAS AND ELECTRIC COMPANY, Peti-
tioner, DYNEGY POWER MARKETING INC.; EL SEGUNDO POWER; LONG
BEACH GENERATION LLC; ENRON POWER MARKETING, INC.; PUBLIC
UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON; EN-
RON ENERGY SERVICES, INC.; CALIFORNIA ELECTRICITY OVERSIGHT
BOARD; PEOPLE OF CALIFORNIA; CALIFORNIA PUBLIC UTILITIES
COMMISSION; CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPO-
RATION; M-S-R PUBLIC POWER AGENCY; MODESTO IRRIGATION DIS-
TRICT(MID); Federal Power Act CITY OF SANTA CLARA; CITY OF RED-
DING; CORAL POWER; CONSTELLATION ENERGY COMMODITIES
GROUP, INC.; POWEREX CORP; THE SALT RIVER PROJECT AGRICUL-
TURAL IMPROVEMENT AND POWER DISTRICT; SACRAMENTO MUNICI-
PAL UTILITY DISTRICT; SOUTHERN CALIFORNIA EDISON COMPANY;
TUCSON ELECTRIC POWER COMPANY; PORTLAND GENERAL ELECTRIC
COMPANY; PINNACLE WEST CAPITAL CORPORATION; ARIZONA PUBLIC

SERVICE COMPANY; PACIFICORP; PUBLIC SERVICE COMPANY OF NEW MEXICO; NORTHERN CALIFORNIA POWER AGENCY; TRACTEBEL ENERGY MARKETING INC.; BP ENERGY COMPANY; AVISTA ENERGY; PUGET SOUND ENERGY; CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER; AVISTA CORPORATION; SEMPRA ENERGY; EL PASO MERCHANT ENERGY L.P.; IDACORP ENERGY; BP ENERGY CO.; WILLIAMS POWER COMPANY, INC; PORT OF SEATTLE; TRANSCANADA ENERGY LTD.; EXELON CORP, Intervenors, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. SACRAMENTO MUNICIPAL UTILITY DISTRICT, Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. STATE WATER CONTRACTORS; THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, Petitioners, TRANSCANADA ENERGY; CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION; POWEREX CORP.; PACIFICORP; TUCSON ELECTRIC POWER COMPANY; PINNACLE WEST CAPITAL CORPORATION; PACIFIC GAS AND ELECTRIC COMPANY; CALIFORNIA POWER AGENCY; PEOPLE OF THE STATE OF CALIFORNIA; CALIFORNIA PUBLIC UTILITIES COMMISSION; POWEREX CORP.; SOUTHERN CALIFORNIA EDISON COMPANY; CALIFORNIA ELECTRICITY OVERSIGHT BOARD; WILLIAMS POWER COMPANY, INC.; M-S-R PUBLIC POWER AGENCY; MODESTO IRRIGATION DISTRICT (MID); CITY OF SANTA CLARA; CITY OF REDDING; CONSTELLATION ENERGY COMMODITIES GROUP, INC.; CITY OF VERNON, Intervenors, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. MODESTO IRRIGATION DISTRICT (MID), Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. PEOPLE OF THE STATE OF CALIFORNIA EX REL. BILL LOCKYER, Petitioner, CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION, Intervenor, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER, Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

No. 01-71051, No. 01-71321, No. 01-71544, No. 02-70254, No. 02-70266, No. 02-70275, No. 02-70282, No. 02-70285, No. 02-70301, No. 02-72113, No. 03-73887, No. 03-74252, No. 03-74527, No. 03-74531, No. 03-74594, No. 04-73501

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*2006 U.S. App. LEXIS 19476*

April 13, 2005, Argued and Submitted, Panel Location Unrecognized
August 2, 2006, Filed

**PRIOR HISTORY:** [*1] Petition for Review of an Order of the Federal Energy Regulatory Commission. FERC No. FERC-EL00-000, EL 00-95-000, EL-0095-0004, EL00-95-001, EL00-95-000, EL00-95-000, EL01-607-000, EL00-95-017, EL00-95-012, EL00-95-031, EL00-95-004, EL00-95-001, FERC-EL95-000, FERC-00-95-000, FERC-0095-000, 02-1058, EL-95-000, Federal Power Act, EL00-95-081, EL00-95-081, Federal Power Act. Pacific Gas & Electric Co. ER00-3673-000; EL00-107-000; EL00-98-000; ER00-3641-000; EL00-95-000 (Nov. 1, 2000, F.E.R.C.) 93 F.E.R.C. P 61121, *2000 FERC LEXIS 2168*; San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. , EL00-95-004 (July 25, 2001, F.E.R.C.) 96 F.E.R.C. P61120, *2001 FERC LEXIS 1810*; San Diego Gas & Elec. Co. v. Sellers of Energy, EL00-95-001 (Dec. 19, 2001, F.E.R.C., Wood, Comr) *2001 FERC LEXIS 3018*; San Diego Gas & Elec. Co, EL00-98-042; EL00-95-045 (Mar. 26, 2003, F.E.R.C.) *102 F.E.R.C. P 61317, 2003 FERC LEXIS 560*; San Diego Gas & Elec. Co, EL00-98-062; EL00-98-073; EL00-95-069; EL00-95-086; EL00-95-081 (Oct. 16, 2003, F.E.R.C.) *105 F.E.R.C. P 61066, 2003 FERC LEXIS 2043*

CASE SUMMARY:

**PROCEDURAL POSTURE:** Petitioner State, energy suppliers, port, and public entities sought review of a series of orders of respondent Federal Energy Regulatory Commission (FERC) relating to an energy crisis that occurred in California in 2000 and 2001. The consolidated petitions involved numerous questions pertaining to the proper scope of FERC's refund orders, including the appropriate temporal reach and the type of transactions properly subject to the refund orders.

**OVERVIEW:** The court held that all the transactions at issue in the case that occurred within the California Power Exchange Corporation (CalPX) or California Independent System Operator (Cal-ISO) markets, or as a result of a CalPX or Cal-ISO transaction, were the proper subject of the refund proceedings instituted by FERC. Therefore, the petitions for review that challenged FERC's inclusion of such transactions were denied. The petitions for review that challenge FERC's exclusion of such transactions were granted. The petitions for review that sought to expand FERC's refund proceedings into the bilateral markets beyond the CalPX and Cal-ISO markets were denied. In particular, FERC properly excluded from the refund proceedings bilateral transactions between the California Energy Resources Scheduling Division of the California Department of Water Resources and other entities that occurred outside the CalPX and Cal-ISO markets. FERC properly established the refund effective date for the § 206, *16 U.S.C.S. § 824d,* proceedings. However, FERC erred in excluding § 309, *16 U.S.C.S. § 825h,* relief for tariff violations that occurred prior to the established effective date.

**OUTCOME:** The petitions challenging FERC's establishment of the effective refund date, the inclusion of certain transactions in the refund proceedings, and the inclusion of sleeve, certain bilateral, and other transactions in the remedy proceedings were denied. The petitioners were otherwise granted. The case was remanded to FERC for further proceedings.

**CORE TERMS:** refund, energy, seller, tariff, unjust, effective date, mitigation, spot market, investor-owned, spot, wholesale, sleeve, electricity, supplier, Federal Power Act, auction, bid, emergency, non-emergency, bilateral, public entities, electric, consumers, grid, challenging, clearing, short-term, sleeving, abuse of discretion, transmission

**LexisNexis(R) Headnotes**

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN1] Under § 206(a), *16 U.S.C.S. § 824d(a)* of the Federal Power Act, the Federal Energy Regulatory Commission (FERC) may investigate whether a particular rate or charge is just and reasonable. If FERC finds a rate unreasonable, it must order the imposition of a just and reasonable rate. *16 U.S.C.S. § 824d(d).* FERC may then order refunds for any period subsequent to the refund effective date, a date FERC establishes that must be at least sixty days after the filing of the complaint. *16 U.S.C.S. § 824e(b).* Under the express language of § 206, *16 U.S.C.S. § 824d,* however, FERC may not order refunds for any period prior to the filing of the complaint. Section 309, *16 U.S.C.S. § 825h,* of the Federal Power Act, on the other hand, gives FERC authority to order refunds if it finds violations of the filed tariff and imposes no temporal limitations.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN2] Section 206(a), *16 U.S.C.S. § 824d(a),* of the Federal Power Act, requires third-party complaints to the Federal Energy Regulatory Commission to state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force. *16 U.S.C. § 824e(a).*

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN3] A complaint challenging the reasonableness of the rates can lead to a refund under § 206, *16 U.S.C.S. § 824d,* of the Federal Power Act even if a refund remedy is not specifically designated in the initial complaint. The Federal Energy Regulatory Commission (FERC) is empowered to investigate the reasonableness of a rate either in the context of a third-party complaint or sua sponte. Indeed, as the United States Court of Appeals for the Ninth Circuit notes, the Federal Power Act requires FERC to establish a refund effective date whenever it institutes a § 206 investigation. *16 U.S.C.S. § 824e(b).*

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN4] The Federal Energy Regulatory Commission's (FERC's) authority to order refunds for filed rates that are later determined to be unjust, unreasonable, or discriminatory derives from § § 205 and 206, *16 U.S.C.S. § 824d,* of the Federal Power Act. FERC also has remedial authority to require that entities violating the Federal Power Act pay restitution for profits gained as a result of a statutory or tariff violation. This authority derives from

§ 309, *16 U.S.C.S. § 825h*, of the Federal Power Act, which authorizes FERC to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of the Federal Power Act. Unlike refund proceedings commenced under § 206, *16 U.S.C.S. § 824d*, no time limits apply to remedial actions filed pursuant to § 309, *16 U.S.C.S. § 825h*.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Judicial Review*
[HN5] On appellate review, the Federal Energy Regulatory Commission (FERC) must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record. FERC must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Duties & Powers*
[HN6] The Federal Energy Regulatory Commission (FERC) enjoys broad discretion in the management of its own *18 C.F.R. § 1b.1* et seq., prosecutorial investigations. FERC investigations may be formal or preliminary, and public or private. *18 C.F.R. § 1b.4*. In contrast to an adjudicated, contested proceeding, in an *18 C.F.R. § 1b.1* et seq., proceeding, FERC may settle claims without review, and need not justify its decision to order refunds, or to decline to order refunds.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Duties & Powers*
[HN7] Because *18 C.F.R. § 1b.1* et seq., investigations are prosecutorial in nature, third parties do not participate. *18 C.F.R. § 1b.11*.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Duties & Powers*
[HN8] When parties seek adjudicative relief from an agency, they are entitled to a reasoned response from the agency. A party's valid request for relief cannot be denied purely on the basis that the agency is considering its own enforcement action that may impart a portion of the relief sought. If an aggrieved party tenders sufficient evidence that tariffs have been violated, then it is entitled to have the Federal Energy Regulatory Commission ad-

judicate whether the tariff has been violated and what relief is appropriate.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN9] Section 309, *16 U.S.C.S. § 825h*, of the Federal Power Act relief is not limited by § 206, *16 U.S.C.S. § 824d*.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN10] Section 206(a), *16 U.S.C.S. § 824d(a)*, of the Federal Power Act requires that before the Federal Energy Regulatory Commission can exercise its remedial power to mitigate an existing rate, it must find an existing rate unjust, unreasonable, unduly discriminatory or preferential. *16 U.S.C.S. § 824e(a)*.

*Administrative Law > Judicial Review > Standards of Review > Statutory Interpretation*
[HN11] An agency's discretion is at its zenith when it is fashioning policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of congressional objectives.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Duties & Powers*
[HN12] The Federal Energy Regulatory Commission may rely on generic or general findings of a systemic problem to support imposition of an industry-wide solution Proportionality between the identified problem and the remedy is the key.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Judicial Review*
[HN13] *16 U.S.C.S. § 825l(b)* provides that a party may obtain review in the appellate court by filing a petition within 60 days after the order of the Federal Energy Regulatory Commission upon the application for rehearing. The appellate court, however, cannot consider an objection unless such objection shall have been urged before the Commission in the application for rehearing.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Judicial Review*

2006 U.S. App. LEXIS 19476, *

[HN14] An appellate court should uphold the Federal Energy Regulatory Commission's decision if its path to making that decision may reasonably be discerned.

*Energy & Utilities Law > Administrative Proceedings > U.S. Federal Energy Regulatory Commission > Jurisdiction*
[HN15] There is no doubt that energy exchanges are considered sales, subject to the Federal Energy Regulatory Commission's jurisdiction. *18 C.F.R. § 35.2(a).*

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > General Overview*
[HN16] The Federal Power Act (FPA) cannot be construed to immunize those who overcharge and manipulate markets in violation of the FPA. The Federal Energy Regulatory Commission is obligated to protect consumers from unjust or unreasonable rates, charges, or classifications, and any rules, regulations, practices, or contracts affecting such rates, charges or classifications. *16 U.S.C.S. § 824e(a).* Nothing in the Federal Power Act limits its application to those transactions that are easy to value. Although multiple variables may make certain transactions difficult to analyze, consumers must still be assured that those transactions are just and reasonable.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN17] The Federal Energy Regulatory Commission's own precedent shows that when parties have failed to propose an acceptable mitigation method in a refund proceeding, it may fashion a method on its own.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN18] One of the fundamental tenets in the Federal Energy Regulatory Commission's (FERC's) jurisprudence is the rule against retroactive ratemaking. This theory underpins the limitations on FERC's remedies under § 206, *16 U.S.C.S. § 824d*, to the post-complaint period. *16 U.S.C.S. § 824e(b).* If FERC finds a rate unjust and unreasonable pursuant to a § 206 complaint, it must order imposition of a just and reasonable rate; however, the refund is limited to periods subsequent to the refund effective date established by FERC, which must be at least 60 days after the filing of the complaint. By this procedure, once a complaint is filed, sellers are on notice that their sales may be subject to refund.

*Energy & Utilities Law > Electric Power Industry > Federal Power Act > Federal Rate Regulation*
[HN19] While the Federal Energy Regulatory Commission has considerable latitude in fashioning § 206, *16 U.S.C.S. § 824d*, relief, the remedies afforded pursuant to a third party § 206 complaint must have a sufficient nexus to the substantive allegations of the complaint so that market participants are placed on notice that they are at risk for sales made after there fund effective date.

**COUNSEL:** Stan Berman, Heller Ehrman White & McAuliffe, Seattle, Washington; Kevin J. McKeon, Hawke McKeon Sniscak & Kennard, Harrisburg, Pennsylvania, for petitioner-intervenor and respondent-intervenor California Parties.

Robert A. O'Neil, San Diego City Attorney's Office, San Diego, California, for petitioner-intervenor City of San Diego.

Dennis Lane, Solicitor, Federal Energy Regulatory Commission, Washington, D.C., for respondent Federal Energy Regulatory Commission.

Mark W. Pennak, Department of Justice, Civil Division, Washington, D.C., for respondent-intervenor and petitioner-intervenor Bonneville Power Administration.

Harvey L. Reiter, Morrison & Hecker, Washington D.C., for respondent-intervenor and petitioners-intervenors Indicated Public Entities.

David C. Frederick, Kellogg, [*2] Huber, Hansen, Todd, Evans & Figel, Washington, D.C.; Lawrence G. Acker, LeBoeuf, Lamb, Greene & MacRae, Washington, D.C.; Ronald N. Carroll, Foley & Lardner, Washington, D.C., for petitioner-intervenor and respondent-intervenor Competitive Suppliers Group.

Charles F. Robinson, Folsom, California; J. Phillip Jordan, Swidler Berlin Shereff Friedman, Washington, D.C., for intervenor California Independent System Operator Corporation.

David L. Alexander, Oakland, California; James M. Costan, McGuire Woods, Washington, D.C., for petitioner Port of Oakland.

Randolph Q. McManus, Baker Botts, Washington, D.C., for intervenor Indicated Generators.

Natalie L. Hocken, Portland, Oregon; Stuart F. Pierson, Troutman Sanders, Washington, D.C., for respondent-intervenor PacifiCorp.

Kenneth W. Irvin, McDermott Will & Emery, Washington, D.C., for intervenor El Paso Merchant Energy, L.P.

**JUDGES:** Before: Sidney R. Thomas, M. Margaret McKeown, and Richard R. Clifton, Circuit Judges.

**OPINIONBY:** THOMAS

**OPINION:** THOMAS, Circuit Judge:

This case comes to us on petitions for review of a series of orders issued by the Federal Energy Regulatory Commission ("FERC") relating to the [*3] energy crisis that occurred in California in 2000 and 2001. Nearly 200 petitions for review of the various FERC orders have been filed in our Court. We consolidated these petitions for administrative management. n1

> n1 We express our appreciation to Lisa Evans of the Ninth Circuit Court of Appeals Mediation Unit; Cole Benson, Supervisor of the Ninth Circuit Procedural Motions Unit; and our colleague Judge Edward Leavy for their extensive work with the parties in organizing judicial management of the cases. We also express our appreciation to the parties and their attorneys for their cooperation, professionalism, and the quality of their presentations.

On November 24, 2004, we issued a consolidated order in this case separating certain issues for decision in two consolidated proceedings, the first of which we termed the "Jurisdictional Cases"; the second we termed the "Scope/Transactions Cases." In the Jurisdictional Cases, we considered whether FERC's refund authority extended to certain governmental entities. [*4] We heard oral arguments on Jurisdictional Cases on April 12, 2005, and issued an opinion concerning the Jurisdictional Cases on September 6, 2005. *Bonneville Power Admin. v. FERC, 422 F.3d 908 (9th Cir. 2005).*

The Scope/Transaction Cases before us here involve numerous questions pertaining to the proper scope of FERC's refund orders, including the appropriate temporal reach and the type of transactions properly subject to the refund orders. We heard oral arguments on the Scope/Transaction Cases on April 13, 2005. This opinion covers the issues presented in the Scope/Transaction Cases.

We grant in relief in part and deny relief in part. In general, we hold that all the transactions at issue in this case that occurred within the California Power Exchange Corporation ("CalPX") or California Independent System Operator ("Cal-ISO") markets, or as a result of a CalPX

or Cal-ISO transaction, were the proper subject of the refund proceedings instituted by FERC. Therefore, we deny the petitions for review that challenge FERC's inclusion of such transactions; we grant the petitions for review that challenge FERC's exclusion of such transactions.

We deny the petitions for [*5] review that seek to expand FERC's refund proceedings into the bilateral markets beyond the CalPX and Cal-ISO markets. In particular, we hold that FERC properly excluded from the refund proceedings bilateral transactions between the California Energy Resources Scheduling ("CERS") Division of the California Department of Water Resources and other entities that occurred outside the CalPX and Cal-ISO markets.

We hold that FERC properly established October 2, 2000 as the refund effective date for the § 206 proceedings, rather than October 29, 2000, as argued by some parties. However, we hold that FERC erred in excluding § 309 relief for tariff violations that occurred prior to October 2, 2000. We reserve consideration of all other issues raised in the various petitions for review for the next phase of our appellate proceedings.

The net effect of our decision is to preserve the scope of the existing FERC refund proceedings, but to expand those refund proceedings to include: (1) tariff violations that occurred prior to October 2, 2000, (2) transactions in the CalPX and Cal-ISO markets that occurred outside the 24-hour period specified by FERC, and (3) energy exchange transactions in the [*6] CalPX and Cal-ISO markets.

**I**

**Parties and Claims**

With that brief summary of the issues, we turn to the specific claims of the parties. The State of California and several intervenors (collectively, "the California Parties") n2 seek review of a number of FERC's decisions, namely: (1) FERC's denial of relief for sales of electricity made at unjust rates prior to October 2, 2000, the refund effective date set by FERC; (2) FERC's denial of relief for energy sales in which CERS was the purchaser; (3) FERC's refusal to order relief for energy exchange transactions; and (4) FERC's refusal to order relief for certain forward market transactions.

> n2 The California Parties consist of the People of the State of California, *ex rel.* Bill Lockyer, Attorney General; the Public Utilities Commission of the State of California; the California Electricity Oversight Board; Pacific Gas and

Electric Company, and Southern California Edison Company.

A group of energy suppliers and generators called the Competitive [*7] Suppliers Group n3 also petitions for review of several of FERC's decisions, namely: (1) FERC's decision to set the refund effective date at October 2, 2000, rather than October 29, 2000; (2) FERC's order of refunds for transactions that took place during non-emergency hours, and (3) FERC's inclusion of certain out-of-market transactions in its refund proceedings.

> n3 This group consists of Powerex Corp.; Avista Energy,Inc.; Constellation Energy Commodities Group, Inc.; Coral Power, L.L.C.; Exelon Corporation on behalf of Exelon Generation Company, LLC; PECO Energy Company; Commonwealth Edison Company; IDACORP Energy LP; Portland General Electric Company; PPL EnergyPlus, LLC; PPL Montana, LLC; Public Service Company of New Mexico; Puget Sound Energy, Inc.; Sempra Energy Trading Corp.; TransAlta Energy Marketing (CA), Inc.; TransAlta Energy Marketing (US), Inc.; and Tucson Electric Power Company.

The Port of Oakland, along with other petitioners and intervenors, petitions for review of FERC's decision to exclude [*8] certain bilateral transactions from its refund order.

Also before us in this case are the Public Entities' n4 and the Bonneville Power Administration's petitions for review of FERC's determination that it had authority to order relief for certain transactions known as "sleeve" and "multi-day" transactions, as well as transactions occurring under § 202(c) of the Federal Power Act. The California Parties have moved to strike, and El Paso Merchant Energy Company has moved to defer, consideration of the arguments until the next phase of our consideration of the FERC orders.

> n4 This group consists of municipal entities, including the Modesto Irrigation District, the City of Los Angeles Department of Water and Power, the Sacramento Municipal Utility District, the City of Redding, and the State Water Contractors/The Metropolitan Water District of Southern California (which represents 27 of the 29 California public entities that provide substantial funding for the California Department of Water Resources' operation of the State Water Project).

[*9]

## II

### Factual Background

During the mid-1990's, FERC began examining whether the wholesale electric power industry should have been restructured and deregulated to separate generation, transmission, and distribution functions. Generation involves the production of power through a variety of means. Transmission generally refers to the conveyance of high voltage electric power from the points of generation to substations for conversion to delivery voltages. Distribution refers to the delivery of the converted low voltage energy from substations to individual consumers. The theory behind separating these functions, known as "unbundling," was that wholesale power competition would be promoted, and consumers would benefit, if public utilities were required to provide nondiscriminatory, open access, transmission. *See Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities, 60 Fed. Reg. 17,662 (proposed April 7, 1995)* (codified at *18 C.F.R. § 35.0 et seq.*). This examination culminated in the issuance of FERC Order No. 888 in 1996. Order No. 888, *Promoting Wholesale Competition [*10] Through Nondiscriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996)* ("FERC Order No. 888"), *on reh'g, 62 Fed. Reg. 12,274 (Mar. 14, 1997), on reh'g, 62 Fed. Reg. 64,688 (Dec. 9, 1997), on reh'g, 82 F.E.R.C. P61046 (1998), aff'd Transmission Access Policy Study Group v. FERC,343 U.S. App. D.C. 151, 225 F.3d 667 (D.C. Cir. 2000)* (per curiam), *aff'd sub nom. New York v. FERC, 535 U.S. 1, 122 S. Ct. 1012, 152 L. Ed. 2d 47 (2002)*. Among other provisions, FERC Order No. 888 included a series of regulations that provided for the creation of competitive markets for wholesale electric power, including the creation of independent regional transmission companies that would allow the development of a competitive electric transmission market.

Prior to these events, the California electricity market was composed of investor-owned utilities, whose generation, transmission, and distribution of electricity were vertically integrated and regulated by the California Public Utilities Commission ("CPUC"), the state agency charged with regulating retail electricity rates. *Cal. Pub. Util. Code § 451* [*11] . The CPUC set retail electrical rates charged by the investor-owned utilities providing service in exclusive service territories. There are three major investor-owned utilities in California: Pacific Gas and Electric Company ("PG&E"), Southern California Edison Company ("Edison"), and San Diego Gas and Electric Company ("SDG&E").

In response to FERC Order No. 888 and energy problems in 1995, the CPUC and the California legislature commenced initiatives to restructure the California electric energy industry. The aim was to convert California's investor-owned, regulated utilities, to a deregulated market, in which the price of electricity would be established by competition, and consumers could select their electrical power supplier. The theory was that competition would lead to better service and a price reduction for consumers.

Toward this end, the California legislature enacted Assembly Bill 1890 ("AB 1890"). Act of September 23, 1996, 1996 Cal. Legis. Serv. 854 (codified at *Cal. Pub. Util. Code § § 330-398.5*). The deregulation was to proceed in several phases, beginning with the deregulation of the wholesale electricity market. After a transition period [*12] during which the investor-owned utilities were to recover their "stranded costs" through fixed prices for electricity, the retail market was to be deregulated. n5

n5 The California legislature recognized that the transition to a deregulated market would leave the investor-owned utilities with some unrecoverable "stranded costs." "Stranded costs" are those costs, generally associated with facility construction, that cannot be recovered because either the charged rate is insufficient to cover the costs or the utility cannot sell enough power. In the case of sales made pursuant to the divestiture requirements, recoverable stranded costs meant the difference between the sales price and the book value of the assets. During the transition to a deregulated market, the investor-owned utilities were to recover certain stranded costs through individual cost-recovery plans, which provided that rates would be frozen for a period of time to allow the investor-owned utilities to generate sufficient profits to recover their stranded costs.

[*13]

Under AB 1890, the major investor-owned, vertically integrated utilities were required to divest a substantial portion of their power generation plants, including fossil fuel generation plants (but excluding hydroelectric facilities and nuclear power plants), to unregulated, nonutility producers. This divestiture was accomplished by a process of market valuation, based on a discount of projected future revenue streams. *See Re Proposeed Policies Governing Restructuring Cals. Elec. Servs, Indus. & Reforming Regulation, 64 Cal. Pub. Util. Comm'n 2d 1, 1995 WL 792086 (1995)* ("CPUC Decision 95-12-063").

Between 1998 and 1999, 22 electrical generation plants were sold.

After divesting the bulk of their generation assets, the investor-owed utilities were required to sell all of their remaining output to CalPX, a nonprofit wholesale clearing-house created by AB 1890. CalPX was to provide a centralized auction market for trading electricity. It was deemed a public utility pursuant to the Federal Power Act, *see 16 U.S.C. § 824(e)*, and thus subject to regulation by FERC, *see 16 U.S.C. § 824(b)* [*14] , *(d)*. It operated pursuant to a FERC-approved tariff and FERC wholesale rate schedules. *Pac. Gas & Elec. Co.,77 F.E.R.C. P61204 at 61,803-05, (1996), reh'g denied, 81 F.E.R.C. P61122 (1997)*. The investor-owned utilities were required to purchase all of electrical energy that they required from the CalPX markets and to conduct all of their sales through the CalPX market. Part of the underlying theory was that the investor-owned utilities could not exercise market power in a single transparent market, either as a buyer or a seller, because prices would be posted and all market participants would be paid the same price.

CalPX commenced operations in 1998. Initially, it operated only a single price auction for its "spot markets," defined as "sales that are 24 hours or less and that are entered into the day of or day prior to delivery."*Pac. Gas & Elec. Co., v. Sellers of Energy, Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 95 F.E.R.C. P61418 at 62,545 ("2001 Order")*. The price in the CalPX spot market was determined by evaluating bids submitted by market participants. As we described the procedure in *Pub. Util. Dist. No. 1 v. Dynegy Power Mktg., Inc., 384 F.3d 756, 759 (9th Cir. 2004)*: [*15]

A seller could submit a series of bids that consisted of price-quantity pairs representing offers to sell (e.g. 5 units at $ 50 each, but 10 units if the price is $ 100 each). Similarly, a buyer could submit a series of bids that consisted of price-quantity pairs representing offers to buy. The PX would then establish aggregate supply and demand curves and set the "market clearing price" at the intersection of the two curves.

Once the market clearing price had been established, "every exchange would take place at the market clearing price, even though some buyers had been willing to pay more and some sellers had been willing to sell for less." *Id.*

The CalPX spot market, or "core market" as it is sometimes called, consisted of: (1) "day-ahead" trading, in which the market clearing price was derived from the sellers' and buyers' price and quantity determinations for the next day's energy transactions and (2) "day of" or "hour-ahead" trading, in which CalPX would determine on an hourly basis, a single market clearing price which all suppliers would be paid. Purchases made in the CalPX spot market were deemed by CPUC to be "prudent per se." *See CPUC Decision 95-12-063, 64 Cal. Pub. Util. Comm'n 2d 1, 1995 WL 792086 at \*26-\*27.* [*16]

In practice, the CalPX spot market generated considerable price uncertainty. Therefore, CalPX started a division, termed CalPX Trading Services ("CTS"), to operate a block forward market by matching supply and demand bids for long term electricity markets. In 1999, CalPX allowed the investor-owned utilities to purchase only a limited percentage of their combined load in the CTS forward market. They were required to purchase the balance of their load in the CalPX spot market.

AB 1890 created another nonprofit entity, the Independent System Operator ("Cal-ISO"), also subject to FERC jurisdiction, which was to be responsible for managing California's electricity transmission grid and balancing electrical supply and demand. Although the investor-owned utilities continued to own the transmission facilities, Cal-ISO exercised operational control over the grid. The Cal-ISO grid included the transmission systems of PG&E, Edison, SDG&E, and the cities of Vernon, Anaheim, Banning, and Riverside, California. To maintain the grid, Cal-ISO was authorized to procure both energy needed to balance the grid ("imbalance energy") and operating reserves (sometimes referred to as "ancillary [*17] services"). The imbalance energy market is the so-called "real time" market, in which bids to supply energy were to be made no later than 45 minutes prior to the operating hour. Cal-ISO would rank the supply bids and purchase the required energy at the market-clearing price. Cal-ISO would then bill CalPX for electricity it required. CalPX would, in turn, bill the investor-owned utilities, who were forced to pay whatever price that Cal-ISO paid its suppliers, even though that price might have exceeded what the utilities could have charged their consumers as a consequence of the retail price freeze.

Because Cal-ISO was responsible for ensuring that all electricity demand was met, Cal-ISO was required to buy energy outside the CalPX market to make up the energy short fall if sellers in the CalPX market were unable or unwilling to provide enough supply to meet California's demand during a particular period. Cal-ISO acquired operating reserves, constituting capacity that could be converted to energy and delivered to the grid in response to unexpected events,such as power outages, from ancillary services suppliers who would agree to reserve capacity during the specified period. The ancillary [*18] suppliers would agree to supply the required electricity during the specified period on demand from Cal-ISO, and were to be paid regardless of whether their capacity was used. All of these operations were to be governed by a tariff and protocols filed with FERC.

As we now know, something happened on the way to the trading forum, and the best laid regulatory plans went astray. The plan to establish a competitive market, while keeping the exercise of monopoly and monopsony power in check, failed to account for energy economics and the sophistication of modern energy trading. As became clear in hindsight, even those who controlled a relatively small percentage of the market had sufficient market power to skew markets artificially. In short, the old assumptions, based on antitrust theory, that market power could not be exercised by those who possessed less than 20% of the market share proved inaccurate in California's energy market.

With the new structure, over 80% of the transactions were being made in the spot markets -- the converse of most other electricity markets, in which more than 80% of transactions are made through long term forward contracts, lending stability to the markets. [*19] Sellers quickly learned that the California spot markets could be manipulated by withholding power from the market to create scarcity and then demanding extremely high prices when scarcity was probable. The energy market is highly dependent upon weather; heat waves or cold snaps inevitably produce demand. Thus, it was quickly apparent to sellers that there was little risk and great profit in withholding capacity when high demand was anticipated based on weather forecasts. In addition, traders soon developed other purely artificial means of market manipulation, such as shutting down power plants when electric demand was high in order to destabilize the electric grid, and to increase prices. In order to maximize profit, traders engaged in anomalous bidding practices, including "hockey-stick bidding," in which an extremely high price is demanded for a small portion of the market, and "round trip trades," in which an entity artificially creates the appearance of increased revenue and demand through continuous sales and purchases.

Enron Corporation allegedly gamed the California markets with impunity, using manipulative corporate strategies, such as those nicknamed "FatBoy," "Get Shorty, [*20] " and "Death Star." Under the "Death Star" strategy, Enron allegedly sought to be paid for moving energy to relieve congestion without actually moving any energy or relieving any congestion. All of the demand was created artificially and fraudulently, creating the appearance of congestion, and then satisfied artificially, without the company providing any energy.

"FatBoy" refers to a strategy through which Enron alleg-edly withheld previously agreed-to deliveries of power to the forward market so that it could sell the energy at a higher price on the spot market. The company would over-schedule its load; supply only enough power to cover the inflated schedule, and thus, leave extra supply in the market, for which Cal-ISO would pay the com-pany. Via the "Get Shorty" strategy, traders were able to fabricate and sell operating reserves to Cal-ISO, receive payment, then cancel the schedules and cover their commitments by purchasing through a cheaper market closer to the time of delivery.

The California Parties allege that Enron was not alone, and criminal charges have been filed against a number of energy traders and executives. For example, the California Parties allege that Powerex Corporation [*21] engaged in fraudulent power scheduling to serve false load schedules. The Vice President of Powerex's Western Trading Desk pleaded guilty to wire fraud for submitting false Cal-ISO schedules. According to the California Parties, executives of Reliant Energy Services, Inc. directed traders to engage in manipulative strategies.

Beginning in May 2000, energy prices in California began to escalate dramatically. Low cost hydroelectric power from the Northwest was not available in the vol-ume of previous years, and wholesale electricity prices skyrocketed, particularly in the CalPX spot markets. In May 2000, the average prices in the CalPX spot market were double those of May 1999.

On June 14, 2000, energy consumers in Northern California experienced their first wave of rolling black-outs. The California Parties allege that this occurred be-cause of market manipulation. They claim that the data indicates that the large California generators utilized economic or physical withholding strategies 94% of the time during the May through November 2000 period.

Under its operating procedures, Cal-ISO would de-clare a "System Emergency" when its operating reserves dipped below a predetermined percentage [*22] of its projected demand. Whenever reserves in California fell below seven percent, the ISO declared a "Stage 1 System Emergency." June 19, 2001 Order, *95 F.E.R.C. P61418 at 62,546.* The hours during which Cal-ISO declared a system-wide emergency are also called "reserve defi-ciency hours." *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy, 97 F.E.R.C. P61275 at 62,246 (2001)* ("December 19, 2001 Order"). During the summer of 2000, high temperatures and lack of supply forced the Cal-ISO to declare system emergencies 39 times. *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., v. Sellers of En-*ergy & Ancillary Servs. Into Mkts. Operated by the Cal. Indep. Sys. Operator, 93 F.E.R.C. P61121 at 61,353 (2000).*

In addition to blackouts, brownouts, n6 and system emergencies, the crisis proved enormously expensive to purchasers of retail power, who were unable to pass along the increased cost to their consumers. In June 2000, California spent more on purchasing energy than in the entire summer of 1999. This increase occurred despite the fact that peak demand was lower in 2000 than in 1999. The California investor-owned utilities, who were still subject to the price freeze that was supposed to lock in their profits, lost billions of dollars. Cooler weather in the fall did not cool prices. Prices continued to escalate throughout [*23] the last quarter of 2000.

n6 A brownout occurs when power is not lost completely, but is provided at reduced voltage levels.

In August 2000, SDG&E filed a complaint under *§ 206* of the Federal Power Act, *16 U.S.C. § 824e(a)*, against all sellers of energy and ancillary services in the CalPX and Cal-ISO markets. SDG&E requested that FERC impose a price cap on sales into those markets. Other parties, including PG&E and the State of Califor-nia, joined the complaint.

On August 23, 2000, FERC issued an order denying the relief requested by SDG&E, but determining that it was appropriate to investigate the justness and reason-ableness of the rates for all sales in the CalPX and Cal-ISO markets. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by the Cal. Indep. Sys. Operator, 92 F.E.R.C. P61172 (2000)* ("August 23, 2000 Order"). Therefore, it established its own investiga-tory proceeding in FERC Docket Nos. EL-00-95 and EL00-98 ("the Remedy Proceedings"). The August 23, 2000 Order established October 29, 2000 as the refund effective date, [*24] which was determined by calculat-ing the date sixty days after publication of notice of the order in the Federal Register. *Id. 92 F.E.R.C. P61172 at 61,608.*

On November 1, 2000, FERC issued an order pro-posing structural changes to the operation of the CalPX and Cal-ISO markets. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 93 F.E.R.C. P61121 (2000)* ("November 1, 2000 Order"). In the No-vember 1, 2000 Order, FERC concluded that:

[T]he electric market structure and market rules for wholesale sales of electric energy in California are seriously flawed and . . . these structures and rules, in conjunction with an imbalance of supply and demand in California, have caused, and continue to have the potential to cause, unjust and unreasonable rates for short-term energy (Day-Ahead, Day-of, Ancillary Services and real-time energy sales) under certain conditions.

*Id. 93 F.E.R.C. P61121 at 61,349.*

FERC concluded that there was "clear evidence" that sellers could "exercise market power when supply is tight" and produce "unjust and unreasonable rates" for wholesale power sales. *Id. 93 F.E.R.C. P61121 at 61,349-50.*

The November 1, 2000 Order proposed, effective sixty days after the date of the order, to (1) eliminate the requirement [*25] that the investor-owned utilities buy and sell power exclusively through the CalPX; (2) require market participants to schedule 95 percent of their transactions in the day-ahead market or be subject to a penalty charge; (3) replace the existing CalPX and Cal-ISO stakeholder boards with independent non-stakeholder boards; and (4) require the filing of generator interconnection procedures.

In addition to ordering structural and rule changes, FERC ordered an evidentiary hearing to determine the appropriate refund. At the behest of the California Parties, FERC changed the refund effective date from October 29, 2000 to October 2, 2000, based on the filing of the SDG&E complaint. FERC also limited the refund to Cal-ISO and CalPX spot market transactions completed during the period from October 2, 2000 through June 20, 2001 (hereinafter referred to as the "Refund Period").

Emergency conditions continued following the issuance of the November 1, 2000 Order, requiring Cal-ISO to serve increasingly larger portions of its load through the real time imbalance energy market and depleting Cal-ISO's operating reserves. As a result, Cal-ISO proposed changes to its tariff, which FERC approved in [*26] an order dated December 8, 2000. *Cal. Indep. Sys. Operator Corp., 93 F.E.R.C. P61239 (2000).* One provision of this order lifted the Cal-ISO price caps, with the goal of attracting more supply into the auction markets.

On December 15, 2000, FERC issued an order substantially adopting the remedies proposed in the November 1, 2000 Order. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the*

*Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by the Cal. Indep. Sys. Operator, 93 F.E.R.C. P61294 (2000)* ("December 15, 2000 Order"). The December 15, 2000 Order attempted to reduce the reliance on spot markets by terminating CalPX's wholesale rate schedules, thereby eliminating the requirement that the investor-owned utilities buy and sell all generation through CalPX. CalPX sought a writ of mandamus from our Court challenging the December 15, 2000 Order's prohibition of the investor-owned utilities' selling power on a voluntary basis in the CalPX market and the termination of the wholesale tariff. The City of San Diego also challenged the December 15, 2000 Order by writ of mandate, arguing that FERC had unreasonably delayed taking action on the purchasers' requests for refunds. We denied those petitions on April 11, 2001. *In re Cal. Power Exch. Corp., 245 F.3d 1110 (9th Cir. 2001).* [*27]

On December 26, 2000, Edison filed a suit against FERC, alleging that it had failed in its responsibility to ensure that wholesale electricity was sold at reasonable rates.

The CalPX market began to collapse and the investor-owned utilities were fast becoming insolvent. On January 17, 2001, the Governor of California declared a State of Emergency and ordered the California Department of Water Resources to purchase energy on behalf of California consumers to halt the rolling blackouts. Subsequently, the California legislature on February 1, 2001 enacted Assembly Bill 1 of the 2001-2002 First Extraordinary Session authorizing the Department of Water Resources to purchase power until December 31, 2002. *Cal. Water Code § 80000,et. seq.*

Following the Governor's declaration, CERS began buying power on January 18, 2001. Energy sellers began refusing to sell to Cal-ISO, and instead sold directly to the investor-owned utilities and CERS through bilateral contracts. Most sales after January 18, 2001 were made directly to CERS, rather than through CalPX or Cal-ISO. CalPX ceased market operations on January 30, 2001 and filed for protection under Chapter 11 of the [*28] Bankruptcy Code on March 9, 2001. The California Parties allege that from January 18, 2001 to June 18, 2001, CERS purchased more than $ 5 billion of energy in the spot market.

On March 1, 2001, the California Electricity Oversight Board ("Cal-EOB") filed a motion with FERC, asking FERC to clarify that the Remedy Proceedings included CERS transactions outside of the CalPX and Cal-ISO markets. The Cal-EOB contended that the sellers that had manipulated the markets were now charging the same or higher rates for the CERS sales.

On March 9, FERC issued an order establishing a provisional formula governing refunds during the January 2001 period. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Servs. Operated by the Cal. Indep. Sys. Operator, 94 F.E.R.C. P61245 (2000)* ("March 9, 2001 Order"). The order directed wholesale sellers to provide refunds or, alternatively, to justify their charges and costs for transactions made during power emergencies that were above a rate it calculated as appropriate. FERC estimated that approximately $ 69 million in January 2001 electricity sales would be subject to refunds.

On April 6, 2001, PG&E filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Although Edison and SDG&E were [*29] in similar financial peril, they avoided bankruptcy filings through arrangements with creditors.

On April 26, 2001, FERC issued an order establishing a prospective mitigation and monitoring plan for wholesale prices through the real time markets operated by Cal-ISO. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. , 95 F.E.R.C. P61115 (2001)* ("April 26, 2001 Order"). The April 26, 2001 Order established a pricing mechanism for sales by California generators made to Cal-ISO when reserves fell below seven percent. The order also established conditions, including refund liability, for market-based rate authority with the goal of preventing anti-competitive bidding behavior in the real time Cal-ISO market.

On June 19, 2001, FERC issued an order reaffirming that "as a result of the seriously flawed electric market structure and rules for wholesale sales of electric energy in California, unjust and unreasonable rates were charged, and could continue to be charged during certain times and under certain conditions, unless certain targeted remedies were implemented." June 19, 2001 Order, *95 F.E.R.C. P61418 at 62,557.*

The June 19, 2001 Order imposed price caps on all spot market sales from June 20, 2001 through [*30] September 30, 2002, and imposed a "must-offer" obligation on generators to prevent them from withholding supply. The prospective price mitigation plan applied to all sellers that voluntarily sold power into the Cal-ISO and other designated spot markets, or that voluntarily used Cal-ISO's or other interstate transmission facilities subject to FERC jurisdiction. According to the California Parties, the effect of the June 19 Order was to put an end to the rolling blackouts, catastrophically high prices, and near-continuous power emergencies.

On July 12, 2001, the Administrative Law Judge ("ALJ") issued a report and recommendation to FERC regarding a refund methodology to govern sales during the Refund Period. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 96 F.E.R.C. P63007 (2001).* In response to the report and recommendation, FERC issued an order on July 25, 2001 in the Refund Proceedings establishing the framework for refunds of past sales in the spot markets operated by CalPX and Cal-ISO. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 96 F.E.R.C. P61120 (2001)* ("July 25, 2001 Order"). FERC ordered limited refunds for the rates it had determined to be unjust and unreasonable and established a mitigated [*31] market clearing price ("MMCP") in an attempt to replicate what it believed to be the just and reasonable rates that an unmanipulated competitive energy market would have produced. Under the MMCP methodology, refunds were to be determined by the difference between the market clearing price, which was the price charged by all electricity suppliers at a given time, and the MMCP calculated for each hour of the Refund Period, subject to certain adjustments. FERC also ordered an evidentiary hearing to calculate the appropriate MMCPs for each hour of the Refund Period and the amount of refunds owed.

However, FERC declined to order refund relief for sales that occurred before the Refund Period, or for any sales out-side of the CalPX and Cal-ISO markets. FERC also excluded transactions of more than twenty-four hours in length, even if those sales were made in the CalPX and Cal-ISO markets within the Refund Period. The California Parties contend that refunds for sales prior to the Refund Period would total $ 2.3 billion in seller overcharges; that refunds for emergency purchases made by CERS would total $ 3.5 billion in seller overcharges; and that other improperly excluded transactions would [*32] amount to over $ 200 million in seller overcharges.

On December 2, 2001, Enron Corporation filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code.

On December 19, 2001, FERC issued another order addressing mitigation of the California spot market prices and conditions. December 19, 2001 Order, *97 F.E.R.C. P61275.* The order clarified that the price mitigation plans applied to all sales into the FERC-regulated spot markets and provided further explanation for why FERC chose October 2, 2000 as the refund effective

date. FERC issued an order denying rehearing of the December 19, 2001 Order on May 15, 2002.

On February 13, 2002, FERC opened a non-public investigation ("FERC Enforcement Proceeding") pursuant to *18 C.F.R. § 1b.i et. seq.* into seller market manipulation of the energy markets in the Western United States. *Fact-Finding Investigation of Potential Manipulation of Elec. & Natural Gas Prices, 98 F.E.R.C. P61165 at 61,614 (2002).* FERC noted that allegations had been made in the Enron bankruptcy that Enron had used its market position to distort electric and natural gas markets. FERC directed its staff [*33] to investigate "whether any entity, including Enron Corporation (through its affiliates or subsidiaries), manipulated short-term prices in electric energy or natural gas markets in the West or otherwise exercised undue influence over wholesale prices in the West, for the period January 1, 2000, forward."*Id.*

In June 2002, some of the California Parties moved this Court for permission to present additional evidence of market manipulation in the Remedy Proceedings. FERC opposed the motion. On August 21, 2002, we directed FERC to allow the parties to present evidence of market manipulation in the Remedy Proceedings, to reconsider its earlier orders denying relief, and to provide to the Court supplemental findings of fact and any recommended modifications to FERC's orders on the basis of such new evidence.

On March 20, 2002, the State of California, through its Attorney General, filed a complaint alleging that generators and marketers selling power into markets operated by CalPX and Cal-ISO, as well as those making spot market sales of energy to CERS, violated *§ 205* of the Federal Power Act by failing to comply with various filing requirements. The complaint also challenged FERC's [*34] approval of market-based tariffs. On May 31, 2002, FERC dismissed the complaint as constituting a collateral attack on prior FERC orders and denied the complaint with respect to the allegations that FERC's market-based rate filing requirements violated the Federal Power Act as a matter of law. *Cal. ex rel. Lockyer v. B.C. Power Exch. Corp., 99 F.E.R.C. P61247 (2002)* ("May 31, 2002 Order"). California filed a petition for review of the May 31, 2002 Order.

In December 2002, the ALJ determined that suppliers owed approximately $ 1.8 billion to Cal-ISO and CalPX for sales at rates in excess of a just and reasonable rate. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 101 F.E.R.C. P63026 (2002).* FERC adopted in part, and modified in part, the ALJ's proposed findings

in an order issued March 26, 2003 Order, 2003. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp.,102 F.E.R.C. P61317 (2003)* ("March 26, 2003 Order").

In its March 26, 2003 Order, FERC stated that it would not alter any of its previous orders in the Remedy Proceedings concerning the time or transaction limitations in light of the evidence presented to the ALJ. This position was reaffirmed in subsequent FERC orders on October 16, 2003, which [*35] also clarified some refund calculation issues. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 105 F.E.R.C. P61066 (2003); San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 105 F.E.R.C. P61065 (2003).* Subsequently, FERC issued a number of orders pertaining to calculation of refunds during the Refund Period. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 107 F.E.R.C. P61165 (2004); San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp.107 F.E.R.C. P61166 (2004); San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 108 F.E.R.C. P61311 (2004),* and *CMS Gas Transmission Co., 109 F.E.R.C. P61219 (2004), order on reh'g, 109 F.E.R.C. P61074 (2004).*cc

On September 9, 2004, we granted in part California's petition for review challenging the May 31, 2002 Order. *Cal. ex rel. Lockyer v. FERC, 383 F.3d 1006 (9th Cir. 2004)* ("Lockyer"). We held that FERC's decision to approve market-based tariffs in the wholesale electricity market did not violate the Federal Power Act. *Id.at 1013.* We also held that FERC erred as a matter of law in concluding retroactive refunds were not available under *§ 205. Id. at 1015.* We remanded the case to FERC for further proceedings.

Before us in [*36] the instant case are those portions of the petitions for review that involve the Scope/Transaction issues. We review FERC orders to determine whether they are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law." *Cal. Dep't of Water Res. v. FERC, 341 F.3d 906, 910 (9th Cir. 2003).* FERC's factual findings are conclusive if supported by substantial evidence. *16 U.S.C. § 825l(b); Bear Lake Watch, Inc. v. FERC, 324 F.3d 1071, 1076 (9th Cir. 2003).* Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.* (quoting *Eichler v. SEC, 757 F.2d 1066, 1069 (9th Cir. 1985)).* "If the evidence is susceptible of more than one rational interpretation, we must uphold [FERC's] findings." *Id.* We review questions of law de novo. *Am. Rivers v. FERC, 201 F.3d 1186, 1194 (9th Cir. 1999).* We review FERC's interpretation of the FPA under the familiar analysis established in *Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)* [*37] and its progeny. *Bonneville Power Admin., 422 F.3d at 914.*

### III

#### Temporal Scope of Refunds

[HN1] Under § 206(a) of the Federal Power Act, FERC may investigate whether a particular rate or charge is "just and reasonable." *16 U.S.C. § 824d(a).* If FERC finds a rate unreasonable, it must order the imposition of a just and reasonable rate. *Id. § 824d(d).* FERC may then order refunds for any period subsequent to the "refund effective date," a date FERC establishes that must be at least sixty days after the filing of the complaint. *Id. § 824e(b).* Under the express language of § 206, however, FERC may not order refunds for any period prior to the filing of the complaint. *Id.* Section 309 of the Federal Power Act, on the other hand, gives FERC authority to order refunds if it finds violations of the filed tariff and imposes no temporal limitations. *Consol. Edison v. FERC, 358 U.S. App. D.C. 239, 347 F.3d 964, 967 (D.C. Cir. 2003); 16 U.S.C. § 825h.*

In its August 23, 2000 Order, FERC established October 29, 2000 as the refund effective date pursuant to § 206. In its November 1, 2000 Order, [*38] FERC modified the refund effective date to October 2, 2000. The Competitive Suppliers Group argues that October 29, 2000 was the proper refund effective date. The California Parties do not dispute FERC's establishment of October 2, 2000 as the refund effective date for the § 206 proceedings, but argue that FERC arbitrarily and capriciously refused to order refunds for tariff violations under § 309 for periods prior to October 2, 2000.

#### %A

We conclude that FERC's order establishing October 2, 2000 as the refund effective date for the § 206 Refund Proceedings was not arbitrary or capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law.

SDG&E filed its initial § 206 complaint on August 2, 2000. In its response to SDG&E's filing, FERC, in its August 23, 2000 Order, announced that it would commence its own investigation and set the refund effective date sixty days after FERC published an announcement of the investigation. The notice was published August

29, 2000; therefore, the refund effective date was set as October 29, 2000.

On September 22, 2000, some of the California Parties, notably PG&E and Edison, requested that FERC establish a [*39] an earlier refund date based on the filing of the SDG&E complaint, rather than on FERC's commencement of the Enforcement Proceedings. Given SDG&E's August 2, 2000 filing date, the earliest possible refund effective date was October 2, 2000. In the November 1, 2000 Order, FERC granted the request and reset the refund effective date to October 2, 2000.

Thus, the question at issue here is whether FERC properly tethered the refund effective date to the SDG&E complaint. Although FERC denied the remedy sought by SDG&E in its complaint, it did not dismiss the SDG&E complaint; rather, it consolidated the SDG&E complaint with its own investigation "for purposes of hearing and decision in view of their common issues of law and fact." December 19, 2001 Order, *97 F.E.R.C. P61275 at 62,198.* Despite consolidation, FERC made it clear that the August 23, 2000 Order "established two separate, but related, investigations." *Id.at 62,197.* According to FERC, the investigation into the "justness and reasonableness of sellers' rates in the ISO and PX markets" had resulted in the refund order grew out of SDG&E's complaint. *Id.*

In addition, FERC noted that its policy "is to establish the earliest [*40] refund effective date allowed in order to give maximum protection to consumers." *Id. at 62,198.* This interpretation is consistent with FERC's "primary purpose" in "protecting consumers." *Lockyer, 383 F.3d at 1017.*

The Competitive Suppliers Group argues that the SDG&E complaint cannot form the basis for establishing the refund effective date because SDG&E did not seek refunds pursuant to § 206 in its complaint, and third-party FERC complaints must specify relief sought. To be sure, [HN2] § 206(a) requires third-party complaints to FERC to "state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force. . . ." *16 U.S.C. § 824e(a).* It is also quite true that SDG&E did not seek a refund remedy in its initial complaint. SDG&E's complaint sought an emergency order capping prices in the CalPX and Cal-ISO markets and a ruling enforcing the cap through limitations on market-based authorizations.

However, the relief sought in the initial complaint is not dispositive of this issue. The key question is whether the SDG&E complaint afforded sufficient notice to alert market participants [*41] that sales and purchases might be subject to refund. The gravamen of the SDG&E complaint was that the rates charges by sellers were unjust and unreasonable. As FERC points out, [HN3] a com-

plaint challenging the reasonableness of the rates can lead to a refund under *§ 206*, even if a refund remedy is not specifically designated in the initial complaint. FERC is empowered to investigate the reasonableness of a rate either in the context of a third-party complaint or *sua sponte*. Indeed, as we have noted, the Federal Power Act requires FERC to establish a refund effective date *whenever* it institutes a § 206 investigation. *16 U.S.C. § 824e(b)*.

Further, some of the California Parties promptly sought rehearing of FERC's initial determination of the refund effective date in its August 23, 2000 Order. In short, market participants were quickly apprised that the original refund effective date might be subject to revision. As FERC noted: "Requests for rehearing of the August 23 Order raising the refund effective date issue were timely filed. Thus, any reliance by sellers on the October 29 refund effective date prior to the issuance of a final order was at their own [*42] risk." December 19, 2001 Order, *97 F.E.R.C. P61275 at 62,198*. Therefore, because SDG&E's § 206 complaint unquestionably could have led to a FERC refund order, because the original refund order establishing the refund effective date was not final, and because rehearing petitions were timely filed challenging the refund effective date, SDG&E's filing of its complaint provided sufficient notice to the market to satisfy § *206*.

The fact that two investigations were initiated by FERC does not alter this conclusion. The investigation initiated by SDG&E's complaint focused on whether the sellers' rates in the CalPX and Cal-ISO markets were just and reasonable; the separate FERC investigation focused on whether the CalPX and Cal-ISO market rules and institutional factors required modification. As FERC noted in its August 23, 2000 Order:

> While the SDG&E has focused on the performance of sellers in the market, the action of sellers may in part be caused by the current market rules and institutional structures. Accordingly, we conclude that it is appropriate to investigate not only the justness and reasonableness of public utility sellers' rates in the PX and ISO markets, but also to investigate [*43] the tariffs and agreements of the ISO and PX to determine whether market rules or institutional factors embodied in those tariffs and agreements need to be modified.

*92 F.E.R.C. P61172 at 61,606.*

In short, FERC launched a § 206 investigation into the justness and reasonableness of the rates pursuant to the SDG&E complaint *and* initiated its own investigation into the CalPX and Cal-ISO tariffs and agreements to determine whether market rules required modification. The Competitive Suppliers Group argues that the § 206 investigation became subsumed into the market investigation. However, this contention contradicts the plain language employed by FERC when it established the two investigations and the subsequent treatment of the investigations in later FERC orders. No substantive consolidation was ever ordered. Even if the cases had been substantively consolidated, consolidation would not necessarily eviscerate a validly established refund effective date based on the original SDG&E complaint. Refunds were eventually ordered as a direct result of the SDG&E complaint. Given all these considerations, we conclude that FERC did not act arbitrarily or capriciously, abuse its discretion, [*44] or act in violation of law in setting the refund effective date based on the SDG&E complaint.

**B**

[HN4] FERC's authority to order refunds for filed rates that are later determined to be unjust, unreasonable, or discriminatory derives from *§ § 205 and 206* of the Federal Power Act. FERC also has remedial authority to require that entities violating the Federal Power Act pay restitution for profits gained as a result of a statutory or tariff violation. *Consol. Edison, 347 F.3d at 967; Towns of Concord, Norwood & Wellesley v. FERC, 293 U.S. App. D.C. 374, 955 F.2d 67 (D.C. Cir. 1992), S.Cal. Edison Co. v. FERC, 256 U.S. App. D.C. 364, 805 F.2d 1068, 1071-72 (D.C. Cir. 1986)*. This authority derives from *§ 309* of the Federal Power Act, which authorizes FERC "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act." *16 U.S.C. § 825h*. Unlike refund proceedings commenced under *§ 206*, no time limits apply to remedial actions filed pursuant to *§ 309*.

In its July 25, 2001 Order, FERC declined to award any [*45] relief pursuant to *§ 309*. The California Parties sought review of that decision. We granted the California Parties' motion for an order requiring FERC to entertain further evidence of market manipulation and tariff violation and to reconsider its orders limiting remedies. After receiving further evidence, FERC ruled that it would not consider further remedies. March 26, 2003 Order, *102 F.E.R.C. P61317 at 62,083*. The California Parties petition for review of FERC's refusal to consider § 309 remedies.

We conclude that FERC's decision not to consider a § 309 remedy for tariff violations was arbitrary and capricious, an abuse of discretion, and not in accordance with law. [HN5] On appellate review, FERC "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record."*N. States Power Co. v. FERC*, 308 U.S. App. D.C. 115, 30 F.3d 177, 180 (D.C. Cir. 1994) (internal quotations omitted). FERC must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn of the U. S., Inc. v. State Farm Mut. Ins. Co.,463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). [*46]*

In this case, FERC offers several rationales for refusing to grant tariff relief. First, it claims that *§ 206* precludes refunds prior to the refund effective date. Second, it contends that no tariff violations occurred. Third, it argues that it need not provide remedies to the California Parties because it has commenced prosecutorial investigations into the question of whether tariff violations occurred, and those investigations may result in remedies which would make the market whole. None of these justifications is sufficient to sustain FERC's decision under the applicable standard of review.

First, FERC's claim that it is precluded from ordering pre Refund Period relief under *§ 206* may be quickly dispatched. The relief sought by the California Parties in this part of the proceeding is based on *§ 309*, not *§ 206*. Although the *§ 206* proceedings seeking refunds because of unjust and unreasonable rates are limited to the Refund Period, *§ 309* proceedings based on tariff violations are not. FERC's apparent conclusion that the time limits applicable to *§ 206* proceedings also apply to *§ 309 proceeding is incorrect as a matter of law. Indeed, FERC emphasized as much in its own filings [*47] in the investigatory proceedings:

> Thus, with respect to the period prior to the October 2, 2000 refund effective date, the Commission can order disgorgement of monies above the post October 2, 2000 refunds ordered in the California Refund Proceeding, if it finds violations of the ISO and PX tariffs and finds that a monetary remedy is appropriate for such violations. Further, while refund protection has been in effect for sales in the ISO and PX short-term energy markets since October 2, 2000, the Commission can additionally order additional disgorgement of unjust profits for tariff violations that occurred after October 2, 2000 (i.e., to June 20, 2001).

*Enron Power Mktg., 103 F.E.R.C. P61346 at 62,351 (2003)*. To the extent that FERC is claiming that the § 206 time limits apply to § 309 proceedings, FERC is wrong.

Second, FERC alleges there were no tariff violations, contending that "there is no basis for finding that the sellers acted inconsistently with Commission-filed tariffs or with specific requirements in their filed rate authorizations." July 25, 2001 Order, *96 F.E.R.C. P61120 at 61,508*. This conclusion is flatly inconsistent with FERC's commencement of the FERC [*48] Enforcement Proceeding, which was initiated to investigate and prosecute tariff violations. It contradicts the conclusion of FERC staff, accepted by FERC, that bid prices in the pre-Refund Period were "excessively elevated solely for the purpose of raising prices" in violation of the Cal-ISO and CalPX rules. *Investigation of Anomalous Bidding Behavior & Practices in the W. Mkts., 103 F.E.R.C. P61120 at 62,360 (2003)*. FERC concluded that "the remedy for these tariff violations, if found to exist, would be the disgorgement of any unjust profits attributable to these tariff violations." *Id.103 F.E.R.C. P61347 at 62,359*.

FERC's assertion in this proceeding that there were no tariff violations prior to the Refund Period is contravened by its own findings in *American Electric Power Services Corp.*, to wit:

> As discussed below, the entities listed in the caption (Identified Entities) appear to have participated in activities (Gaming Practices), that constitute gaming and/or anomalous market behavior in violation of the California Independent System Operator Corporation's (ISO) and California Power Exchange's (PX) tariffs during the period January 1, 2000 to June 20, 2001, that warrant [*49] a monetary remedy of disgorgement of unjust profits and that may warrant other additional, appropriate non-monetary remedies. These determinations are based on certain of the tariffs' provisions, an ISO study, a report by Commission Staff, and evidence and comments submitted by market participants.

*103 F.E.R.C. P61345 at 62,328 (2003). See also Enron Power Mktg, 103 F.E.R.C. P61346.*

In addition to FERC's own conclusions, the California Parties also presented significant evidence of pervasive tariff violations during the pre-Refund Period. In sum, there is no support for FERC's second rationale for denying the California Parties' request for pre-Refund Period relief.

FERC's third stated reason for denying the request is that it is pursuing tariff violations in the separate FERC Enforcement Proceeding. Obviously, this rationale contradict's FERC's second rationale -- that no tariff violations exist.

This reason for rejecting the California Parties' request for § 309 relief is also unsupportable.

In explaining its third reason for denying the request, FERC describes at length its broad investigatory and prosecutorial authority under § 307(a)(*16 U.S.C. § 825f* [*50] ) and § 309 (*16 U.S.C. § 825h*). However, no one disputes this authority. What FERC fails to explain, or support, is how its inherent authority to commence investigations and enforcement proceedings under *18 C.F.R. § 1b.1 et. seq.* precludes a civil proceeding instituted by third party complaint.

The two types of proceedings are quite distinct. One is investigative and prosecutorial; the other is a contested proceeding. [HN6] FERC enjoys broad discretion in the management of its own § 1b prosecutorial investigations. FERC "[i]nvestigations may be formal or preliminary, and public or private." *18 C.F.R. § 1b.4.* In contrast to an adjudicated, contested proceeding, in a § 1b proceeding, FERC may settle claims without review, and need not justify its decision to order refunds, or to decline to order refunds.

[HN7] Because § 1b investigations are prosecutorial in nature, third parties do not participate. *18 C.F.R. § 1b.11.* For example, in this case FERC denied the California Parties' motion to intervene in the FERC Enforcement Proceeding, explaining:

> The Commission intends the proceedings [*51] listed in the caption of this order to proceed as investigative and, where appropriate, enforcement proceedings. Their purpose is to examine instances of potential wrongdoing and take remedial action where needed. The Commission is thus acting in a prosecutorial manner in these matters, rather than strictly as an adjudicator. . . .
>
> . . . [This] has important implications, particularly with respect to potential interve-

nors. There are no parties to an investigative proceeding. *18 C.F.R. § 1b.11 (2003)*. Moreover, only a party can contest a settlement, *18 C.F.R. § 385.602(h) (2003)* . . . . Another implication of the application is the Commission's rules governing off-the-record communications. These rules apply only to contested, on-the-record proceedings; they do not apply to Part 1b investigations unless the Commission specifically makes an exception to allow formal interventions and party status. *18 C.F.R. § 385.2201(c) (2003)*

. . . .

. . . Consequently, the Commission is treating all pending motions for intervention as motions to file comments and, to the extent the Commission to date may [*52] have erroneously allowed intervention, rescinding those interventions that have heretofore been granted.

*Fact-Finding Investigation of Potential Mkt. Manipulation of Elec. & Natural Gas Prices, 105 F.E.R.C. P61063 at 61,352 (2003)*

Commissioner Massey dissented from this decision, writing:

> I do not agree that the investigation of Anomalous Bidding Behavior and Practices in the Western Markets should be treated exclusively as an investigation under Part 1b and that there should be no parties to the proceeding. Much of the evidence supporting the investigation was adduced by parties pursuant to a court order in the California refund proceeding. The California parties are integral to the assessment of and weight to be given the evidence. The Commission should not decide, in isolated enforcement proceedings, issues upon which the court-ordered adduced evidence has a bearing where those that adduced the evidence are not parties and have no appeal rights.

*Id. 105 F.E.R.C. P61063 at 61,353.*

At various times, FERC has stated that it reserves the right to impose market-wide inquiries in the FERC

Enforcement Proceedings; however, in these proceedings to date, it has only pursued [*53] "company-specific" investigations into the actions of various market participants, rather than conducting a market-wide inquiry. *San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 105 F.E.R.C. P61066 at 61,385.* FERC itself casts its company-specific approach as supplemental to the adjudicative refund proceedings undertaken pursuant to *§ 206. See, e.g., San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 105 F.E.R.C. P61066 at 61,391* ("Any such company-specific disgorgement or other appropriate remedies would be in addition to the refunds associated with the mitigated market clearing prices developed pursuant to this order and could apply to conduct both prior to the Refund Period and during the Refund Period."); *102 F.E.R.C. P61108 at 61,289 (2003)* ("The payment to be made by Reliant will be in addition to any refund ultimately owed by Reliant as part of the refund proceeding in Docket No. EL00-95, et al.").

In contrast, the California Parties seek a market-wide refund remedy for tariff violations pursuant to *§ 309* through its adjudicative filing. The fact that FERC may be seeking similar remedies against specific companies in its *§ 1b* investigations does not justify its denial of the California Parties' [*54] request for § 309 relief. [HN8] When parties seek adjudicative relief from an agency, they are entitled to a reasoned response from the agency. Here, the California Parties filed a cognizable request for relief and tendered credible evidence in support of their request. A party's valid request for relief cannot be denied purely on the basis that the agency is considering its own enforcement action that may impart a portion of the relief sought. If an aggrieved party tenders sufficient evidence that tariffs have been violated, then it is entitled to have FERC adjudicate whether the tariff has been violated and what relief is appropriate.

In sum, none of the reasons given by FERC for refusing to adjudicate whether tariffs were violated is sustainable. [HN9] Section 309 relief is not limited by *§ 206.* FERC's determination that no tariff violations occurred is not supported by the record. FERC cannot avoid adjudicating a third-party petition because it may or may not choose to commence a separate enforcement action. For these reasons, we conclude that FERC's categorical rejection of the California Parties' request for § 309 relief was arbitrary, capricious, and an abuse of discretion. Therefore, [*55] we grant the petition for review as it pertains to the California Parties' challenge to FERC's foreclosure of relief for tariff violations. We deny the California Parties' petition insofar as it calls for us to decide the merits of its request for § 309 relief. We do not prejudge how FERC should address the merits or

fashion a remedy if appropriate. FERC cannot, however, categorically refuse to entertain the application; it must address the merits.

## IV

### Out of Market Spot Transactions

FERC's July 25, 2001 Order mandated retrospective relief for sales to Cal-ISO, including out-of-market ("OOM") transactions. These purchases were made by Cal-ISO from sellers outside the Cal-ISO single price auction market within 24 hours or less of delivery, and served to stabilize the grid when supply was insufficient to meet demand. Because Cal-ISO had no choice but to buy energy to ensure grid reliability, potential sellers were in a position to exercise improper market leverage by exploiting the structural flaws in the market. FERC concluded that the OOM transactions provided the best opportunity for extracting unjust and unreasonable rates and therefore, made them subject to potential [*56] refunds.

The Competitive Suppliers Group petitions for review of FERC's decision to include OOM sales into the Cal-ISO because (1) FERC made no express finding that the rates charged for OOM sales were unjust and unreasonable and (2) the Remedy Proceedings had been limited since their inception to the Cal-ISO/CalPX single-price auction market. We deny this petition for review.

### A

[HN10] *Section 206(a)* of the Federal Power Act requires that before FERC can exercise its remedial power to mitigate an existing rate, it must find an existing rate "unjust, unreasonable, unduly discriminatory or preferential." *16 U.S.C. § 824e(a); Fed. Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 353, 76 S. Ct. 368, 100 L. Ed. 388 (1956).* The Competitive Suppliers Group argues that although FERC made a finding that prices within the auction markets were unjust and unreasonable, they never made such a finding with respect to OOM sales to Cal-ISO.

In its July 25, 2001 Order, FERC adopted the MMCP to calculate just and reasonable rates for Cal-ISO and CalPX. The MMCP was the benchmark for determining the amount of refunds that sellers had to pay -- FERC simply looked at their [*57] transactions during the refund period then ordered them to pay the difference between the rate and the MMCP.

Application of the MMCP *was* a determination that a rate was unjust and unreasonable. As FERC explains in its brief,

[B]ecause the conditions under which [Cal-ISO] OOM spot transactions were entered into made it likely that the rates for those transactions were unjust and unreasonable, FERC required that all transactions be examined to decide which ones would be subject to refund. . . . [A] market-wide mitigation methodology was needed in the [Cal-ISO] and CalPX auction markets because systemic dysfunctions caused by structural problems in those markets had the potential to cause unjust and unreasonable rates 'independent of any conclusive showing of a specific abuse of power.' In addition, a showing of market power abuse is not a prerequisite for finding %rates are outside the zone of reasonableness and, therefore, unjust and unreasonable.

FERC Br., citing July 21, 2001 Order.

FERC's analysis of this issue is correct. The Federal Power Act does not require the detailed individualized finding that Competitive Suppliers Group requests, nor does [*58] it require a showing of market power abuses, and no court has held that it does.

FERC found that there was systemic dysfunction in the wholesale energy market and that, during the time that Cal-ISO was making OOM purchases, it was in an emergency must-buy situation, which gave the seller seven greater market power, and thus increased the likelihood that the rates were unjust and unreasonable. These facts constituted a sufficient finding that the rates were unjust and unreasonable. FERC was not required to make an additional individualized finding, in addition to the imposition of the MMCP, that rates for Cal-ISO OOM transactions were unjust and unreasonable.

**B**

Contrary to the Competitive Suppliers Group's argument, the Remedy Proceedings were not limited to the Cal-ISO and CalPX single-price auction markets. First, nothing in the language of the August 2, 2000 complaint or early orders necessarily limited the Remedy Proceedings to the Cal-ISO and CalPX in-market transactions. Indeed, the SDG&E complaint was "directed against all sellers in the ISO and PX markets." FERC did not add the Cal-ISO OOM transactions to the proceeding. Rather, it clarified in its orders that the transactions [*59] were encompassed in the scope of the SDG&E complaint proceeding.

Second, FERC offered a sufficient explanation as to why the Cal-ISO OOM transactions were subject to re-

funds, namely that the purchases, like in-market purchases, were made to "procure the resources necessary to reliably operate the grid." July 25, 2001 Order, *96 F.E.R.C. P61120 at 61,515.* Therefore, there was no meaningful distinction to be drawn between the in-and out-of-market transactions. FERC further noted that the Cal-ISO OOM transactions were contemplated in the Cal-ISO tariff as a backstop to the Cal-ISO auction market.

The Competitive Suppliers Group points out that OOM transactions made by Cal-ISO are fundamentally different from those made in the Cal-ISO market. Certainly, there are significant differences. The OOM transactions at issue here were bilaterally negotiated sales of power at different prices than the market clearing price established in the auction market. However, as FERC points out, these bilateral transactions were closely intertwined with the Cal-ISO single price auction spot market because manipulation of the single price auction market could create artificial market forces, making it probable [*60] that rates charged in the OOM transactions were unjust and unreasonable. Although different in form, both the single price auction purchases and Cal-ISO OOM purchases occurred in the same market, so the structural flaws that allowed unjust and unreasonable prices to be charged in the single-price auction also allowed unjust and unreasonable prices to be charged in the Cal-ISO OOM transactions. Given this structural relationship, it was reasonable for FERC to examine those Cal-ISO OOM transactions that were affected by the manipulated market conditions and order refunds when appropriate.

It is also significant to note that FERC did not order refunds for all Cal-ISO OOM transactions. Rather, FERC ordered all Cal-ISOOOM spot transactions to be examined to decide which ones would be subject to potential refund. [HN11] An agency's discretion is at its zenith when it is "fashioning [] policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives." *Niagara Mohawk Power Corp. v. FPC, 126 U.S. App. D.C. 376, 379 F.2d 153, 159 (D.C. Cir. 1967).* Given this level of deference, [*61] coupled with FERC's reasoned explanation of its decision, we conclude that FERC did not act arbitrarily, capriciously, or in abuse of its discretion when it included the Cal-ISO OOM transactions in the Remedy Proceedings.

**V**

**Non-Emergency Hours Transactions**

**A**

In its initial mitigation orders, FERC limited price mitigation only to "emergency hours" when supply was deficient and suppliers knew that their bids, however high, would be accepted. June 19, 2001 Order, *95 F.E.R.C. P61418 at 62,546-62,547.* FERC believed that during hours when there were sufficient energy reserves to ensure that the Cal-ISO controlled grid would remain reliable, called "non-emergency hours," suppliers would be motivated to bid competitive prices. FERC reasoned that with excess supplies in the market, suppliers would bid competitively because they ran the risk that their bids would not be accepted. *See id. 95 F.E.R.C. P61418 at 62,547.*

Overtime, however, FERC observed that because energy supply was generally low, suppliers could count on their bids being accepted in both emergency and non-emergency hours. So, the incentive to bid high prices was as evident during non-emergency hours as it was during emergency [*62] hours. *See* December 19, 2001 Order, *97 F.E.R.C. P61275 at 62,247* ("[D]uring non-emergency periods where there were no excess supplies in the market and all suppliers would be dispatched, the incentive to bid high prices remained."). Although FERC's targeted remedies had improved the wholesale power market to some extent, *see* June 19, 2001 Order, *95 F.E.R.C. P61418 at 62,546*, the market remained generally dysfunctional, *id. at 95 F.E.R.C. P61418 at 62,556.*

Thus, in an attempt to provide "the incentives needed to correct the [remaining] market dysfunctions," FERC expanded the market monitoring and mitigation plan to address all operating hours. *Id. 95 F.E.R.C. P61418 at 62,547.* FERC implemented prospective relief for non-emergency hours by modifying the formula it had used to set the market clearing price in emergency hours. *Id. 95 F.E.R.C. P61418 at 62,558.* Recognizing that rates should decrease in non-emergency hours due to an increase in supply, FERC set the market clearing price for non-emergency hours at 85 percent of the market clearing price established during the last system emergency. *Id. 95 F.E.R.C. P61418 at 62,548.* FERC would permit a higher bid only if justified by the supplier. *Id. 95 F.E.R.C. P61418 at 62,558.* FERC's intention [*63] was to "emulate . . . a competitive market," and "prevent possible abuses that could lead to unjust and unreasonable rates." *Id. 95 F.E.R.C. P61418 at 62,558.*

In its July 25, 2001 Order, FERC declined to order refunds because it felt that an evidentiary hearing was necessary to resolve "material issues of fact" before deciding whether to order a refund July 25, 2001 Order, *96 F.E.R.C. P61120 at 61,519-61,520.* FERC ordered Cal-ISO to apply the MMCP to each operating hour and report the data to an ALJ. *Id. 96 F.E.R.C. P61120 at 61,520.* FERC then directed the ALJ to

make findings of fact with respect to: (1) the mitigated price in each hour of the refund period; (2) the amount of refunds owed by each supplier according to the methodology established herein; and (3) the amount currently owed to each supplier (with separate quantities due from each entity) by the ISO, the investor owned utilities, and the State of California.

*Id.*

FERC explained that its decision to review rates in all operating hours was based on its original finding of systemic market dysfunction, which "was not limited to reserve deficiency periods." December 19, 2001 Order, *97 F.E.R.C. P61275 at 62,246.* Referencing the finding [*64] in its November 1, 2000 Order that the market was structurally flawed, FERC stated: "We determined that structural problems, which existed in all hours, had the potential to cause market prices to exceed that which one would expect in a competitive market. While our solution requires review for all hours, that does not mean that this will result in refunds for all hours." *Id.*

The Competitive Suppliers Group petitions for review of FERC's decision to apply the MMCP to non-emergency operating hours. It argues that FERC's decision to order mitigation for non-emergency hours was arbitrary and capricious because FERC did not expressly find that rates during non-emergency hours were unjust and unreasonable.

**B**

As we have noted, before FERC can exercise its remedial powers under *FPA § 206*, it must find that the rate at issue is unjust and unreasonable. *16 U.S.C. 824e(a).* The Competitive Suppliers Group attacks the adequacy of FERC's general finding of systemic market dysfunction, arguing that it did not satisfy the condition precedent to § 206(a) authority.

The Competitive Suppliers Group claims that FERC was required to make explicit findings that specific [*65] rates charged in each operating hour were unjust or unreasonable. However, as we have noted, no such requirement exists. [HN12] FERC "may rely on 'generic' or 'general' findings of a systemic problem to support imposition of an industry-wide solution." *Interstate Natural Gas Ass'n of Am. v. FERC, 350 U.S. App. D.C. 366, 285 F.3d 18, 37 (D.C. Cir. 2002).* "[P]roportionality between the identified problem and the remedy is the key." *Id.*

To be sure, if FERC found isolated problems within the wholesale electric energy market, its market-wide remedy would have been inappropriate. *See Assoc. Gas Distribs. v. FERC, 263 U.S. App. D.C. 1, 824 F.2d 981, 1019 (D.C. Cir. 1987)* ("Neither *Wisconsin Gas* nor any other case of which we are aware supports an industry-wide solution for a problem that exists only in isolated pockets. In such a case, the disproportion of remedy to ailment would, at least at some point, become arbitrary and capricious."). However, faced with a market plagued by structural problems and operating under "seriously flawed" rules, FERC could have reasonably considered a market-wide remedy necessary.

FERC's response was proportional to the identified problem: [*66] It ordered wholesale review of a market that it had identified as wholly dysfunctional. Moreover, the method FERC used to review the system resulted in an individualized analysis of the rates charged in each operating hour. FERC explained that its expansion of mitigation measures over time was a reflection of both the "rapidly changing circumstances" during the refund period and its attempt to balance competing interests while fulfilling its FPA obligations:

> In response to [its November 1 dysfunctional market] findings, the Commission has sought to intervene in markets in as limited a manner as possible consistent with its responsibilities to ensure just and reasonable rates under the FPA, to rely on market principles whenever it can, and to balance carefully the need for price relief against the need for price signals to attract critical supply entry.

December 19, 2001 Order, *97 F.E.R.C. P61275 at 62,246.*

Given all of these considerations, we cannot say that FERC's decision to include non-emergency hours transactions in its market mitigation orders was arbitrary, capricious, or an abuse of discretion.

## VI

### Spot Market Limitation (24-Hour Limit)

[*67] A

In it July 25, 2001 Order, FERC restricted the refund proceedings to "spot transactions in the organized markets operated by the ISO and PX during the [Refund Period]." July 25, 2001 Order, *96 F.E.R.C. P61120 at 61,499.* In its June 19 Order, it defined the spot market at issue as constituting "sales that are 24 hours or less and

that are entered into the day of or day prior to delivery." June 19, 2001 Order, *95 F.E.R.C. P61418 at 62,545.* By these two orders, FERC excluded sales made in the Cal-ISO and CalPX spot markets of greater than 24 hours. Although this limitation was made without explanation, it apparently was based on FERC's construction of the original SDG&E complaint. The California Parties petition for review of this limitation. n7

> n7 As a threshold matter, FERC argues that the California Parties' and Cal-ISO's arguments are procedurally defaulted because they were not raised on rehearing. [HN13] *16 U.S.C. § 825l(b)* provides that a party may obtain review in this court by filing a petition" within sixty days after the order of the Commission upon the application for rehearing." We, however, cannot consider an objection "unless such objection shall have been urged before the Commission in the application for rehearing." *Id.* In their multiple requests for rehearing of FERC's orders, the California Parties fairly raised objections to FERC's limitation of price mitigation to the Cal-ISO real-time market, and its limitation of refunds to "spot sales." Thus, FERC had the opportunity to address the California Parties' challenges and we have jurisdiction to consider FERC's limitation. *See Transmission Access Policy Study Group, 225 F.3d at 685 n. 4.*

[*68]

In order to analyze this issue properly, a brief procedural review is appropriate. In the original complaint, SDG&E asked FERC to put a price cap on all sales into the Cal-ISO and CalPX markets and urged FERC to enter into a "full examination of the reasons why the ISO/PX markets are not workably competitive." In its August 23, 2000 Order, FERC instituted hearing proceedings to "detect and . . . to resolve as expeditiously as possible, any defects in the operation of competitive power markets in California." *92 F.E.R.C. P61172 at 61,603.*

Although FERC mentioned the "spot market" in the body of its August 23 order, it did not explicitly define spot transactions or limit its investigation to transactions of a certain length. *See id. 92 F.E.R.C. P61172 at 61,605, 61,607.* FERC did inform interested parties that it may "further refine" or "narrow the focus" of the hearing after it reviewed its own staff's investigative findings. *See id. 92 F.E.R.C. P61172 at 61,603, 61,609.*

On November 1, 2000, after FERC's staff issued its findings, FERC issued an order identifying serious market flaws that had caused and "ha[d] the potential to cause, unjust and unreasonable rates for short-term en-

ergy (Day-Ahead, Day-of, Ancillary [*69] Services and real-time energy sales) under certain conditions." November 1, 2000 Order, *93 F.E.R.C. P61121 at 61,349.* FERC proposed remedies designed to "facilitate forward contracting" and discourage an "over reliance on spot markets." *Id. 93 F.E.R.C. P61121 at 61,359.*

On December 15, 2000, FERC again stressed that high prices were mostly due to over-reliance on short-term contracts, and encouraged market participants to acquire both short-term and long-term contracts. December 15, 2000 Order, *93 F.E.R.C. P61294 at 61,993-61,994.* Although market participants expressed concerns that long-term contracts would be affected by the "spiraling spot prices" from the previous summer, FERC assured them that it would "monitor prices in [long-term] markets and also adopt a benchmark that we will use as a reference point in addressing any complaints regarding the pricing of long-term contracts negotiated over the next year." *Id. 93 F.E.R.C. P61294 at AP 61,994.*

FERC first explicitly limited refunds to spot markets in its July 25, 2001 Order, stating,"[t]he Commission makes clear that transactions subject to refund are limited to spot transactions in the organized markets operated by the ISO and PX during the [refund period]. [*70] " July 25, 2001 Order, *96 F.E.R.C. P61120 at 61,499.* FERC used the same description for "spot market" as it had in its June 19 order. *Id. 96 F.E.R.C. P61120 at AP 61,515-61,516.*

In contesting this limitation, the California Parties offered testimony from economist Dr. Peter Fox-Penner and Director of Market Monitoring and Analysis for Southern California Edison Dr. Gary A. Stern to support their claim that sellers manipulated both short-term energy markets and forward markets and succeeded in raising rates above just and reasonable levels in both. Dr. Fox-Penner testified that sellers had purposefully manipulated short-term energy markets to cause an increase in forward rates by withholding supply from the short-term market, forcing Cal-ISO to buy necessary energy outside of the spot market at higher prices and for longer contract periods. Dr. Stern testified that if the MMCP mitigation method were applied to Cal-ISO's forward contracts, refunds would exceed $ 54.5 million.

Despite this testimony, FERC continued to limit refunds to "spot market" transactions as described in its June 19, 2001 order. *See March 26, 2003 Order, 102 F.E.R.C. P61317 at 62,084.* The California Parties requested rehearing [*71] of FERC's decision, arguing that after they had submitted additional evidence showing that the sellers' insistence on longer duration sales was often an element of the exercise of market power, and that FERC should have reconsidered its decision to exclude forward contracts from the monitoring and mitiga-

tion plan. The California Parties argued that FERC should include in the Remedy Proceedings all sales up to one month in duration. FERC responded on October 16, 2003, by rejecting the California Parties' arguments as being "identical to those they have already raised," and stating that it had "already thoroughly considered and rejected" the same arguments. *San Diego Gas & Elec.. Co.. 105 F.E.R.C. P61066 at 61,365.*

**B**

FERC's primary reason for excluding the forward market transactions is that, in its view, these transactions were not included in the original SDG&E complaint. It notes that its § 206 refund authority "is discretionary and limited to those rates challenged as the subject of a proceeding." Thus, FERC argues that it was prevented from mitigating forward transactions because the original complaint limited the scope of the proceeding to only "spot market" [*72] transactions.

The record does not support FERC's conclusion. The original complaint explicitly referred to both short-term and forward sales in the Cal-ISO and CalPX markets. SDG&E expressed concern about the "day-ahead, hour-ahead, and block forward markets conducted by the PX." The complaint clearly challenged rates for forward transactions, asserting that "until workable competition is established, supply bids into the California *forward and real-time markets* should be capped at $ 250 per Mwh." (emphasis added). The complaint logically did not reference sales outside the ISO and PX's formal markets because SDG&E was, at that time, required to purchase energy through the formal spot markets. However, within that limitation, SDG&E cast as wide a net as possible, including challenging those forward transactions it was allowed to enter. The original complaint did not limit FERC's section 206 refund authority to only "spot market" transactions. Thus, the primary reason given by FERC for excluding the transactions is without adequate foundation in the record.

FERC does not offer any other justification for excluding the transactions. Significantly, even in the face of new evidence [*73] concerning forward markets, FERC simply reiterated that the issue was outside the scope of the original complaint. FERC's failure to even address the additional evidence is another reason that we reject its exclusion of these transactions.

FERC initially thought spot prices would discipline forward prices, and that more forward contracting was the answer to the market dysfunction. Thus, early in the Remedy Proceedings, FERC focused its mitigation measures on short-term sales and actually encouraged market participants to acquire more forward contracts. *See December 15, 2000 Order, 93 F.E.R.C. P61294 at 61,993-61,994.* However, later evidence suggested that

forward prices had not been reigned in by FERC's mitigation of the spot markets, and that sellers had successfully manipulated forward markets to raise prices.

In denying rehearing of its continued exclusion of forward transactions, FERC did not explain why the new evidence had no effect on its decision. *See 105 F.E.R.C. P61066 at 61,365- 61,366.* FERC merely referenced its previous explanation, from its December 19, 2001 Order, in which it found that only the rates in "spot markets" were potentially unjust and unreasonable. [*74] However, FERC issued that order *before* the California Parties had offered additional evidence to support their claim. FERC never explained why the additional evidence did not affect its decision to limit mitigation procedures to only "spot market" transactions.

[HN14] We should uphold FERC's decision if its path to making that decision "may reasonably be discerned." *See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.* However, it is difficult, if not impossible, to discern FERC's analytical path here, particularly when its decision is viewed in light of its simultaneous decision to expand mitigation measures to include other previously excluded categories of transactions.

For instance, FERC expanded its mitigation measures to include non-emergency hours, even though it had earlier believed that rates in non-emergency hours would be sufficiently disciplined by its mitigation measures in emergency hours. *See December 19, 2001 Order, 97 F.E.R.C. P61275 at 62,247.* FERC later recognized new evidence that refuted its earlier belief and acted accordingly, expanding its mitigation measures to include all operating hours. When sellers argued against this expansion, FERC responded: [*75]

> As Commission orders are not final while subject to rehearing, and rehearing was requested of all orders in this proceeding, the mitigation measures and related procedures implemented in those orders were subject to adjustment or replacement. Sellers could not reasonably have expected therefore, that the mitigation measures and related procedures implemented in earlier orders in this proceeding would remain unchanged during the rehearing process.

*Id. 97 F.E.R.C. P61275 at 62,218.*

FERC's explanation applies with equal force here. Throughout the proceedings, FERC emphasized that it was engaged in a continuing examination of all market forces. Its investigation was not static and yet it proffered no reason for rejecting the new evidence that suggested that the forward market was affected by market manipulation that may have produced unjust and unreasonable rates. When faced with a similar situation in which FERC acted differently in two related situations without offering a reasoned explanation, we have granted a petition for review. *See Cal. Dep't of Water Res. v. FERC, 341 F.3d 906, 910 (9th Cir. 2003).*

FERC's decision to foreclose relief in the forward markets cannot [*76] be sustained. Its cramped reading of the original SDG&E complaint is not supported by a close examination of the record, and FERC does not offer any other explanation for its decision. In view of the evidence tendered by the California Parties that sellers manipulated both the short term and long term spot markets, FERC's limitation of remedy without a reasonable explanation was arbitrary, capricious, and an abuse of discretion. n8

> n8 The Public Entities argue that FERC erred in finding that some of the Public Entities' transactions with Cal-ISO were spot market transactions -- not multi-day transactions -- and thus subject to refunds pursuant to FERC's orders. The California Parties have moved to strike this contention because it involves implementation questions not appropriate for this phase of the proceedings. Given our decision that the forward market transactions are subject to refund liability, the issues raised by the Public Entities are likely moot. However, to the extent that any issues remain, we grant the California Parties' motion because the questions raised by the Public Entities are fact-specific inquiries as to the nature of particular transactions that are appropriately considered in conjunction with implementation issues.

[*77]

VII

YEnergy Exchange Transaction

A

Exchange transactions involved two different sellers. The first seller, the "Exchange Seller," agreed to provide Cal-ISO with energy in exchange for an in-kind return of the same amount of energy plus an additional agreed-upon amount. *See March 26, 2003 Order, 102 F.E.R.C. P61317 at 62,083-62,084.* Cal-ISO then purchased energy from the second seller, the "Spot Seller," on the spot market and used that energy to pay back the Exchange Seller. In a typical exchange transaction, an Exchange Seller would provide Cal-ISO with one unit of power in

exchange for Cal-ISO's promise to return two units of power at a later time. Cal-ISO would use the one unit of power to supply its power grid. Then Cal-ISO would buy two units of power from a Spot Seller in order to pay back the Exchange Seller. Exchange transactions had varying return ratios. At times, the parties agreed that Cal-ISO must return the energy in "like time," for instance in "on-peak" hours.

Cal-ISO's purchases on the spot market were mitigated when FERC ordered Spot Sellers to refund amounts they had charged in excess of the MMCP. *See id. 102 F.E.R.C. P61317 at 62,084.* However, FERC [*78] declined to include Exchange Sellers in the Refund Proceedings.

The California Parties and Cal-ISO challenge the exclusion of Exchange Sellers, contending that they also should be liable for refunds because they used exchange transactions to exert market power by demanding exorbitant exchange ratios. The California Parties' witness, Dr. Carolyn Berry, an independent economic consultant and former FERC economist, testified in support of their claim that Exchange Sellers had violated the Federal Power Act. Dr. Berry testified that "return ratios were excessively high." She suggested that Exchange Sellers "may have been hoping to avoid refund liability by making sales in-kind rather than for explicit monetary payment." Dr. Berry noted that some of the sellers' internal emails supported her conclusion that those sellers were aware that using in-kind exchanges was a way for them to avoid FERC's scrutiny.

Economist Dr. Peter Fox-Penner also testified on behalf of the California Parties regarding exchange transactions. He testified that "[t]here is no economic difference to a buyer between paying for a power purchase in dollars and paying for it in a commodity whose price is well-established [*79] in dollars in the marketplace. . . . [thus], there is no economic basis for excluding such transactions from mitigation."

The Public Entities argue that Cal-ISO actually benefitted from exchange transactions because the Exchange Sellers offered desperately needed flexibility in a crisis situation. In support of their claim, the Public Entities referred to a *Wall Street Journal* article in which Cal-ISO Vice President Jim Detmers was described as praising exchange transactions because they were "a good deal" for California and "might even have saved [the state] money because daily peak prices were sometimes more than twice the off-peak prices the ISO paid for BPA's replacement power."

In its March 26, 2003 Order, FERC held that it would not subject the Exchange Sellers to refund liability for exchange transactions. The primary reason given by FERC in excluding Exchange Sellers from the Refund Proceedings was the difficulty in calculating a refund. March 26, 2003 Order, *102 F.E.R.C. P61317 at 62,084.*

**B**

FERC improperly excluded the Exchange Sellers from the refund proceeding. [HN15] There is no doubt that energy exchanges are considered sales, subject to FERC's jurisdiction. [*80] *18 C.F.R. § 35.2(a).* By refusing relief simply because the calculation was difficult, FERC abandoned its duty under the Federal Power Act to ensure just and reasonable rates. *See 16 U.S.C. § 824d(a).* As we have previously stated, [HN16] "[t]he FPA cannot be construed to immunize those who overcharge and manipulate markets in violation of the FPA." *Lockyer, 383 F.3d at 1017.* FERC is obligated to protect consumers from unjust or unreasonable rates, charges, or classifications, and any rules, regulations, practices, or contracts affecting such rates, charges or classifications. *See 16 U.S.C. § 824e(a).* Nothing in the Federal Power Act limits its application to those transactions that are easy to value. Although multiple variables may make certain transactions difficult to analyze, consumers must still be assured that those transactions are just and reasonable.

FERC's approach to the exchange transactions created a loophole through which Exchange Sellers could exercise market power and manipulate the energy market without being subjected to the requirements of the Federal Power Act. FERC's failure [*81] to exercise its broad remedial discretion to analyze exchanges of power during the Refund Period and address any unjust and unreasonable practices was arbitrary and capricious, and an abuse of discretion.

FERC argues that it is impossible to determine whether the Exchange Sellers demanded unjust and unreasonable exchange ratios because there is no way to assign a monetary value to exchange transactions. FERC claims that, because exchange transactions involved multiple variables like the shortage of hydro-electric generation power in the Pacific Northwest, it cannot determine whether Exchange Sellers demanded and received value in excess of what would have been just and reasonable under the circumstances. However, FERC did not conduct a specific analysis to conclude that the rates were just and reasonable, given the variables, nor did it make a finding that the variables showed that the rate was just and reasonable. FERC simply concluded that the calculation was too difficult.

The challenge of monetizing the transactions does not give FERC a safe harbor to throw up its hands and say it can't be done. Significantly, FERC did not provide a reasoned explanation of impossibility, only [*82] a conclusory observation of difficulty. But saying so doesn't make it so. Constructing a methodology did not prove

too taxing for the California Parties, who tendered a mitigation methodology for examining the Exchange Sellers' transactions. FERC rejected the California Parties' proposed mitigation method because it did not account for all relevant variables. *See* March 26, 2003 Order, *102 F.E.R.C. P61317 at 62,084* ("The CA Parties' request to reform the exchange ratio completely ignores the severe energy shortfall in the Pacific Northwest, where most of these energy exchange transactions originated, during the 2001 time period.").

The fact that FERC was dissatisfied with the California Parties' proposed mitigation method does not justify its decision to exclude Exchange Sellers from the refund proceeding on a categorical basis. [HN17] FERC's own precedent shows that when parties have failed to propose an acceptable mitigation method, it may fashion a method on its own. *See In re Green Mt. Power Corp., 61 F.E.R.C. P61203 (1992)* (using the value of a contemporaneous cash sale from the same power unit to value an exchange of capacity for purposes of ordering a refund).

FERC also argues [*83] that because the energy exchanges were conducted over periods greater than 24 hours, the transactions cannot be considered spot market transactions subject to mitigation. However, we have already rejected this argument as a general matter, so it does not afford FERC a valid basis for excluding the transactions at issue here.

In sum, because FERC did not articulate a valid basis for excluding the energy exchange transactions from the Refund Proceedings, we conclude that its action was arbitrary, capricious, and an abuse of discretion.

## VIII

### Sleeve Transactions

"Sleeve transactions" were used when the investor-owned utilities were on the brink of insolvency and credit problems began to limit the ability of the investor-owned utilities to purchase power. As FERC described it:

A "sleeve" transaction involves three parties: a seller, a purchaser and a creditworthy third party "sleever" or "sleeving party" who provides the financial underpinnings for the transaction. Thus, if either party to a transaction determines that it cannot buy from or sell to its commercial counterparty due to concerns about the other party's creditworthiness, the sleeving party steps in to [*84] provide the necessary financial backing so that the transaction can go forward.

*San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv. Into Mkts. Operated by the Cal. Indep. Sys. Operator Corp., 107 F.E.R.C. P61165 at 61,640.*

To obtain adequate supplies of energy to continue to power the grid, Cal-ISO entered into transactions whereby sleeving parties would buy power directly from energy sellers and then resell the power to Cal-ISO at a premium to reflect the credit risk.

Cal-ISO decided that certain sleeve transactions should not be subject to mitigation, but the ALJ reached the opposite conclusion. After considering the ALJ report, FERC determined that the sleeve transactions should be subject to mitigation; in other words, those transactions should not be excluded from potential refund liability. FERC concluded that the sleeve transactions were similar to other sales and that the sleeving parties assumed the same risks of making spot energy sales to Cal-ISO, including the risk of refund liability. Therefore, FERC adopted the ALJ's findings and included the sleeve transactions as part of the refund proceedings. The Public Entities now petition for review of that decision, arguing that sleeve transactions were individually negotiated transactions [*85] outside the scope of the Remedy Proceedings. n9

n9 The California Parties moved to strike the portion of Public Entities' briefs addressing sleeve transactions, and El Paso Merchant Energy moved to defer consideration of sleeving issues. Both parties argue that consideration of sleeving is an issue of implementation, not an issue of scope, and therefore belongs in the next round of briefing. However, there is no principled way to distinguish a hypothetical exemption for sleeve transactions, as a distinct category, from the exemptions or non-exemptions FERC has considered, and we are now considering, for OOM, energy exchange, forward market, and other categories of transactions. Sleeve transactions appear to be a distinct category, subject to the same type of analysis as the other issues. We therefore deny the California Parties and El Paso Merchant Energy's motions as to sleeve transactions and consider the merits of Public Entities's claim that sleeve transactions as a category should have been exempted. However, to the extent that the Public Entities are raising fact-specific issues related to implementation, as opposed to a categorical challenge, we grant the California Parties' motion.

[*86]

The Public Entities contend that the sleeve transactions should not be included in the refund proceedings because the sleeving parties merely acted as financial intermediaries and facilitators. In their view, the sleeve transactions were individually negotiated transactions that did not take place in the single-price auction market. FERC contends that the parties saw the sleeve transactions as comprising two sales: one from the supplier to the sleeving party and the second from the sleeving party to Cal-ISO. In FERC's view, the sleeving parties were subject to Cal-ISO rules because all sellers in the Cal-ISO market had the responsibility to comply with market rules and the tariff. The final transaction of the two-step process occurred, according to FERC, in the Cal-ISO market.

The record supports FERC's conclusion. All sleeve transactions that are subject to challenge here occurred as spot market transactions in the Cal-ISO market. The fact that the sleeving parties received a risk premium does not relieve them from liability if, independent of the risk premium, they charged an unjust and unreasonable rate in the spot market, which was part and parcel of the Cal-ISO market. Thus, [*87] FERC did not act arbitrarily or capriciously, or abuse its discretion in including the sleeve transactions in the refund proceeding.

## IX

### California Energy Resources Scheduling ("CERS") Division Transactions

#### A

In its December 8, 2001 Order, FERC lifted the Cal-ISO price caps, hoping to attract more supply into the auction markets. December 8, 2000 Order, *93 F.E.R.C. P61239.* In its December 15, 2001 Order, FERC eliminated the requirement that the investor-owned utilities buy and sell all energy through CalPX. December 15, 2001 Order, *93 F.E.R.C. P61294.* As we have discussed, when these remedies did not stem the rise of electricity prices, and the investor-owned utilities were on the brink of insolvency, Governor Davis ordered CERS to enter into contracts to buy power directly on behalf of California consumers. These purchases were made in bilateral contracts outside the CalPX and Cal-ISO markets and totaled more than $ 5 billion of purchases.

On March 1, 2001, the Cal-EOB filed a motion with FERC, asking FERC to clarify that the Remedy Proceedings included CERS transactions. FERC denied the motion, concluding that the bilateral transactions were entered into outside [*88] the CalPX and Cal-ISO markets, and therefore, were outside the scope of the Remedy Proceedings. In its order, FERC noted that "if DWR or another party believes that any of its contracts are unjust

or unreasonable, it may file a complaint under *FPA Section 206 . . . ."* CPUC and Cal-EOB filed such complaints, which are the subject of separate petitions for review before this Court. *See Pub. Utilis. Comm'n of State of Cal. et al. v. FERC,* nos. 03-74207, et al. In this case, the California Parties petition for review of FERC's decision to exclude the CERS transactions from the Remedy Proceedings, and the various FERC orders denying rehearing. We conclude that FERC's decision to exclude the CERS transactions was not arbitrary, capricious, or an abuse of discretion.

#### B

[HN18] One of the fundamental tenets in FERC jurisprudence is the rule against retroactive ratemaking. *Ark. La. Gas Co. v. Hall, 453 U.S. 571, 578, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981).* This theory underpins the limitations on FERC's remedies under *§ 206* to the post-complaint period. *§ 824e(b). Consol. Edison Co. of N. Y., Inc. v. FERC, 358 U.S. App. D.C. 239, 347 F.3d 964, 967 (D.C. Cir. 2004).* [*89] If FERC finds a rate unjust and unreasonable pursuant to a *§ 206* complaint, it must order imposition of a just and reasonable rate; however, the refund is limited to periods subsequent to the "refund effective date" established by FERC, which must be at least sixty days after the filing of the complaint. *Id.* By this procedure, once a complaint is filed, sellers are on notice that their sales may be subject to refund.

Thus, [HN19] while FERC has considerable latitude in fashioning *§ 206* relief, the remedies afforded pursuant to a third party *§ 206* complaint must have a sufficient nexus to the substantive allegations of the complaint so that market participants are placed on notice that they are at risk for sales made after there fund effective date. We have already concluded that the substantive allegations of the SDG&E complaint were sufficient to put sellers on notice that the OOM, non-emergency, energy exchange, and sleeve transactions might be subject to refund. All of these transactions were directly associated with the CalPX and Cal-ISO markets. However, the bilateral CERS transactions occurred in a different market -- one that did not even exist when the SDG&E complaint was [*90] filed. Thus, neither the SDG&E complaint nor the subsequent actions by FERC in establishing the Remedy Proceedings were sufficient to put participants in the CERS transactions on notice that their sales might be subject to refund.

There are fundamental differences between the CalPX/Cal-ISO markets and the bilateral contracts negotiated by CERS. As we have discussed, the CalPX and Cal-ISO markets were centralized, single-price, auction markets, involving multiple participants. In contrast, the CERS transactions were two-party contracts of varying

prices, terms and duration that were mutually negotiated -- ostensibly at arms-length-outside the CalPX and Cal-ISO markets. Unlike the Cal-ISO OOM and sleeve transactions that we have concluded were properly considered in the Refund Proceedings, the CERS transactions occurred in a market that was not directly influenced by the market manipulations in the Cal-ISO and CalPX spot markets. The record reflects no direct nexus between the CERS bilateral transactions and the CalPX and Cal-ISO spot markets.

Given these differences, and the fact that the entire focus of the SDG&E complaint and FERC's orders creating the Remedy Proceedings were directed [*91] at the CalPX and Cal-ISO markets, it is clear that the substantive allegations of the SDG&E complaint did not bear a sufficient nexus to the bilateral CERS transactions to afford parties to the CERS contracts sufficient notice that their sales might be subject to refund.

Indeed, when the SDG&E complaint was filed, the investor-owned utilities were required to conduct all of their sales and purchases through the CalPX and Cal-ISO markets. It was not until FERC's December 15, 2000 Order, some six months after the filing of the SDG&E complaint, that investor-owned utilities were free to conduct energy transactions outside the CalPX and Cal-ISO markets. And, it was not until January, 8, 2001 that CERS began to make its purchases.

Thus, FERC concluded that:

> DWR transactions are negotiated bilateral contracts for the procurement of energy on behalf of California [investor-owned utilities], and are distinctly beyond the realm of ISO and PX centralized market operations that have been the subject of this proceeding since its inception . . . . No party could reasonably have believed that the Commission intended the proceeding to be broader.

December 19, 2001 Order, [*92] 97 F.E.R.C. P61275 at 62,195.

We agree with FERC's analysis. Because the SDG&E complaint was not sufficient to put the CERS transaction participants on notice, expanding the Refund Proceeding to include the CERS transactions would violate the rule against retroactive rate making.

The California Parties argue, with considerable force, that unjust and unreasonable rates were charged in the CERS transactions and that the transactions in substance were indistinguishable from transactions within the CalPX and Cal-ISO markets. However, FERC did not close the door on potential § 206 relief based on the CERS transactions; in fact, it invited aggrieved participants to file new complaints directed specifically at the CERS transactions. Thus, while the bilateral CERS transactions are beyond the scope of the Remedy Proceedings at issue here, those transactions may be the subject of other challenges, the posture and merits of which are beyond the scope of the instant case.

Given all of this, we conclude that FERC's construction of the SDG&E complaint as not including the CERS transactions was not arbitrary, capricious, or an abuse of discretion.

X

**Port of Oakland and Other Bilateral Transactions [*93]**

The Port of Oakland argues that its bilateral contracts with energy suppliers, entered into during the CERS period to meet the needs of Oakland's airport, should also be subject to the Refund Proceedings. FERC denied the request on the same basis that it denied the California Parties' entreaty to include the CERS transactions in the Refund Proceedings. The analysis of the CERS and Port of Oakland transactions is the same. We deny the petition for review filed by the Port of Oakland for the same reasons that we deny the petition by the California Parities for review of the CERS transactions.

XI

**Section 202(c) Transactions**

By December 2000, in the middle of the energy crisis, energy suppliers were reluctant to bid into the CalPX and Cal-ISO auction markets because the investor-owed utility buyers in those markets were verging on insolvency. In order to correct for this shortage of sales, Cal-ISO requested the United States Department of Energy to intervene. Pursuant to Cal-ISO's request, the Department of Energy issued a series of orders under the emergency provisions of Federal Power Act § 202(c), which required energy suppliers to sell excess available power to Cal-ISO. [*94] The Public Entities were parties to some of these sales, which were later exempted from a refund by FERC because of the fact that they were compulsory.

The Public Entities attack FERC's affirmance of the ALJ's conclusion that certain of these sales were exempt from refund liability. The California Parties have moved to strike this argument on the basis that it constitutes an implementation issue to be decided in a different phase of this case, rather than an issue that concerns the scope of the refund proceeding.

No party challenges FERC's determination that sales pursuant to § 202(c) are exempt from refund liability.

The Public Entities do not argue that § 202(c) transactions *categorically* should or should not be included in the scope of the refund proceeding. Rather, the Public Entities contest the manner in which FERC determined the definition -- the scope -- of the § 202(c) exemption. The Public Entities do not argue that any particular category or subcategory of transactions should be considered § 202(c) transactions. Instead, they take issue with the methods and information FERC uses to determine what is a § 202(c) exemption. Thus, we conclude that the § 202(c) issues [*95] raised by the Public Entities should be considered an implementation issue, rather than a scope transaction issue. Therefore, we grant the California Parties' Motion to Strike with respect to § 202(c) transactions.

## XII

### Conclusion

In general, we hold that all the transactions at issue in this case that occurred within the CalPX or Cal-ISO markets, or as a result of a CalPX or Cal-ISO transaction, were the proper subject of the Refund Proceedings. We deny the petitions for review that challenge FERC's inclusion of such transactions; we grant the petitions for review that challenge FERC's exclusion of such transactions. We deny the petitions for review that seek to expand the Refund Proceedings into the bilateral markets other than the CalPX and Cal-ISO markets. We hold that FERC properly established October 2, 2000 as the refund effective date for the § 206 proceedings. We hold that

FERC erred in excluding § 309 relief for tariff violations that occurred prior to October 2, 2000.

Specifically, we (1) deny the Competitive Suppliers Group's petition for review challenging FERC's establishment of the effective refund date; (2) grant the California Parties' petition for [*96] review of FERC's decision to exclude § 309 relief; (3) deny the Competitive Suppliers Group's petition for review challenging the inclusion of the OOM transactions in the Refund Proceedings; (4) grant the California Parties' petition for review challenging FERC's exclusion of forward market transactions from the Refund Proceedings; (5) grant the California Parties' petition for review challenging FERC's exclusion of the energy exchange transactions from the Refund Proceedings; (6) deny the Public Entities' petition for review challenging FERC's inclusion of sleeve transactions in the Remedy Proceedings; (7) deny the California Parties' petition for review challenging FERC's exclusion of the CERS transactions from the Remedy Proceedings; (8) deny the Port of Oakland's petition for review challenging FERC's exclusion of its bilateral CERS transactions from the Remedy Proceedings; and (9) grant the motion of the California Parties to exclude the Public Entities' *§ 202(c)* and challenges to the categorization of multi-day transactions from this proceeding. Each party shall bear its own costs on appeal.

PETITIONS GRANTED IN PART; DENIED IN PART; REMANDED FOR FURTHER PROCEEDINGS. [*97]

LEXSEE 2004 U.S. DIST. LEXIS 2425

In re: DIRECTV LATIN AMERICA, LLC, Debtor. RAVEN MEDIA INVEST-
MENTS LLC, Appellant, v. DIRECTV LATIN AMERICA, LLC, Appellee.

Civ. No. 03-981-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2004 U.S. Dist. LEXIS 2425; 42 Bankr. Ct. Dec. 169*

**February 4, 2004, Decided**

**PRIOR HISTORY:** [*1] Chapter 11, Bankruptcy No. 03-10805 (PJW).

**DISPOSITION:** Reversed and remanded.

**COUNSEL:** William H. Sudell, Jr., Esquire and Robert J. Dehney, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Appellant. Lawrence O. Kamin, Esquire and Alan J. Lipkin, Esquire of Willkie Farr & Gallagher LLP, New York, New York. Of Counsel.

Joel A. Waite, Esquire and M. Blake Cleary, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Appellee. Lawrence K. Snider, Esquire, Stuart M. Rozen, Esquire, Fern C. Bomchill, Esquire, and Sean T. Scott, Esquire of Mayer, Brown, Rowe & Maw LLP, Chicago, Illinois. Of Counsel.

Laura Davis Jones, Esquire of Pachulski Stang Ziehl Young Jobes & Weintraub P.C., Wilmington, Delaware. Counsel for Appellee Official Committee of Creditors Holding Unsecured Claims. Marc A. Beilinson, Esquire and Brad R. Godshall, Esquire of Pachulski Stang Ziehl Young Jobes & Weintraub P.C., Los Angeles, California. Of Counsel.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On October 24, 2003, appellant [*2] Raven Media Investments LLC ("Raven") filed this appeal from the August 22, 2003 bankruptcy court order to subordinate any claims of Raven arising from a put agreement ("the Put Agreement") between debtor-appellee DirecTV Latin America LLC ("DTLVA"). (D.I. 1) The court has jurisdiction to hear this appeal pursuant to *28 U.S.C. § 158(a)(1)*. The facts on appeal are undisputed and the issue before the court is whether the bankruptcy court erred in granting DTLVA's motion to subordinate Raven's contract claim pursuant to *11 U.S.C. § 510(b)*. Because the court concludes that Raven's claim is outside the scope of *§ 510(b)*, the bankruptcy court's decision shall be reversed.

**II. STATEMENT OF FACTS**

**A. Procedural History**

DTVLA filed a voluntary petition for under Chapter 11 of the Bankruptcy Code on March 18, 2003. That same day, DTVLA filed a motion for an order authorizing rejection of the Put Agreement and subordinating any claims arising from the Put Agreement pursuant to *11 U.S.C. § 510(b)*. (D.I. 6 at 1-10) Raven filed its objection to DTVLA's motion to reject and subordinate on April 4, 2003. On July 11, 2003, DTVLA [*3] filed a motion for summary judgment subordinating the claims, which was opposed by Raven. (Id. at 51-88) On August 6, 2003, the bankruptcy court held a hearing on the summary judgment motion and ruled from the bench, granting DTVLA's motion to reject and subordinate Raven's claim. (Id., ex. G)

**B. Factual Background**

DTVLA provides direct-to-home satellite television entertainment in Latin America. DTLVA's services are distributed in Argentina through Galaxy, a local operat-

ing company. DTVLA is a privately held company primarily owned by Hughes Electronics Corp., Inc. ("Hughes"). Raven is a wholly owned subsidiary of Grupo Clarin, Inc. ("Grupo Clarin"), an Argentine communications company.

During the period of October 30, 1997 through November 10, 2000, DTVLA and DTVLA Holdings, Inc., owned a forty-nine percent (49%) interest in Galaxy. The remaining fifty-one percent (51%) of Galaxy was then owned by Plataforma Digital, S.A. ("Plataforma"), another wholly owned subsidiary of Grupo Clarin. Due to some restructuring among Grupo Clarin subsidiaries, Plataforma's interests related to DTVLA were transferred to Raven.

As a result of conflicts between Raven and DTVLA concerning [*4] the operation of Galaxy, the companies began exploring options to terminate their joint venture. In February 2000, DTVLA expressed its interest in acquiring Raven's interest in Galaxy. In September 2000, several meetings took place between the parties and Mogan Stanley, DTVLA's financial advisor, to discuss the potential transaction. The parties negotiated a purchase price for Raven's interest in Galaxy of $ 170 million; that price was subsequently reduced to $ 169 million.

On November 10, 2000, the parties executed a stock purchase agreement ("the Stock Purchase Agreement") and the Put Agreement. (D.I. 6, ex. A) On April 30, 2001, the parties executed a limited liability company admission agreement, subsequently amended by an amended and restated limited liability agreement ("LLC Agreement"). (Id.)

Pursuant to the Stock Purchase Agreement, DTVLA purchased Raven's interest in Galaxy in exchange for a four percent (4%) membership interest in DTVLA and the rights under the Put Agreement. The percentage interest conveyed to Raven resulted from an apparent unilateral determination by DTVLA, without discussion or an independent valuation. n1

n1 If four percent (4%) reflected an accurate valuation, than Galaxy would have had a worth of approximately $ 4.25 billion, which at that time would have accounted for twenty-seven (27%) of Hughes's market capitalization. (D.I. 6 at 92)

[*5]

Under the LLC Agreement, DTVLA's interest was subject to certain restrictions including: (1) the requirement that DTVLA approve any sale of Raven's interest to a competitor; (2) a right of first refusal granted to other members on any third-party sale of Raven's interest; and

(3) drag-along rights (e.g., DTVLA's right to require Raven to sell its interest at the same time and on the same terms as the majority interest holder, provided those terms are no less than the amount of the Put Agreement). (D.I. 6, ex. A, B) Pursuant to the parties' agreements, Raven was also required to sign an irrevocable proxy in favor of the other DTVLA members with respect to any matter requiring a supermajority vote. (Id.)

The parties' agreements also exempted Raven from the DTVLA's restriction on a member's ability to pledge its interest in DTVLA, and Raven held no obligation to make capital contributions to DTVLA, and would not suffer dilution as the result of other member's contributions. (Id.) Further, Raven did not receive notice of DTVLA meetings, decisions made at those meetings, or the exercise of Raven's proxy. Raven did not receive a position on DTVLA's governing executive committee, [*6] and was not consulted in any manner with respect to DTVLA affairs.

Under the Put Agreement, Raven could exercise its option during a ten-day period in November 2003, three years after the date the agreement was executed. The Put Agreement fixed the amount DTVLA was required to pay to a base purchase price of $ 169 million, plus interest at approximately five percent (5%) per annum, for a total price of $ 194.8 million. (Id., ex. A) DTVLA's obligation to pay could also be triggered by certain accelerating events, including whether DTVLA or any of its significant subsidiaries "shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." (Id., ex. A at 7) Other accelerating events including certain DTVLA mergers or consolidations unrelated to DTVLA's financial condition.

DTVLA has stipulated, for purposes of its summary judgment motion, that a put accelerating event occurred more than two months prior to the petition date. Under the Put Agreement, the option was automatically deemed to be exercised, and any requirements of presentment, demand, protest, or similar notices were expressly waived by DTVLA. (Id. at [*7] 8) Consequently, as of January 8, 2003, Raven held a contract claim under the Put Agreement in the amount of $ 169 million exclusive of interest.

## III. STANDARD OF REVIEW

In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See *Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999)*. With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but

Case 1:06-cv-00247-JJF    Document 7-2    Filed 08/30/2006    Page 34 of 35

2004 U.S. Dist. LEXIS 2425, *; 42 Bankr. Ct. Dec. 169

Page 3

exercises 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991)* (citing *Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)).* The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo [*8] basis bankruptcy court opinions. *Former Emples. of Builders Square Retail Stores v. Hechinger Inv. Co. (In re Hechinger Inv. Co.), 298 F.3d 219, 224 (3d Cir. 2002).*

In the present case, Raven contends that the bankruptcy court committed legal error and, thus, the de novo standard of review applies.

## IV. DISCUSSION

*Section 510(b) of the Bankruptcy Code* provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

In *In re Telegroup, Inc.*, the United States Court of Appeals for the Third Circuit considered whether a post-issuance contractual breach of a stock purchase agreement is within the scope of *§ 510(b). 281 F.3d 133 (2002).* In that case, the shareholders alleged that the company had breached its contractual [*9] obligation to use good faith efforts to register the stock. Had the company done so, the shareholders might have mitigated their losses when the company began to decline.

In construing *§ 510(b)*, the Third Circuit first concluded that the statute's plain language was ambiguous. *Id. at 138.* The legislative history suggested that the congressional intent was to prevent shareholders from using allegations of securities fraud to bootstrap their claims in an effort to avoid the effect of the absolute priority rule. Otherwise, such claims might permit shareholders to

avoid the statutory design to treat shareholders as residual claimants. *Id. at 142.* As residual claimants, the Bankruptcy Code requires that shareholders bear the risk of unlawful conduct which results in a loss of share value. See *id. at 143.* Central to the Third Circuit analysis is that equity investors choose to participate in profits and, in exchange, assume the risk of business failure; this is the distinguishing factor between equity and creditors and justifies the subordination of certain claims in bankruptcy. See *at 142.*

Nonetheless, simply being a holder of equity [*10] interest would be too broad of a basis to justify subordination of claims, just as limiting subordination to only tort claims would prove too narrow. As a result, the Third Circuit applied a hypothetical securities fraud test to the shareholders' claims. See *id. at 143.* In *Telegroup*, the post-issuance breach alleged by the shareholders was the debtor's failure to use good faith efforts to register the stock. The court reasoned that the same essential claim could be brought as securities fraud if, at the time of purchase, the shareholder was told the company was using its best efforts to register the stock. In the latter case, the shareholder's claim would be subordinated. The court held that since the asserted contract claims were indistinguishable from a hypothetical securities fraud claim, they too were within the scope of *§ 510(b).* Id. The court concluded that "since claimants in this case are equity investors seeking compensation for a decline in the value of Telegroup's stock, we believe that the policies underlying *§ 510(b)* require resolving textual ambiguity in favor of subordinating claims." *Id. at 142.*

Applying the Third Circuit's [*11] hypothetical securities fraud claim test, this court concludes that the present case is distinguishable from *Telegroup* and from the scope of claims covered by *§ 510(b).* As an initial matter, the transaction's structure clearly shows that Raven did not seek to hold an equity interest in DTVLA. The transaction was structured such that Raven did not participate in the entity's management. Raven's interest was apportioned not based upon a fair valuation of DTVLA, but apparently upon an arbitrary figure. Raven was excused from capital contributions required of other LLC participants, and its interest was subject to certain restrictions on transferability. Raven did not participate in LLC management and was not informed of the business affairs of DTVLA or even the exercise of its proxy. These are not conditions consistent with a purchase of equity, and certainly not consistent with an equity investment in the amount of approximately $ 170 million. Raven's interest also received unique treatment in that it was exempt from certain member restrictions, enabling it to monetize the holdings and obtain immediate cash. Most importantly, it is indisputable that the transaction was so structured [*12] that Raven would not bear the

Case 1:06-cv-00247-JJF    Document 7-2    Filed 08/30/2006    Page 35 of 35

Page 4

2004 U.S. Dist. LEXIS 2425, *; 42 Bankr. Ct. Dec. 169

risk of illiquidity or insolvency. In sum, while Raven held equity in name, it possessed few of the characteristics consistent with that status.

The essence of the asserted claim in the present case is distinguishable from Telegroup. In that case, the contract claim could have been brought as a misrepresentation claim and the damages would be predicated upon diminished share value. *Telegroup, 281 F.3d at 143.* In contradistinction, Raven asserts a claim neither predicated upon misleading statements nor measured by diminished share value. Raven's right to payment arose without respect to actionable conduct by DTVLA, and without relation to the present value of its interest in DTVLA.

DTVLA contends that, as the Put Agreement simply gave Raven the right but not an obligation to sell its interest back to DTVLA, it participated in the profits and, therefore, falls within the scope of Telegroup. (D.I. 12 at 12) While participation in profits is a critical aspect of an equity interest, participation in the risk of loss is similarly crucial. See *Telegroup, 281 F.3d at 139-42.* In the present case, DTVLA can not reasonably [*13] assert that the transaction, as structured, was intended to expose Raven to any risk of loss. Consequently, *§ 510(b)* should not subordinate Raven's claim for payment under the Put Agreement.

To be clear, the court does not conclude that a shareholder's possession of a put option to the debtor alone relieves a holder of equity of the effect of the abso-

lute priority rule. The application, however, of a simple bright-line test is not consistent with the Third Circuit's analysis in Telegroup. See *Telegroup, 281 F.3d at 144 n.2.* Instead, Telelgroup counsels the court to consider whether subordinating the claim furthers the anti-bootstrapping intent of *§ 510(b)* so that those who have contractually accepted the risk of business failure, bear that burden in bankruptcy. In the present case, the court concludes that the purpose of *§ 510(b)* is not served by imposing the risk of business failure upon a party that unequivocally did not contract for it.

## IV. CONCLUSION

For the reasons state above, the court concludes that the bankruptcy court's decision was in error and should be reversed. An order consistent with this opinion shall issue.

## ORDER

At Wilmington, [*14] this 4th day of February, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that the August 23, 2003 bankruptcy court order in the above captioned case is reversed and remanded for disposition consistent with this opinion.

Sue L. Robinson

United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | Case No. 02-10429 (JKF) |
| KAISER ALUMINUM CORPORATION, | : | |
| et al., | : | |
| | : | |
| Debtors. | : | |
| | : | |
| PUBLIC UTILITY NO. 1 OF CLARK | : | |
| COUNTY d/b/a Clark Public Utilities, | : | |
| | : | Civil Action No. 06-247 (JJF) |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| KAISER ALUMINUM & CHEMICAL | : | |
| CORPORATION, et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Frederick B. Rosner, certify that I am not less than 18 years of age, and that service of a

copy of the **Brief of Appellant** was served on the individuals on the attached Service List in the

manner indicated.

Under penalty of perjury, I declare the foregoing is true and correct.


Dated: August 30, 2006                         /s/ Frederick B. Rosner
      Wilmington, Delaware              Frederick B. Rosner (DE 3995)
                                          Duane Morris LLP
                                          1100 North Market Street, Suite 1200
                                          Wilmington, Delaware 19801-1246
                                          Telephone:    (302) 657-4900
                                          Facsimile:    (302) 657-4901
                                          E-mail:       fbrosner@duanemorris.com

Daniel J. DeFranceschi
Kimberly D. Newmarch
RICHARDS, LAYTON & FINGER
One Rodney Square
PO Box 551
Wilmington, Delaware 19899
*Via Hand Delivery*

William A. Wood, III
Warren W. Harris
Tracy C. Temple
BRACEWELL & GIULIANI LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
*Via Regular Mail*

William P. Bowden, Esquire
ASHBY & GEDDES
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
*Via Hand Delivery*

Marla R. Eskin, Esquire
Mark T. Hurford, Esquire
CAMPBELL & LEVINE, LLC
800 King Street, Suite 300
Wilmington, DE 19801
*Via Regular Mail*

Peter Van N. Lockwood, Esquire
CAPLIN & DRYSDALE, CHARTERED
One Thomas Circle, N.W.
Washington, DC 20005
*Via Regular Mail*

Gregory M. Gordon
Daniel P. Winikka
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
*Via Regular Mail*

George H. Williams
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, DC 20006
*Via Regular Mail*

Lisa Beckerman, Esquire
Brian A. Kilmer, Esquire
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
590 Madison Avenue
New York, NY 10022
*Via Regular Mail*

Elihu Inselbuch, Esquire
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022
*Via Regular Mail*