# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PUBLIC UTILITY NO. 1 OF CLARK
COUNTY d/b/a Clark Public Utilities,

                  Appellant,

v.

KAISER ALUMINUM
CORPORATION, et al.,

                  Appellees.

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 06-247 (JJF)

Bankruptcy Case No. 02-10429 (JKF)

## BRIEF OF APPELLEES
## KAISER ALUMINUM CORPORATION, ET AL.

Dated: September 14, 2006

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR APPELLEES
KAISER ALUMINUM CORPORATION, et al.

**TABLE OF CONTENTS**

Page

NATURE OF THE CASE, COURSE OF PROCEEDINGS AND DISPOSITION BELOW ........................................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................... 3

STATEMENT OF FACTS ...................................................................................... 6

ARGUMENT ........................................................................................................ 16

    I.      STANDARD OF REVIEW ..................................................... 16

    II.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT IT HAD JURISDICTION OVER A MOTION TO DISALLOW PROOFS OF CLAIM FILED IN A PENDING BANKRUPTCY CASE ...................................................................... 17

    III.   THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THERE ARE NO GENUINE ISSUES OF MATERIAL FACT ......................................................................................... 21

    IV.   THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THE UNAUTHORIZED SALE CLAIM WAS BARRED BY RES JUDICATA ............................................................... 24

          A.    Res Judicata Applies in FERC Proceedings .................. 24

          B.    The Bankruptcy Court Correctly Determined That the Elements of Res Judicata Are Satisfied ...................... 27

    V.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THE UNREASONABLE RATE CLAIM SHOULD BE DISALLOWED ........................................................................ 37

CONCLUSION ..................................................................................................... 38

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

Abraham v. Raso,
    183 F.3d 279 (3d Cir. 1999) ................................................................17

Anderson v. Consol. Rail Corp.,
    297 F.3d 242 (3d Cir. 2002) ...................................................16, 17, 22

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ................................................................16

Astoria Fed. Sav. & Loan Ass'n v. Solimino,
    501 U.S. 104 (1991) ................................................................25

Cal. Elec. Oversight Bd.,
    114 FERC ¶ 61,003 (2006) ................................................................18

California v. Enron Corp. (In re Enron Corp.), 2005 WL 1185804 (S.D.N.Y. May
    18, 2005) ................................................................20

California Department of Water Resources v. Calpine Corp. (In re Calpine
    Corp.), 337 B.R. 27 (S.D.N.Y. 2006) ...................................................18, 19, 20

Cemer v. Marathon Oil Co.,
    583 F.2d 830 (6th Cir. 1978) ................................................................27

Churchill v. Star Enters.,
    183 F.3d 184 (3d Cir. 1999) ...................................................27, 30

Clark-Cowlitz Joint Operating Agency v. FERC,
    826 F.2d 1074 (D.C. Cir. 1987) ...................................................24, 26, 31

Cohen v. Superior Oil Corp.,
    90 F.2d 810 (3d Cir. 1937) ................................................................31

Costantini v. TransWorld Airlines,
    681 F.2d 1199 (9th Cir. 1981) ................................................................28

Dade Cty. Sch. Dist. v. Johns-Manville Corp. (In re Johns-Manville Corp.),
    53 B.R. 346 (Bankr. S.D.N.Y. 1985) ................................................................17

Exxon Co., U.S.A. v. Amerada Hess Pipeline Corp., et. al.,
    83 FERC ¶ 63,011 (1998) ................................................................25

Hanson v. Hunt Oil Co.,
    505 F.2d 1237 (8th Cir. 1974) ................................................................27

Harper Plastics, Inc. v. Amoco Chems. Corp.,
    657 F.2d 939 (7th Cir. 1981) ................................................................31

In re Indep. Ref. Corp.,
    65 B.R. 622 (S.D. Tex. 1986) ........................................................................21

Lake Murray Docks, Inc. v. South Carolina Elec. & Gas Co.,
    57 FERC ¶ 61,320 (1991) .......................................................................28, 29

In re Marcus Hook Dev. Park Inc.,
    943 F.2d 261 (3d Cir. 1991).........................................................................17

Mirant Corp. v. Potomac Electric Power Co. (In re Mirant),
    378 F.3d 511 (5th Cir. 2004) ........................................................................18

O'Shea v. Amoco Oil Co.,
    886 F.2d 584 (3rd Cir. 1989) .......................................................................31

Polsby v. Thompson,
    201 F. Supp. 2d 45 (D.D.C. 2002) ...............................................................31

Protocomm Corp. v. Novell, Inc., Case No. 94-7774, 1998 WL 351605 (E.D. Pa.
    June 30, 1998)................................................................................................33

U.S. Radio Corp. of Am.,
    358 U.S. 334 (1959).....................................................................................26

Reed v. Amax Coal Co.,
    971 F.2d 1295 (7th Cir. 1992) .....................................................................25

Se. Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),
    831 F.2d 410 (3d Cir. 1987).........................................................................17

Serbin v. Bora Corp.,
    96 F.3d 66 (3d Cir. 1996).............................................................................16

In re Siciliano,
    13 F.3d 748 (3d Cir. 1994)...........................................................................16

Stuckey v. Weinburger,
    488 F.2d 904 (9th Cir. 1973) .......................................................................26

In re Swilley,
    295 B.R. 839 (Bankr. D.S.C. 2003) ............................................................31

Szczubelek v. Cendant Mortgage Corp.,
    215 F.R.D. 107 (D.N.J. 2003)................................................................16, 22

Trunkline LNG Co. v. FERC,
    921 F.2d 313 (D.C. Cir. 1990).....................................................................36

United States v. Reve,
    241 F. Supp. 2d 470 (D.N.J. 2003) ..............................................................16

United States v. Utah Constr. & Mining Co.,
    384 U.S. 394 (1966)..........................................................................20, 25, 36

DLI-6028134v2

Williams Natural Gas,
    83 FERC ¶ 63,015 (1998) ..................................................................................27

## FEDERAL STATUTES

11 U.S.C. § 101(5) .........................................................................................................19

28 U.S.C. § 1334(b)(e) ..................................................................................................17

28 U.S.C. § 157(b)(2)(B) ......................................................................................1, 3, 17

28 U.S.C. § 157(b)(2)(B) ..........................................................................................3, 17

28 U.S.C. § 158(a)(1) .......................................................................................................1

Fed. R. Civ. P. 56(c) ......................................................................................................16

## MISCELLANEOUS

Restatement (Second) of Judgments § 26(1) .................................................................26

## NATURE OF THE CASE, COURSE
## OF PROCEEDINGS AND DISPOSITION BELOW

This proceeding is an appeal by Public Utility No. 1 of Clark County,

d/b/a Clark Public Utilities ("Clark") from an order of the bankruptcy court granting

Kaiser Aluminum & Chemical Company ("KACC") summary judgment on its Verified

Motion to Disallow Claims Filed by Clark Public Utilities and disallowing and expunging

two proofs of claim filed by Clark in KACC's bankruptcy case, each of which arise from

Clark's purchase of power for the months of August and September 2001. The Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 158(a)(1). This is a core proceeding

under 28 U.S.C. § 157(b)(2)(B).

In August 2001, Clark intervened in a Federal Energy Regulatory

Commission ("FERC") proceeding commonly known as the Puget Sound Proceeding and

alleged that KACC had sold power to Clark and, in doing so, violated the Federal Power

Act by charging Clark unjust and unreasonable rates (the "Unreasonable Rate Claim").

After extensive discovery and an evidentiary hearing that included live testimony and the

opportunity to cross examine witnesses, Clark lost on the merits of the Unreasonable Rate

Claim before a FERC Administrative Law Judge (the "ALJ"). KACC thereafter

commenced its chapter 11 case on February 12, 2002.

Recognizing that the FERC was likely to adopt the ALJ's conclusions and

reject the Unreasonable Rate Claim, Clark began casting about for another way to recover

the amounts it paid for the August and September 2001 power. Clark ultimately

drummed up a new theory of liability — the power sales purportedly violated the Federal

Power Act because they constituted a jurisdictional sale of power that was not authorized

by the FERC (the "Unauthorized Sale Claim"). Clark asserted the Unauthorized Sale

Claim for the first time when Clark sought relief from the automatic stay to pursue the

Unauthorized Sale Claim in June 2002, more than nine months after discovery had ended

and the ALJ had entered her decision in the Puget Sound Proceeding. The bankruptcy

court denied that motion, and Clark did not appeal the decision. On June 25, 2003, the FERC issued a final decision in the Puget Sound Proceeding, denying Clark relief on the merits of the Unreasonable Rate Claim. The FERC decision has since been appealed to the Ninth Circuit, but Clark is not a party to that appeal.

In January 2003, prior to the FERC decision, Clark filed two proofs of claim in KACC's bankruptcy case, one for amounts allegedly due if it were successful on the Unreasonable Rate Claim and the other for amounts allegedly due if it were successful on the Unauthorized Sale Claim. Because the FERC's decision constituted a final judgment on the merits of the Unreasonable Rate Claim, which also precluded any attempt by Clark to litigate the Unauthorized Sale Claim, on October 10, 2005, KACC filed its Verified Motion to Disallow Claims Filed by Clark Public Utilities (the "Motion to Disallow") (Bankr. D.I. 7480), seeking to expunge Clark's proofs of claim from the registry. Clark responded by objecting to KACC's Motion to Disallow and requesting that this Court withdraw the reference from the bankruptcy court.

At a hearing before the bankruptcy court on November 14, 2005 to consider the Motion to Disallow, the bankruptcy court requested additional briefing on the applicability of res judicata and requested that KACC file a motion for summary judgment on its request to disallow Clark's claims. After briefing was completed and after this Court deferred ruling on Clark's request to withdraw the reference, the bankruptcy court held a telephonic hearing on January 12, 2006 and ruled on January 30, 2006 that Clark's two proofs of claim should be disallowed because (i) the Unauthorized Sale Claim was barred by res judicata, and (ii) the Unreasonable Rate Claim was, at best, a contingent claim that did not represent a valid liability of KACC.

The bankruptcy court entered its order granting the Motion for Summary Judgment and disallowing the Unreasonable Rate Claim and the Unauthorized Sale Claim on March 7, 2006 (Bankr. D.I. 8371), and Clark filed its notice of appeal from that order on March 16, 2006 (Bankr. D.I. 8415). Pursuant to this Court's scheduling order,

-2-

Clark filed its opening brief on August 30, 2006 (the "Clark Brief"). KACC submits this brief in response.

## SUMMARY OF ARGUMENT

There are no disputed issues of material fact, and the bankruptcy court correctly granted the Motion for Summary Judgment, disallowing the Unreasonable Rate Claim and the Unauthorized Sale Claim. The FERC has rejected the Unreasonable Rate Claim on the merits, and the bankruptcy court correctly concluded that the FERC's decision precludes any attempt by Clark to litigate the Unauthorized Sale Claim and establishes that the Unreasonable Rate Claim is not a valid liability of KACC.

Clark makes three principle arguments that the bankruptcy court erred in reaching those conclusions: (i) the bankruptcy court did not have jurisdiction over KACC's motion to disallow Clark's claims because they are purportedly subject to the exclusive jurisdiction of the FERC; (ii) the Unauthorized Sale Claim is not barred by res judicata because the Unauthorized Sale Claim and the Unreasonable Rate Claim are different causes of action and Clark was unable to bring the Unauthorized Sale Claim at the Puget Sound Proceeding; and (iii) the Unreasonable Rate Claim is not barred by res judicata because the FERC's decision is on appeal and the FERC did not address Clark's specific arguments. Each of these argument is meritless.

With respect to the first argument, which Clark makes for the first time on appeal, the bankruptcy court unquestionably had jurisdiction over the motion to disallow Clark's claims. In fact, not only is the disallowance of claims in a pending bankruptcy case clearly within a bankruptcy court's jurisdiction, it is by statute a core proceeding, as the bankruptcy court expressly concluded. 28 U.S.C. § 157(b)(2)(B). In suggesting that the bankruptcy court did not have jurisdiction over the motion to disallow its claims, Clark characterizes the bankruptcy court's ruling as somehow interfering "with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts." (Clark Br. at 17.) The disallowance of Clark's claims, however, did not require the bankruptcy

-3-

court to reach the merits of the claims. The FERC had already heard the merits and ruled against Clark. The bankruptcy court merely disallowed the claims based on the FERC's decision in the Puget Sound Proceeding. The bankruptcy court clearly had jurisdiction to disallow Clark's proofs of claim.

Clark's contention that the Unauthorized Sale Claim is not barred by res judicata is also completely erroneous. Clark contends that the Unauthorized Sale Claim and the Unreasonable Rate Claim are not the same cause of action because they seek different remedies and are based on different sections of the Federal Power Act. The claims, however, involve the same transaction, the same facts, an alleged violation of the same statute and the same legal question as to whether KACC was a "seller" of power. Thus, regardless of the form or extent of damages sought and their statutory bases for the claim, they are unquestionably the same cause of action. The bankruptcy court correctly concluded, under well-established and principles of res judicata, that the Unauthorized Sale Claim and the Unreasonable Rate Claim involved the same cause of action.

Clark also argues that it was unable to bring the Unauthorized Sale Claim in the Puget Sound Proceeding because the "issues in the Puget Sound Proceeding were limited to the unjust and unreasonable rate issues" and the proceeding "did not encompass whether various sellers were authorized to make sales under the Federal Power Act." (Clark Br. at 25.) Clark, however, did not even attempt to bring the claim until after the ALJ had ruled, and there were no limits placed on Clark's ability to raise arguments or assert claims in the Puget Sound Proceeding. The fact that the scope of the issues addressed in the Puget Sound Proceeding did not encompass unauthorized sale claims is solely a function of Clark's failure to assert such a claim.

Furthermore, the automatic stay in no way prevented Clark from asserting the Unauthorized Sale Claim. Clark first asserted the claim more than nine months after the ALJ's decision and more than four months after KACC filed for bankruptcy. Clark had ample time and opportunity to assert the Unauthorized Sale Claim at an appropriate

-4-

stage of the Puget Sound Proceeding but failed to do so. And if Clark disagreed with the bankruptcy court's order enforcing the stay, then its proper remedy was to appeal that order. Clark never appealed and it cannot now argue that its failure to appeal somehow preserves its claim.

The only reason that Clark did not assert the Unauthorized Sale Claim in a timely manner is that it had not yet thought of it. Clark only concocted the claim after it had already lost on the merits of the Unreasonable Rate Claim before the ALJ. Clark's belated attempt to assert the Unauthorized Sale Claim is a textbook case of splitting a cause of action. The law does not permit Clark to seek relief based on a new theory of liability simply because its previous theory was defeated on the merits. Because the Unauthorized Sale Claim could have been brought in the Puget Sound Proceeding and was not, the bankruptcy court correctly held that it is now precluded by res judicata.

Finally, with respect to the Unreasonable Rate Claim, Clark argues only that the bankruptcy court erred in finding that it was barred by res judicata because the FERC's decision in the Puget Sound Proceeding is currently on appeal to the Ninth Circuit. Clark misunderstands the bankruptcy court's ruling. The bankruptcy court did not disallow the Unreasonable Rate Claim because it was barred by res judicata; it disallowed the Unreasonable Rate Claim because the FERC had rejected the claim on its merits, and therefore it does not represent a valid liability of KACC. Moreover, disallowance was entirely appropriate given that (i) Clark has the ability to seek reconsideration of the claim under section 502(j) of the Bankruptcy Code in the highly unlikely event that the Ninth Circuit reverses the FERC's decision in the Puget Sound Proceeding; and (ii) the Debtors' plan of reorganization requires that KACC maintain a reserve of stock in Reorganized KACC sufficient to make a distribution on the full amount of Clark's claims until all appeals of the bankruptcy court's disallowance of the claims are concluded. The bankruptcy court correctly applied traditional principles of bankruptcy law to disallow the Unreasonable Rate Claim.

-5-

## STATEMENT OF FACTS[1]

### *The Power Sales Agreement Between KACC and the BPA*

Clark is a customer-owned municipal corporation that provides electricity
to approximately 170,000 customers in Clark County, Washington. (Clark Br. at 5.)
Since 1981, Clark purchased its power through requirements contracts with the
Bonneville Power Administration (the "BPA") — the sole federal power marketing
agency in the Pacific Northwest and the region's major wholesaler of electricity. (Id.)
That contract expired on June 30, 2001. (Id.) Clark planned to negotiate a new contract
with the BPA effective July 1, 2001 that would satisfy its future power needs. (Id.) In
1998, however, the BPA announced that it would henceforth change the
anniversary/termination date of its contracts from July 1 to October 1 to coincide with its
fiscal year. Therefore, any new contract that Clark signed with the BPA would not
become effective until October 1, 2001, leaving Clark with a two-month gap in its power
supply.[2] (Clark Br. at 5.) Clark was apparently unaware of the change in the BPA's
policy until it initiated contract negotiations with the BPA sometime late in the year
2000. At that time, Clark began searching for a source of power for the months of
August and September 2001. (Id.)

KACC owns an aluminum rolling mill and previously owned two primary
aluminum reduction smelters in Washington State. (Declaration of Joseph Patrick
Hoerner, Bankr. D.I. 795, Ex. A (the "Hoerner Dec.") at ¶¶ 2-4.) To secure power for
those facilities, KACC executed a five-year Power Sales Agreement with the BPA for
service from October 1, 1996 to September 30, 2001 (the "PSA"). (Id.) Well into the
term of the PSA, as a result of business conditions, KACC began reducing production at
its Washington facilities and, as a direct result of those reductions, curtailing its power

---

[1]     The vast majority of the facts in this section, including all material facts, are
undisputed.

[2]     Clark had contracted for power from another source for the month of July 2001.
(Clark Br. at 5 n.2.)

DLI-6028134v2

purchases from the BPA. (Id.) Under the PSA, if KACC desired to curtail purchases from the BPA, KACC had to provide the BPA notice of the amount and duration of the curtailment. (Id.) KACC also could request that the BPA sell the power to another entity. (Id.) Further, KACC had the option to identify a designated third-party that was willing to pay a specified price for the power, or KACC could request that the BPA find a purchaser for the power. (Id.)

In the event that KACC curtailed its purchases from the BPA, the BPA thus had a wide range of options. (Hoerner Dec. ¶ 5.) The BPA could sell the power to a different purchaser with public preference on the same terms as KACC's notice; the BPA could retain the power for its own use or dispose of the power on whatever alternative terms the BPA might separately arrange; or the BPA could offer a contract for sale of the power to the entity identified in KACC's notice. (Id.)

If the BPA chose to sell the power to the entity designated in KACC's notice, the BPA would offer a power sales contract to the entity and, if accepted, the BPA also would agree with KACC for crediting of the payments under the terms of the PSA. (Hoerner Dec. ¶ 6.) If the BPA elected to sell to a different buyer at a different price or retain the power for its own use, the BPA would still credit KACC for sale revenue based on the price in KACC's notice. (Id.) The notice price established the mitigation to KACC for not purchasing the federal power; the notice did not determine the price or to whom the BPA would sell the power. (Id.)

Thus, KACC did not have a right, contractual or otherwise, to dictate whether the BPA would sell the power to a third-party or retain it for its own use. (Hoerner Dec. ¶ 7.) KACC likewise did not have the right, contractual or otherwise, to determine to whom the BPA would sell the power if the BPA chose to sell it to a third-party. (Id.) Additionally, KACC did not have (i) the right to establish the price at which the BPA would sell the power to parties that bought power from the BPA or

-7-

(ii) the right to sell the power itself. (Id.) In fact, the BPA insisted that the BPA itself had to be the seller of any federal power that KACC did not take. (Id.)

*Consultations Between Clark and KACC*

In January 2001, a consultant contacted KACC on behalf of Clark. (Hoerner Dec. ¶ 8.) The consultant was aware that because of KACC's reduced operations at its Washington facilities, the BPA might have a block of federal power for sale that would otherwise belong to KACC under the PSA. (Id.) Thereafter, KACC and Clark independently approached other potential buyers and sellers to determine a market price for power for August and September 2001. (Id.) They each obtained price information so that KACC could name Clark as a party willing to buy power from the BPA at a specified price in the notice KACC would provide to the BPA of curtailment of KACC's own August and September 2001 purchases. (Id.) The price ultimately set forth in the notice was below the market quotes Clark had received from other sellers. (Id.)

After the consultant and KACC negotiated regarding what would be an acceptable price for Clark's purchase of such available power, KACC sent Clark a letter on February 2, 2001 outlining how the sale from the BPA to Clark might be implemented. (Hoerner Dec. ¶ 9.) A factor precipitating the letter was Clark's concern with KACC's creditworthiness and desired clarification that Clark's power sale contract, if offered, would be with the BPA for federal power, and not with KACC. (Id.)

*Clark's Agreement with the BPA*

Also on February 2, 2001, KACC provided notice to the BPA that it intended to curtail its purchases under the PSA for the months of August and September 2001 and identified Clark as a potential purchaser of the curtailed power. (Hoerner Dec. ¶ 10.) Pursuant to the terms of the PSA, the BPA elected to sell Clark a block of power from the PSA for a term commencing on August 1, 2001 and terminating on September 30, 2001. (Id.)

### *The Puget Sound Proceeding Before the Administrative Law Judge*

Upon information and belief, on or about October 26, 2000, Puget Sound Energy, Inc. ("Puget Sound"), a utility company in the Pacific Northwest, filed a complaint with the FERC seeking the imposition of a cap on the price that could be charged for energy sold under the Western Systems Power Pool Agreement into Pacific Northwest Power Markets (the "Puget Sound Proceeding").[3] (Hoerner Dec. ¶¶ 13-15.) The FERC issued an order in the Puget Sound Proceeding on July 25, 2001 initiating an evidentiary proceeding to develop a factual record on whether there might have been unjust and unreasonable charges for spot market bilateral sales of energy in the Pacific Northwest during the period December 25, 2000 through June 20, 2001 and assigning the matter to the ALJ. (Id.) On August 7, 2001, more than nine months after Puget Sound filed its complaint, Clark filed a motion for leave to intervene out of time in the Puget Sound Proceeding, alleging that KACC had violated the Federal Power Act by charging Clark unjust and unreasonable rates for the power Clark purchased for the months of August and September 2001 (the Unreasonable Rate Claim). (Id.) Clark requested that the FERC compel KACC to refund any amounts charged in excess of a just and reasonable rate. (Id.) The ALJ permitted Clark to intervene in the Puget Sound Proceeding. (Id.) KACC opposed Clark's request for a refund by, among other things, explaining that the BPA, not KACC, had sold the electricity in question to Clark.

After Clark and KACC each conducted discovery and submitted prepared testimony, an evidentiary hearing was held before the ALJ at which a record was developed concerning the circumstances faced in Pacific Northwest power markets during the period December 25, 2000 through June 20, 2001 and the claims of individual litigants seeking refunds. (Hoerner Dec. ¶ 22.) Clark and KACC were given the

---

[3]     The FERC proceeding was styled <u>Puget Sound Energy, Inc. v. All Sellers of Energy and/or Capacity at Wholesale Into Electric Energy and/or Capacity Markets in the Pacific Northwest, Including Parties to the Western Systems Power Pool Agreement</u>, FERC Docket No. EL01-10-000, <u>et al.</u>

-9-

opportunity during that evidentiary hearing to conduct live cross-examination of each other's witnesses. (Id.) Thereafter, each party filed post-hearing briefs and proposed findings of fact with the ALJ. (Id.)

The ALJ issued her Recommendations and Proposed Findings of Fact to the full commission on September 1, 2001 (the "ALJ Decision"). (Hoerner Dec. ¶ 23.) The ALJ concluded that the prices in the Pacific Northwest during the relevant time period were the result of a number of factors, including a shortage of supply, excess demand, a drought, increased natural gas prices and price signals from California markets. (Id.) She also concluded that the Pacific Northwest was a competitive market, and that the transactions at issue in the case resulted from bilateral agreements between the parties. (Id.) Accordingly, the ALJ found that no refunds should be ordered, and she recommended that the FERC terminate the Puget Sound Proceeding. (Id.)

After the issuance of the ALJ Decision, numerous parties, including Clark and KACC, submitted comments to the full Commission advocating their various positions to the FERC. (Hoerner Dec. ¶ 24.) For its part, Clark disagreed with the ALJ Decision and requested that the FERC order refunds from KACC to Clark either in the Puget Sound Proceeding or in another proceeding before the FERC, entitled <u>Investigation of Wholesale Rates of Public Utility Sellers of Energy and Ancillary Services in the Western Systems Coordinating Council</u>, FERC Docket No. EL01-68, initiated by the FERC in April 2001 (the "WSCC Proceeding"). (Id.) This alternative suggestion was somewhat odd in that neither Clark nor KACC were parties to the WSCC Proceeding.[4] (Id.)

All of these actions occurred prior to KACC's commencement of its chapter 11 case on February 12, 2002.

---

[4]     Clark later sought to intervene in the WSCC Proceeding, but Clark's request was denied.

***The Proceedings in the Bankruptcy Court***

Recognizing that it would probably not prevail on the merits of the Unreasonable Rate Claim, Clark began searching for other ways to recover the money it paid for power in the months of August and September 2001. On June 14, 2002, more than nine months after the ALJ Decision, Clark filed a Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (Bankr. D.I. 644) seeking, among other things, relief from the stay to pursue an additional claim against KACC (a claim not previously articulated in any other forum) that KACC had violated the Federal Power Act by making a jurisdictional sale of power without obtaining prior FERC authorization (the Unauthorized Sale Claim). The Official Committee of Unsecured Creditors (the "Creditors' Committee") and KACC filed objections to Clark's motion (Bankr. D.I. 783, 795), arguing, among other things, that Clark already had a full opportunity to present and litigate its claims and that lifting the automatic stay to permit Clark to bring a new proceeding to assert the Unauthorized Sale Claim would give Clark an unwarranted second bite at the apple. On September 17, 2002, the bankruptcy court entered an order denying Clark's motion for limited relief from the automatic stay (Bankr. D.I. 1090). Clark did not appeal that order.

On December 19, 2002, in the wake of disclosures regarding Enron Corporation's manipulation of wholesale electrical prices in the California market, the FERC granted a motion filed by the City of Tacoma to reopen the evidentiary record in the Puget Sound Proceeding. The FERC issued an order allowing parties in the Puget Sound Proceeding to conduct additional discovery and submit any additional evidence to the FERC by February 28, 2003 (the "Discovery Order"). On January 7, 2003, Clark filed its Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (Bankr. D.I. 1555), seeking relief from stay to conduct additional discovery and submit modified proposed findings of fact in the Puget Sound Proceeding. The Creditors' Committee and KACC filed objections (Bankr. D.I.

-11-

1574, 1580). At a hearing on January 15, 2003, the Court denied Clark's emergency motion, but allowed Clark to seek clarification from the FERC as to whether the Discovery Order applied to Clark's dispute with KACC. (Tr. of Jan. 15, 2003 Hr'g at 23).

On February 3, 2003, the FERC issued a clarification to the Discovery Order and concluded that it would be appropriate, subject to bankruptcy court authorization, to allow Clark to seek additional discovery regarding its transaction with KACC. Thereafter, on February 5, 2003, Clark filed an Emergency Motion for Reconsideration of Motion Dated January 7, 2003 Requesting Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (Bankr. D.I. 1725). The Court issued an oral order on February 11, 2003, granting Clark limited discovery regarding its transaction with KACC, (Bankr. D.I. 1739), and on March 17, 2003, the Court entered an Order Granting in Part and Denying in Part the Emergency Motion of Clark County for Reconsideration of January 7, 2003 Motion (Bankr. D.I. 2000).

After considering the additional evidence provided pursuant to the terms of the Discovery Order, the FERC issued a decision on June 25, 2003, terminating the Puget Sound Proceeding and denying refunds to any party (Bankr. D.I. 7842 Ex. B) (the "June 25[th] FERC Decision"). The FERC concluded that "appropriate relief was provided by institution of the West-wide mitigation plan in June 2001 and that the equities do not justify refunds." (June 25th FERC Decision at 2 ) The FERC also adopted the conclusions of the ALJ that:

> [i]f the position of the refund claimants is accepted, they would be relieved of the consequences of their conscious economic decisions at the expense of a functioning competitive market in which a vast majority of the [Pacific Northwest] purchasers during this period accept responsibility for the choices they made.

(June 25th FERC Decision at ¶ 41.)

On July 18, 2003, Clark filed another Emergency Motion for Limited Relief from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation (Bankr. D.I. 2598) requesting relief from stay to file a request for rehearing with the FERC as a jurisdictional prerequisite to an appeal of the FERC's decision to the United States Circuit Court of Appeals for the Ninth Circuit. KACC filed an objection (Bankr. D.I. 2612), arguing that allowing Clark "to continue pursuing its increasingly specious litigation will impose yet further inappropriate burdens on the Debtors' estates" and that the time had arrived for the Court "to conclude Clark's actions in this matter." (Objection at 2.) The Court entered an order denying Clark's motion on July 23, 2003. (Bankr. D.I. 2616). Clark did not appeal that order. The June 25th FERC Decision is currently on appeal before the Ninth Circuit Court of Appeals, but Clark is not a party to that appeal.

### *The Motion to Disallow Clark's Claims*

On January 30, 2003, Clark filed two proofs of claim against KACC. One claim, Claim No. 3122, asserts a general, unsecured claim against KACC in an unliquidated amount for any refund ordered by the FERC in the Puget Sound Proceeding (i.e., the Unreasonable Rate Claim). (Bankr. D.I. 8017, Ex. 11.) The other claim, Claim No. 7245, asserts a general, unsecured claim for $63,716,317 for any disgorgement or refund ordered by the FERC for KACC's alleged violation of the Federal Power Act for making a jurisdictional sale of power without prior FERC authorization (i.e., the Unauthorized Sale Claim). (Bankr. D.I. 8017, Ex. 10.)

Given that the June 25th FERC Decision (i) established that KACC had no liability to Clark in respect of the Unreasonable Rate Claim, and (ii) precluded any attempt to litigate the Unauthorized Sale Claim, KACC filed the Motion to Disallow on October 10, 2005, seeking to expunge the corresponding proofs of claim from the claims registry.

-13-

On October 24, 2005 and October 25, 2005, Clark filed a blizzard of responsive pleadings: (i) a Motion to Withdraw the Reference (Bankr. D.I. 7572); (ii) a brief and motion for determination that the Motion to Disallow is a non-core proceeding (Bankr. D.I. 7582);[5] (iii) a response to the Motion to Disallow (Bankr. D.I. 7593) (the "Response to the Motion to Disallow"); (iv) an emergency motion (the "Emergency Stay Motion") (Bankr. D.I. 7596) requesting that the bankruptcy court stay adjudication of the Motion to Disallow pending determination of the motion to withdraw the reference; and (v) a motion to shorten notice (Bankr. D.I. 7595) requesting that the bankruptcy court shorten notice with respect to the Emergency Stay Motion.

On November 3, 2005, KACC filed (i) a Brief in Response to the Motion to Withdraw the Reference (Bankr. D.I. 7644); and (ii) a response to Clark's brief and motion for determination that the Motion to Disallow is a non-core proceeding (Bankr. D.I. 7645). On November 4, 2005, the Creditors' Committee filed joinders in support of KACC's November 3 filings (Bankr. D.I. 7646, 7647).

At the November 14, 2005 omnibus hearing, the bankruptcy court granted Clark's motion to shorten notice and heard argument regarding the Emergency Stay Motion. The bankruptcy court also heard argument regarding the Motion to Disallow and Clark's brief and motion for determination that the Motion to Disallow is a non-core proceeding. After argument, the bankruptcy court determined that the Emergency Stay Motion should be denied and that the Motion to Disallow is a core proceeding.[6] With

---

[5]    The bankruptcy court later required Clark to file a separate motion for a determination that the Motion to Disallow is a non-core proceeding. Clark filed that motion on November 21, 2005 (D.I. 7775).

[6]    Although Clark's motion for determination that the Motion to Disallow is a non-core proceeding was scheduled to be heard at the December 19, 2005 omnibus hearing, the bankruptcy court explained its view that the Motion to Disallow is a core proceeding at the November omnibus hearing and Clark agreed that an order reflecting the bankruptcy court's determination could be entered, obviating the need for argument on the motion at the December 19, 2005 hearing. The bankruptcy court entered an order determining that the Motion to Disallow is a core proceeding on November 28, 2005 (D.I. 7804).

respect to the Motion to Disallow, the bankruptcy court stated that it would like additional briefing regarding the applicability of res judicata and asked KACC to file a motion for summary judgment.

KACC filed its motion for summary judgment (the "Motion for Summary Judgment") and a brief in support thereof on December 2, 2005 (Bankr. D.I. 7841, 7842). Clark filed a responsive brief on December 22, 2005 (Bankr. D.I. 8017), and KACC filed its reply on December 29, 2005 (Bankr. D.I. 8043). On December 5, 2005, Clark filed in this Court (i) an emergency motion to stay proceedings in the bankruptcy court regarding the Motion to Disallow pending this Court's determination of the motion to withdraw the reference (District Court case no. 05-836, D.I. 6.); (ii) a brief in support thereof (District Court case no. 05-836, D.I. 7.); and (iii) a motion for expedited hearing regarding the emergency motion to stay (District Court case no. 05-836, D.I. 8.) KACC filed a response and an answering brief on December 15, 2006 (District Court case no. 05-836, D.I. 12, 13), and Clark filed its reply on December 22, 2005 (District Court case no. 05-836, D.I. 15.) The Court held a hearing regarding Clark's emergency motion to stay on January 10, 2006 and entered an order on April 12, 2006 that (i) denied the motion to withdraw the reference with leave to renew, and (ii) stayed and administratively closed the case (District Court case no. 05-836, D.I. 25.)

The bankruptcy court held a telephonic hearing regarding the Motion for Summary Judgment on January 12, 2006, and issued its ruling at a hearing on January 30, 2006. The bankruptcy court granted the Motion for Summary Judgment and (i) disallowed the Unauthorized Sale Claim because it was precluded, and (ii) disallowed the Unreasonable Rate Claim because it was, at best, a contingent claim that did not represent a valid liability of the Debtors. The bankruptcy court entered an order to that effect on March 7, 2006 (Bankr. D.I. 8371).

Clark filed a notice of appeal from the bankruptcy court's order on March 16, 2006 (Bankr. D.I. 8415), and the appeal was docketed in this Court on April 19, 2006.

-15-

After unsuccessful attempts by the parties to settle the matter, the parties requested that the Court waive the mediation requirement. The Court entered a scheduling order on August 15, 2006. Pursuant to that order, Clark filed its Brief of Appellant (the "Clark Opening Brief") on August 30, 2006.

## ARGUMENT

### I. STANDARD OF REVIEW

A bankruptcy court's findings of fact are subject to review under the clearly erroneous standard while its conclusions of law are subject to de novo review. In re Siciliano, 13 F.3d 748, 750 (3d Cir. 1994). If there are mixed questions of law and fact, the Court should separate issues into their respective parts and examine the legal component de novo, affirming factual conclusions unless clearly erroneous.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002); Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 122 (D.N.J. 2003) (citing Serbin v. Bora Corp., 96 F.3d 66, 69 n.2 (3d Cir. 1996)). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); United States v. Reve, 241 F. Supp. 2d 470, 475 (D.N.J. 2003) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis added). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Consol. Rail Corp., 297 F.3d at 247 (citing Liberty Lobby, Inc., 477 U.S. at 248); Szczubelek, 215 F.R.D. at 122. A factual dispute is "material" if it might affect the

-16-

outcome of the case under governing law. Consol. Rail Corp., 297 F.3d at 247; Abraham

v. Raso, 183 F.3d 279, 287 (3d Cir. 1999).

## II.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT IT HAD JURISDICTION OVER A MOTION TO DISALLOW PROOFS OF CLAIM FILED IN A PENDING BANKRUPTCY CASE

Despite the fact that (a) the bankruptcy court ruled that the Motion to

Disallow was a core proceeding and (b) Clark never previously argued in its multiple

pleadings filed in the bankruptcy court or in this Court, Clark now contends that the

bankruptcy court did not even have jurisdiction over the Motion to Disallow. (Clark Br.

at 12-18.) Clark is wrong.

Congress has provided this Court with "exclusive" jurisdiction over "all of

the property" of the estate, 28 U.S.C. § 1334(e), and granted this Court "original but not

exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related

to cases under title 11," "notwithstanding any Act of Congress that confers exclusive

jurisdiction on a court or courts other than the district courts." Id. at § 1334(b). As an

adjunct of this Court, the bankruptcy court has jurisdiction to "hear and determine all

cases under title 11 and all core proceedings arising under title 11 or arising in a case

under title 11 . . . ." 28 U.S.C. § 157(b)(1). The allowance or disallowance of claims is a

core proceeding. 28 U.S.C. § 157(b)(2)(B). See also, In re Marcus Hook Dev. Park Inc.,

943 F.2d 261, 267 (3d Cir. 1991) (holding that a proceeding was core because it

comported with one of the examples provided by section 157); Se. Sprinkler Co., Inc. v.

Meyertech Corp. (In re Meyertech Corp.), 831 F.2d 410, 418 (3d Cir. 1987) (same); Dade

Cty. Sch. Dist. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 53 B.R. 346, 352

(Bankr. S.D.N.Y. 1985) (holding that the claims process is the "exclusive framework for

asserting claims against a debtor and adjudicating claim disputes"). Accordingly, the

bankruptcy court clearly had jurisdiction to disallow the Clark claims.

In challenging the bankruptcy court's jurisdiction, Clark simply ignores

the fact that the merits of its claims have been fully and completely litigated in, or

-17-

otherwise foreclosed by, the Puget Sound Proceeding. Instead, Clark relies on <u>California Department of Water Resources v. Calpine Corp. (In re Calpine Corp.)</u>, 337 B.R. 27 (S.D.N.Y. 2006) to argue that its claims "are clearly within the exclusive jurisdiction of FERC and should not have been subject to the bankruptcy court's proceedings here." (Clark Br. at 13.) To attempt to bring the allowance or disallowance of its claims within the holding of <u>Calpine</u>, Clark characterizes the bankruptcy court's ruling as somehow interfering "with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts." (Clark Br. at 17.) The holding in <u>Calpine</u>, however, is completely inapplicable here.

In <u>Calpine</u>, the debtors sought rejection of several long-term power supply contracts pursuant to section 365(a) of the Bankruptcy Code. Upon motion by the counter-parties to the power supply contracts, the <u>Calpine</u> court withdrew the reference to the bankruptcy court concerning the debtors' motion to reject the contracts. <u>Calpine</u>, 337 B.R. at 30. In ruling on the ability of the debtors to reject the contracts under section 365 of the Bankruptcy Code, the <u>Calpine</u> court stated that "the bankruptcy court's authority cannot be exercised so as to interfere with the jurisdiction of a federal agency acting in its regulatory capacity." <u>Id.</u> at 35. The <u>Calpine</u> court went on to hold that it did not have jurisdiction to approve rejection of the power supply contracts because doing so "would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts." <u>Id.</u> at 36.[7]

---

[7]    Although the holding in <u>Calpine</u> does not undercut the bankruptcy court's jurisdiction in this case, the <u>Calpine</u> holding is questionable and conflicts directly with the Fifth Circuit Court of Appeals' ruling in <u>Mirant Corp. v. Potomac Electric Power Co. (In re Mirant)</u>, 378 F.3d 511 (5th Cir. 2004). In <u>Mirant</u>, the Fifth Circuit held that bankruptcy courts are the appropriate forum for determining whether a debtor may properly reject a power contract that is subject to FERC's exclusive jurisdiction. Moreover, the <u>Calpine</u> court ignored the fact that the FERC, consistent with the Fifth Circuit's holding in <u>Mirant</u>, has specifically held that the Federal Power Act does not preempt a district court's jurisdiction to authorize the rejection of a FERC-regulated executory contract as part of a bankruptcy proceeding. <u>See Cal. Elec. Oversight Bd.</u>, 114 FERC ¶ 61,003, ¶ 8 (2006).

Clark's reliance on <u>Calpine</u> to argue that the bankruptcy court lacked jurisdiction to disallow the claims is completely misguided and unsupportable because, among other things, Clark ignores the fact that the FERC already ruled on the merits of the Unreasonable Rate Claim and denied Clark a refund. The bankruptcy court did not rule on the merits of Clark's claims. Rather, the bankruptcy court disallowed the claims based on what the FERC had already ruled. Specifically, the bankruptcy court ruled that based on the FERC decision in the Puget Sound Proceeding, the Unauthorized Sale Claim was barred under the doctrine of <u>res judicata</u> and the Unreasonable Rate Claim should be disallowed as a contingent claim that did not represent a valid liability of KACC. The Bankruptcy Court's ruling does not impinge on the FERC's authority, effect rates or otherwise determine that rates are reasonable; the disallowance of the claims simply has no effect outside the context of KACC's bankruptcy case.

The Bankruptcy Court's ruling required nothing more than the straightforward application of well-established principles of bankruptcy law and claim preclusion. The Unauthorized Sale Claim is precluded because it could have been brought in the Puget Sound Proceeding but was not, and the Unreasonable Rate Claim has already been decided on the merits. The Bankruptcy Court based its decision to disallow the Clark claims on traditional principles of bankruptcy law applicable to the claims allowance and disallowance process. There was absolutely no issue requiring an interpretation of the Federal Power Act, let alone a material and substantial consideration of the statute. Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a bankruptcy estate only to the extent that it has a "right to payment" for the asserted liability. <u>See</u> 11 U.S.C. § 101(5). By contrast, there is no right to payment — and therefore no claim — where the asserted liabilities are not due and owing by a debtor. Because the June 25th FERC Decision eliminated any prospect for Clark to recover amounts from KACC in connection with the purchase of BPA power for the

-19-

months of August and September 2001, Clark has no right to payment and the
Bankruptcy Court correctly disallowed Clark's claims.

Indeed, notwithstanding its holding in <u>Calpine</u>, the United States District
Court for the Southern District of New York has specifically held that bankruptcy courts
have jurisdiction to resolve objections to, and the allowance or disallowance of, proofs of
claim, such as those at issue here. <u>California v. Enron Corp. (In re Enron Corp.)</u>, 2005
WL 1185804 (S.D.N.Y. May 18, 2005). In <u>Enron</u>, the plaintiffs filed separate proofs of
claim against the debtors for (1) refunds and amounts based upon violations of the
Federal Power Act; (2) violation of various state and federal laws premised on debtors'
alleged gaming and manipulation of the electric, power and natural gas markets; and
(3) pre-petition "meter data errors." <u>Id.</u> at *1. The debtors filed objections to all proofs
of claim on various grounds, and the plaintiffs sought withdrawal of the reference to the
bankruptcy court of the disputes relating to the debtors' claim objections. <u>Id.</u> The
plaintiffs argued that withdrawal of the reference was mandated because the debtors'
objections would require substantial interpretation of FERC-approved tariffs and the legal
applicability of disputed and unsettled law. <u>Id.</u> at *2. In denying withdrawal of the
reference, the court held that the debtors' "objections to the proofs of claim do not lead to
any jurisdictional conflict requiring substantial and material interpretation of
non-Bankruptcy federal law." <u>Id.</u> The court concluded that the bankruptcy court was the
proper forum for the resolution of the debtors' objections to the proofs of claim. "The
Bankruptcy Court is more thoroughly familiar with the Debtors claims and issues in the
instant matter and all of the other Enron-related cases. Thus, the Bankruptcy Court is in a
better position to adjudicate them all." <u>Id.</u> * 3.

As in <u>Enron</u>, even though Clark's claims may arise under the Federal
Power Act, the bankruptcy court clearly had jurisdiction to rule on the preclusive effect
of the June 25th FERC Decision. <u>See</u> <u>United States v. Utah Constr. & Mining Co.</u>, 384
U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and

-20-

resolves disputed issues of fact properly before it which the parties have had an adequate

opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce

repose."); In re Indep. Ref. Corp., 65 B.R. 622 (S.D. Tex. 1986) (holding that remedial

order issued by the Office of Hearings and Appeals was entitled to res judicata effect

despite pending appeal of the remedial order to the FERC and allowing Department of

Energy's proof of claim, which was filed as a result of the remedial order).

Moreover, although Clark now ignores established law regarding the

preclusive effect of the June 25th FERC Decision, in one of its emergency motions to lift

the automatic stay, Clark previously represented to the bankruptcy court that any decision

FERC issued would have preclusive effect in the bankruptcy case:

> Cause to lift the stay exists in this case simply because
> FERC will render a decision in the Puget Sound Proceeding
> that will bind Clark in Kaiser's bankruptcy case and will
> determine whether Clark as [sic] a valid unjust rate claim
> against Kaiser and the amount of such claim.

(Emergency Motion of Public Utility District No. 1 of Clark County for Limited Relief

from the Automatic Stay Protecting Kaiser Aluminum and Chemical Corporation, D.I.

1555, at 14.) Contrary to its arguments now that only FERC can adjudicate the claim,

Clark also previously represented to this Court that it could adjudicate the Unauthorized

Sale Claim. (Motion and Brief of Clark Public Utilities to Withdraw the Reference of the

Debtors' Motion for an Order Disallowing Claims, D.I. 7583 at 3, 19.) Clark's continual

recasting of judicial and administrative standards should not be tolerated and, in any

event, cannot eliminate the unassailable fact that the FERC ruled against issuing refunds

in the Puget Sound Proceeding. Accordingly, the determination to disallow the Clark

claims was completely within the jurisdiction of the bankruptcy court.

## III.    THE BANKRUPTCY COURT CORRECTLY DETERMINED
## THAT THERE ARE NO GENUINE ISSUES OF MATERIAL FACT

Clark asserts that there are "fact issues with regard to the elements

required to establish the res judicata bar." (Clark Br. at 18.) Clark, however, never

precisely describes those fact issues. In a footnote Clark states that there is a dispute

between the parties regarding whether KACC was the seller of power to Clark, seemingly

implying that the dispute raises a fact issue sufficient to defeat the Motion for Summary

Judgment. (Id. at 24 n. 6.) Any such suggestion is absurd. Although KACC believes

that the undisputed documentary evidence establishes that KACC was not the seller, even

if there were a genuine dispute, its resolution is irrelevant to these proceedings. It was

not necessary for the bankruptcy court to determine whether KACC was the seller to

conclude that the Unauthorized Sale Claim was barred by res judicata or that the

Unreasonable Rate Claim should be disallowed in light of the fact that it was rejected on

the merits by the FERC and does not, at least at this point, represent a valid liability of

KACC.

   Clark also asserts that there is a genuine dispute of material fact as to

whether the Unauthorized Sale Claim could have been brought in the Puget Sound

Proceeding. (Clark Br. at 27 ) To establish a genuine issue of fact, however, Clark must

present evidence sufficient to permit a reasonable jury to return a verdict in its favor.

Consol. Rail Corp., 297 F.3d at 247 (citing Liberty Lobby, Inc., 477 U.S. at 248);

Szczubelek, 215 F.R.D. at 122. Clark fails to present any evidence to support the

assertion that the Unauthorized Sale Claim could not have been brought in the Puget

Sound Proceeding. On the contrary, there is nothing that would have prevented Clark

from bringing the Unauthorized Sale Claim in the Puget Sound Proceeding. The ALJ

placed no limits on Clark's ability to raise arguments or assert claims prior to closing the

evidentiary record, and numerous buyers submitted evidence specific to their seller or

transaction.

   Clark's entire argument that the Unauthorized Sale Claim could not have

been brought in the Puget Sound Proceeding is based on assertions about the "scope" of

the proceeding and the issues addressed. The scope of the proceeding and issues

addressed, however, is necessarily defined and limited by the claims asserted. Of course

-22-

the ALJ and the FERC did not address whether KACC or any of the actual sellers were unauthorized sellers because no such claims were asserted. The fact that such claims were not asserted, however, does not establish that they could not have been asserted.

Moreover, even though no unauthorized sale claims had been asserted, the scope of the issues for trial outlined by the ALJ, which was of course based on the claims parties had asserted, was nonetheless clearly broad enough to encompass such a claim. On August 23, 2001, the ALJ entered her Order on Issues, attached hereto as Exhibit C and incorporated herein by reference, which listed the issues to be tried in the Puget Sound Proceeding. Item 2f in the Order on Issues specified the following as an issue for trial: "Did any seller exercise market power, or violate any conditions or limitations of its market based tariffs or agreements entered into under the Western Systems Power Pool Agreement?" (Order on Issues at 874762). A violation of a market-based tariff obviously would encompass an allegation that a party was required, but failed, to file a market-based tariff and was therefore an unauthorized seller.

Clark counters, without any authority or substantiation, that this language in the Order on Issues "in no way addresses whether a seller of electricity had authority under the Federal Power Act to make the sale in the first place" and, thus, "does not encompass the Unauthorized Sale Claim." (Clark Br. at 26.) But putting aside the fact that the language is in fact clearly broad enough to include an unauthorized sale claim, the Order on Issues was necessarily framed by the claims that had been asserted. Had Clark thought to assert the Unauthorized Sale Claim, the Order on Issues may have been worded differently.

Clark offers no evidence that it could not have raised the Unauthorized Sale Claim.[8] Indeed, the only evidence before the Court is that Clark simply failed to

---

[8]    In the Factual Background section of its opening brief, Clark selectively quotes from the FERC order granting Clark leave to intervene in the Puget Sound Proceeding (Bankr. D.I. 8017, Ex. 11) (the "Intervention Order"): "this proceeding is about price . . ." (Clark Br. at 7 (internal citation omitted).) Clark

assert the Unauthorized Sale Claim. Accordingly, there is no genuine dispute, and the

bankruptcy court correctly concluded that summary judgment was appropriate in this

case.

## IV.   THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THE UNAUTHORIZED SALE CLAIM WAS BARRED BY RES JUDICATA

### A.   Res Judicata Applies in FERC Proceedings.

Clark devotes several pages of its brief to a misguided attempt to convince

the Court that res judicata as applied in FERC proceedings is some sort of mystical and

flexible concept that can only be interpreted and applied by the FERC. Clark's argument

is meritless. Although res judicata can be said to apply flexibly in certain situations,

typically where an administrative agency acts in a rulemaking or ratemaking capacity,[9]

---

(continued...)

apparently includes this quotation in an attempt to provide some evidence that the Unauthorized Sale Claim could not have been brought at the Puget Sound Proceeding — i.e., since the issue in the Puget Sound Proceeding was price, the FERC would not have considered an issue related to a seller's authorization. Read in context, however, the Intervention Order provides no evidence to support Clark's assertion that the Unauthorized Sale Claim was outside the scope of the Puget Sound Proceeding. The Puget Sound Proceeding was established to investigate the reasonableness of charges for spot market bilateral sales in the Pacific Northwest for the period December 25, 2000 through June 20, 2001. KACC and several other parties objected to Clark's motion to intervene in the proceeding because Clark purchased power for the months of August and September 2001, dates that were outside the relevant period for the Puget Sound Proceeding. The ALJ ultimately permitted Clark to intervene because "this proceeding is about price and to exclude transactions based on the delivery date misses the point of the proceeding." (Intervention Order at 2). Obviously, the Intervention Order did not establish the issues for trial and was necessarily limited to the scope of what Clark, in its intervention request, sought to assert. The language in the Intervention Order in no way establishes that the Puget Sound Proceeding was, or would have been, strictly limited to price issues. On the contrary, the ALJ's willingness to include Clark's transaction, which was clearly outside the scope of the Puget Sound Proceeding as defined prior to Clark's intervention, demonstrates how willing the ALJ was to include in the Puget Sound Proceeding all relevant issues related to sales of power in the Pacific Northwest during that time. Clark simply never asked the ALJ to consider the Unauthorized Sale Claim.

[9]   For example, in a case Clark heavily relies upon, the Court of Appeals for the District of Columbia held that, even if collateral estoppel were applicable, the court would not apply it to prevent the FERC from adopting an interpretation of a provision of the Federal Power Act that differed from an interpretation the FERC

-24-

res judicata principles apply with full force when the administrative agency acts in a judicial capacity: "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966). Res judicata applies "when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency, be it state or federal, which acts in a judicial capacity."[10] Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 109 (1991) (internal citations omitted).

    Indeed, in a case Clark cited in previous pleadings filed in the bankruptcy court for the proposition that res judicata is applied flexibly in FERC proceedings, the Ninth Circuit expressly held that res judicata "retains full force when applied to adjudications of 'past facts, where the second proceeding involves the same claim or the same transaction.' In those situations the findings and decisions are res judicata and 'the question whether (the tribunal making the decision is) an agency or court is immaterial.'"

_____

(continued...)

    adopted in a prior declaratory judgment proceeding. Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074 (D.C. Cir. 1987). Clearly there are reasons why a court would be reluctant to use collateral estoppel to bind an administrative agency, which has an evolving duty to interpret and enforce statutory law, to an outdated interpretation of the statute it is empowered to enforce. Just as clearly, those reasons do not apply here.

[10]    In the Puget Sound Proceeding, the FERC was indisputably acting in a judicial capacity. An agency acts in a judicial capacity when it provides the following safeguards: (i) representation by counsel; (ii) pretrial discovery; (iii) the opportunity to present memoranda of law; (iv) examinations and cross-examinations of witnesses; (v) the opportunity to introduce exhibits; (vi) the chance to object to evidence; and (vii) final findings of fact and conclusions of law. Exxon Co., U.S.A. v. Amerada Hess Pipeline Corp., et. al., 83 FERC 63,011 at p 65,095 (1998) (reversed on other grounds) (citing Reed v. Amax Coal Co., 971 F.2d 1295, 1300 (7th Cir. 1992)). As in Exxon, each of the seven criteria were satisfied in the Puget Sound Proceeding and "clearly the Commission's decision was made in its judicial capacity and the preclusion doctrines do apply." Id.

-25-

Stuckey v. Weinburger, 488 F.2d 904, 911 (9th Cir. 1973) (internal citation omitted).

Citing U.S. Radio Corp. of Am., 358 U.S. 334 (1959), the Restatement (Second) of

Judgments § 26(1)(c) (1982) and the Clark-Cowlitz decision discussed in footnote 9

supra, Clark contends that "[c]ourts have refused to apply res judicata principles to

agency decisions where the agency did not address a specific issue . . . " (Clark Br. at 19.)

None of those authorities supports the proposition that claim preclusion is discretionary

or would not apply with equal force to an agency decision when the agency is acting in a

judicial capacity.  The Radio Corp. case is completely inapposite.  The issue in Radio

Corp. was whether the FCC's approval of a request by private parties to exchange TV

stations and licenses barred the Department of Justice from subsequently asserting that

the exchange was in furtherance of a conspiracy to violate federal antitrust laws.  Radio

Corp., 358 U.S. at 352.  The FCC was not a plaintiff or defendant in the first proceeding,

but was acting in its regulatory capacity and considering the request before it.

Accordingly, the principles of claim preclusion that a party must being all claims arising

from the same transaction in the same proceeding has absolutely no application.  The

section of the Restatement Clark cites merely recognizes that claim preclusion does not

apply if the plaintiff is unable to assert the claim in the first action because of limitations

on jurisdiction or authority.  Obviously, there was no jurisdictional limitation on FERC's

ability to adjudicate Clark's Unauthorized Sale Claim.  And Clark-Cowlitz, as noted

already, is completely inapposite because it involved the authority of the FERC to adopt

an interpretation of a provision of the Federal Power Act that was different than an

interpretation the FERC had adopted in a prior proceeding.  See discussion in footnote 9

supra.

Here, Clark brought a claim for relief based on a specific power sale

transaction and, after losing on the merits, Clark now seeks, pursuant to its Unauthorized

Sale Claim, to initiate a new proceeding seeking relief on the same power sale transaction

but based on a new legal theory.  It completely belies common sense, as well as

-26-

applicable law, to contend that the application of <u>res judicata</u> in this context is a matter that only FERC can decide as a matter of discretion.

**B.    The Bankruptcy Court Correctly Determined That the Elements of <u>Res Judicata</u> Are Satisfied.**

"A claim is barred in a FERC proceeding by administrative <u>res judicata</u> if: (1) the prior proceeding involved the same cause of action as the current proceeding; (2) the same parties were involved in both proceedings; and (3) there was a final judgment on the merits in the previous action." <u>Williams Natural Gas,</u> 83 FERC 63,015 at p. 65,116 (1998). "When the above three factors are met in a FERC proceeding, '[t]he original judgment on the merits is conclusive not only as to matters actually raised but also to matters which could have been raised and litigated.'" <u>Id.</u> (citing <u>Williams Natural Gas Co.,</u> 72 FERC 63,006 at p. 65,135 (1995)).

1.    *The Unauthorized Sale Claim Involves the Same Cause of Action as the Unreasonable Rate Claim*

Generally, claims involve the same cause of action when they arise from the same underlying events — "[a] determination of whether two lawsuits are based on the same cause of action 'turns on the essential similarity of the underlying events giving rise to the various legal claims.'" <u>Churchill v. Star Enters.,</u> 183 F.3d 184, 194 (3d Cir. 1999) (internal citations omitted). Courts "take a broad view, focusing on the underlying events of the two transactions." <u>Id.</u> Courts should not apply the test mechanically, "but should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out of the same occurrence in a single suit." <u>Id.</u> (internal citation omitted). Thus, claims involve the same cause of action when the plaintiffs rely "on different legal theories to seek redress . . . for a single course of wrongful conduct." <u>Id.</u> at 195; <u>see also</u> <u>Cemer v. Marathon Oil Co.,</u> 583 F.2d 830, 832 (6th Cir. 1978) (same); <u>Hanson v. Hunt Oil Co.,</u> 505 F.2d 1237, 1240 (8th Cir. 1974) (same).

Both the Unauthorized Sale Claim and the Unreasonable Rate Claim seek damages related to Clark's acquisition of power for the months of August and September

2001. Accordingly, Clark's claims are merely alternative theories of liability for the same course of allegedly wrongful conduct and involve the same cause of action.

Clark argues that the two claims do not involve the same cause of action because the elements of a Ninth Circuit test employed by the FERC in Lake Murray Docks, Inc. v. South Carolina Elec. & Gas Co., 57 FERC 61,320 (1991), have supposedly not been satisfied.[11] (Clark Br. at 21.) However, consistent with the principles set forth above and any other test for determining whether claims involve the same cause of action, the factors set forth in Lake Murray Docks clearly establish that the Unauthorized Sale Claim and the Unreasonable Rate Claim involve the same cause of action.

In the Ninth Circuit test employed by Lake Murray Docks, four factors are considered in determining whether two claims arise from the same cause of action: (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts. Lake Murray Docks, 57 FERC at 62,037. Not all of the factors must be present to find that the two claims involve the same cause of action. Indeed, the FERC in Lake Murray Docks determined that the two claims involved the same cause of action and the subsequent claim was precluded even though only the third and fourth factors were present. Id. at 62,038.

Here, Clark concedes that the fourth factor is present because the two claims arise out of the same transactional nucleus of facts. (Clark Br. at 25 ("[t]he only element of the Lake Murray Docks test that is met is that Clark's two causes of action arise out of the same set of facts").) Similarly, Clark effectively concedes that the third

---

[11]   In Lake Murray Docks, the FERC utilized a test originally set forth by the Ninth Circuit in Costantini v. TransWorld Airlines, 681 F.2d 1199, 1201 (9th Cir. 1981), a case that did not involve an administrative proceeding.

factor is also satisfied because the two claims involve an infringement of the same right. Clark asserts that the Unreasonable Rate Claim is "premised on the notion that FERC is responsible, under Section 205(a) of the Federal Power Act, to ensure that rates charged for jurisdictional sales of power are 'just and reasonable.'" (Clark Br. at 21.) A few pages later, Clark asserts that the prior notice and filing requirement that forms the predicate of the Unauthorized Sale Claim "is intended to facilitate the Commission's responsibilities under Section 205 of the Federal Power Act to ensure that all rates and charges for jurisdictional services are just and reasonable." Id. at 23 n.5. Clearly, both claims involve the alleged infringement of Clark's purported right under section 205 of the Federal Power Act to pay no more than a just and reasonable rate for power.

Although not necessary to resolve the question, the remaining factors of the Lake Murray Docks test are also satisfied. The first factor is satisfied because the Puget Sound Proceeding established that KACC has no obligation to refund amounts to Clark for the transaction at issue, and Clark's prosecution of its new theory now seeks to destroy that established right. As to the second factor, the proceedings on the two claims involve the same evidence — whether KACC was the seller of power to Clark. Clark argues that different evidence would be presented because evidence that KACC was not authorized to sell based on its failure to file a schedule of rates for such sale was not presented in the Puget Sound Proceeding. (Clark Br. at 24.) The fact that KACC did not file a schedule of rates, however, is undisputed and a matter of public record. The only factual issue to be resolved in a proceeding on the Unauthorized Sale Claim is whether KACC was the seller, and since that identical issue was hotly disputed in the Puget Sound Proceeding, all the relevant evidence has already been submitted to the FERC.

Finally, Clark argues that the Unauthorized Sales Claim and the Unreasonable Rate Claim are different causes of action because they seek different remedies and are based on different sections of the Federal Power Act. Specifically, the Unauthorized Sale Claim seeks monetary damages in the form of disgorgement of profits

-29-

and is based upon sections 201(a), 205(c) and 309 of the Federal Power Act; whereas the

Unreasonable Rate Claim sought monetary damages in the form of a refund of excess

profits and was based on section 205(a) of the Federal Power Act. (Clark Br. at 21-33.)

Clark's argument defies common sense and is wrong as a matter of law. Where two

claims "seek redress . . . for a single course of wrongful conduct," the second claim arises

from the same cause of action as the first and is barred by res judicata even if the second

claim alleges "new elements of . . . damages," and even if it is based on a different

statute. Churchill, 183 F.3d at 195 (holding that action alleging violations of the

Americans with Disabilities Act and the Pennsylvania Human Relations Act was based

on same underlying facts as prior action alleging violation of the Family and Medical

Leave Act and therefore barred by res judicata).

2.    *The Unauthorized Sale Claim and the Unreasonable Rate Claim
Involve the Same Parties*

Clark does not dispute that KACC and Clark were the parties in the Puget

Sound Proceeding and would be the parties in any proceeding on the Unauthorized Sale

Claim.

3.    *The June 25th FERC Decision Was a Final Judgment on the Merits
of the Unreasonable Rate Claim*

In the June 25th FERC Decision, the FERC refused to grant Clark relief on

the merits of the Unreasonable Rate Claim. Clark was afforded a full and complete

opportunity to participate in the Puget Sound Proceeding and to present its case to the

FERC, including the opportunity to: (i) submit prepared testimony; (ii) conduct

discovery; (iii) participate in the evidentiary hearing before the ALJ; (iv) cross-examine

KACC's witnesses; (v) submit post-hearing briefs and proposed findings of fact and

conclusions of law; and (vi) submit comments to the ALJ Decision. This all occurred

prior to KACC's chapter 11 filing. In addition, when the FERC re-opened the record, the

bankruptcy court permitted Clark to conduct additional discovery and submit additional

evidence to the FERC pursuant to the Discovery Order. After considering the

-30-

comprehensive record before it, the FERC refused to grant the relief sought by Clark in the Unreasonable Rate Claim — "the equities do not justify refunds" (June 25th FERC Decision at 2) — and terminated the Puget Sound Proceeding.[12]

4.    *The Unauthorized Sale Claim Could Have Been Brought in the Puget Sound Proceeding*

As explained in Section II above, there was nothing that prevented Clark from bringing the Unauthorized Sale Claim in the Puget Sound Proceedings, and Clark offers no evidence to the contrary. In its opening brief, Clark makes three arguments in an attempt to convince the Court that it could not have brought the Unauthorized Sale Claim. First, Clark cites Clark-Cowlitz and contends that "[w]here a prior tribunal did not have an opportunity to address the claim, there can be no preclusion under res judicata." (Clark Br. at 25.) Clark is confusing the concepts of issue preclusion and claim preclusion. Obviously issue preclusion does not apply where the prior court did not address, or have the opportunity to address, the issue.[13] It is contrary to the entire

---

[12]    Clark incorrectly asserts that the Unreasonable Rate Claim was disallowed on res judicata grounds. As explained in Section V below, the Unreasonable Rate Claim was not disallowed on the grounds that it was barred by res judicata. In the context of its argument that the Unreasonable Rate Claim is not barred by res judicata, however, Clark incorrectly asserts that the June 25th FERC Decision is not a judgment on the merits because the FERC failed to specifically address Clark's arguments: "there is no specific finding in the Commission's decision as to the merits of Clark's claims against Kaiser in the June 25, 2003 proceeding." (Clark Br. at 29.) It is settled law, however, that a decision on the merits for purposes of res judicata "is a term of art and does not necessarily mean that issues were actually litigated." In re Swilley, 295 B.R. 839, 894 (Bankr. D.S.C. 2003). Generally, a decision is on the merits "when the court renders a decision after considering the legal claim." Polsby v. Thompson, 201 F. Supp. 2d 45, 48 (D.D.C. 2002). "Traditionally, a judgment is on the merits if it completely disposes of the underlying cause of action." Harper Plastics, Inc. v. Amoco Chems. Corp., 657 F.2d 939, 942 (7th Cir. 1981). The June 25th FERC Decision unquestionably disposed of the Unreasonable Rate Claim. To argue otherwise absurdly implies that Clark could go back to the FERC and bring the same Unreasonable Rate Claim in another FERC proceeding. Moreover, although the June 25th FERC Decision has been appealed, it is settled law that the pendency of an appeal does not alter the res judicata effect of an otherwise final federal judgment. Cohen v. Superior Oil Corp., 90 F.2d 810, 811-12 (3d Cir. 1937).

[13]    Issue preclusion operates to prevent an issue that was litigated between the parties from being re-litigated in a subsequent proceeding, whereas claim preclusion is intended to ensure that all claims arising from the same transaction and

-31-

concept of claim preclusion, however, to assert that a claim cannot be barred if the claim could have been, but was not, brought. By definition, claim preclusion applies to claims that could have been, but were not, asserted in the prior action. In such cases, the prior tribunal obviously did not have an opportunity to address the claim.

Second, Clark argues that the Unauthorized Sale Claim could not have been brought because the "issues in the Puget Sound Proceeding were limited to the unjust and unreasonable rate issues" and the proceeding "did not encompass whether various sellers were authorized to make sales under the Federal Power Act." The only support Clark cites for this, however, is the Order on Issues, which of course was determined based on the claims that had been asserted. The fact that the issue in the Puget Sound Proceeding did not encompass unauthorized sale claims is solely a function of Clark's failure to assert such a claim.[14]

Finally, Clark asserts that it was prevented from bringing the Unauthorized Sale Claim by operation of the automatic stay. That assertion is baseless. The automatic stay did not come into effect until more than five months after discovery had ended and the ALJ had issued her decision. Clark had more than ample time and opportunity to raise the Unauthorized Sale Claim, but failed to do so.

More importantly, if Clark thought that the bankruptcy court's refusal to lift the automatic stay was preventing Clark from pursuing the Unauthorized Sale Claim in the Puget Sound Proceeding, which at that point was awaiting the FERC's decision on the ALJ's recommendation, Clark should have appealed the bankruptcy court's decision.

---

(continued...)

      underlying events are brought at the same time and precludes claims that could have been, but were not, asserted in the first proceeding. O'Shea v. Amoco Oil Co., 886 F.2d 584, 593-94 (3rd Cir. 1989).

[14]    Furthermore, as explained in Section II supra, notwithstanding that no such unauthorized sale claims had been asserted, Item 2f of the Order on Issues was clearly broad enough to include such a claim.

In a very similar case, the court stated that "it is immaterial [to a decision that a claim is barred by claim preclusion] that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to do so because they were not alleged in the complaint and an application to amend the complaint came too late." Protocomm Corp. v. Novell, Inc., Case No. 94-7774, 1998 WL 351605, at *10 (E.D. Pa. June 30, 1998) (internal citations omitted).

In Protocomm, the plaintiff had sought leave to amend its complaint in a prior proceeding to add new claims almost a year after the litigation had commenced. Id. The court denied the motion as untimely. The plaintiff later tried to assert the claims it intended to bring in the amended complaint in a new proceeding. The court held the claims were barred by res judicata. As the court explained, the court "had discretion to deny leave to amend the complaint," and the plaintiff had an opportunity to bring its new claims in a timely manner. Id. Additionally, if the plaintiff disagreed with the court's order denying leave to amend, "then its remedy was to appeal that decision . . . [not] to circumvent that decision by pursuing those same claims in this lawsuit." Id.

The reasoning behind the Protocomm decision applies equally here. The bankruptcy court had the discretionary authority to deny Clark's motion for relief from stay. The bankruptcy court exercised that authority because Clark failed to bring the Unauthorized Sale Claim in a timely manner, and, as KACC explained, the Unauthorized Sale Claim was by that time already precluded. Clark had ample opportunity to bring the Unauthorized Sale Claim at a more appropriate stage of the Puget Sound Proceeding, but failed to do so, instead waiting until almost a year after the litigation had effectively concluded and the ALJ had issued her decision. Finally, if Clark disagreed with the bankruptcy court's order denying relief from stay to bring the Unauthorized Sale Claim, then Clark should have appealed that order. It did not, and Clark cannot now argue that its dereliction in failing to assert the Unauthorized Sale Claim in a timely manner and in

-33-

failing to appeal the bankruptcy court's decision somehow preserves the Unauthorized Sale Claim.

The only obstacle preventing Clark from asserting the Unauthorized Sale Claim at the Puget Sound Proceeding was the fact that Clark had not yet thought of it. It was only after Clark had lost before the ALJ on the merits of its Unreasonable Rate Claim that Clark came up with the Unauthorized Sale Claim. Clark should not be allowed to invent new theories of liability and demand new proceedings on those theories whenever its prior theories are rejected on the merits. The Unauthorized Sale Claim could have been brought at the Puget Sound Proceeding, but was not; it is now precluded by the June 25th FERC Decision.

5.    *It Was Not Inequitable for the Bankruptcy Court to Hold That the Unauthorized Sale Claim Was Precluded*

Clark argues that it was inequitable for the bankruptcy court to apply res judicata to the Unauthorized Sale Claim because Clark was not allowed to fully litigate the Unreasonable Rate Claim in the Puget Sound Proceeding. In particular, Clark contends that it "was barred at every turn from asserting its unauthorized sale claim against Kaiser due to the bankruptcy stay." (Clark Br. at 30.) Clark further asserts that "the automatic stay is not an offensive weapon" and the bankruptcy court erred because it "granted Kaiser's request to turn the automatic stay into a sword." (Id. at 31-32.)

What Clark completely ignores, however, is the fact that the litigation was essentially concluded before KACC even filed its chapter 11 case. As outlined above, Clark was afforded a full and complete opportunity to participate in the Puget Sound Proceeding and to present its case to the FERC, including the opportunity to: (i) submit prepared testimony; (ii) conduct discovery; (iii) participate in the evidentiary hearing before the ALJ; (iv) cross-examine KACC's witnesses; (v) submit post-hearing briefs and proposed findings of fact and conclusions of law; and (vi) submit comments to the ALJ Decision. All of this occurred well prior to the bankruptcy. Moreover, after the FERC

-34-

subsequently re-opened the record and Clark filed its second motion for relief from the

automatic stay (a motion in which Clark did not request authority to assert the

Unauthorized Sale Claim), the bankruptcy court, following the FERC's clarification on

the Discovery Order, granted Clark authority to conduct additional discovery and submit

additional evidence to the FERC. Clark's assertions that it was somehow prevented from

fully and fairly litigating its claims before the FERC are completely unfounded.

   Clark also suggests that the bankruptcy court implied that Clark would be

entitled to litigate the merits of its Unauthorized Sale Claim through the claims allowance

process in KACC's bankruptcy — "[t]he bankruptcy court even stated that Clark had a

'pure and simple' damage claim that had to be asserted in the bankruptcy proceeding

rather than the FERC." (Clark Br. at 30.) Clark argues that it is now somehow

inequitable that the bankruptcy court did not reach the merits of the Unauthorized Sale

Claim. Clark conveniently ignores, however, the Court's statements at the same hearing

recognizing that the Unauthorized Sale Claim may be precluded:

> THE COURT: - - this is premature. I think you need to
> wait and see what happens, what ruling you get from the
> Commission. If the Commission's action somehow isn't res
> judicata, or doesn't collaterally estop on some other theory,
> then perhaps at that point you can seek relief from stay.
> But I'm not sure if the Commission acts piecemeal, I would
> think it not likely, I mean most Courts want to know all the
> theories at one time so we only have to look at a transaction
> once, and the Commission I think wouldn't be much
> different from that.

(Tr. of July 23, 2002 Hr'g at 92.) In no way was the bankruptcy court suggesting that the

Unauthorized Sale Claim could be litigated as part of the claims allowance process free

of any assertion that it was precluded as a result of Clark's failure to raise it in the Puget

Sound Proceeding. The Bankruptcy Court made this clear in its ruling on the Motion for

Summary Judgment:

> "Clark did raise one point that perhaps I should address.
> And that is that they were compelled by the Court to bring
> their claims before this Court so that the issues could go
> forward in the claims objection process. And that is true.

> The Debtor, however, still has objections that can be raised
> in that claims objection process, and in this instance I think
> the Debtor has established that <u>res judicata</u> bars that second
> bite at the apple, whether it's here or before the FERC."

(Tr. of Jan. 30, 2006 Hr'g at 7.)  Clark filed a claim and participated in the claims

allowance process as suggested by the bankruptcy court, and its claim was simply

defeated by a valid defense of KACC in the normal course of that process.  Clark was

neither promised a successful outcome nor a hearing on the merits of its claims, and there

is no inequity in the bankruptcy court's application of <u>res judicata</u> to bar an obviously

precluded claim.

### 6.    *It Would Be Inappropriate at This Point to Defer to the FERC to Determine Whether the Unauthorized Sale Claim Is Precluded*

Finally, Clark argues that since the FERC has to consider the public

interest in its decisions, only the FERC should decide whether specific FERC decisions

should be accorded preclusive effect.  (Clark Br. at 32.)  This contention is wrong as a

matter of law.  Although every administrative agency considers the public interest when

it acts, the Supreme Court has specifically authorized courts to give <u>res judicata</u> effect to

the judgments of administrative agencies when they are acting in a judicial capacity.

<u>United States v. Utah Constr. & Mining Co.</u>, 384 U.S. 394, 422 (1966).  The Supreme

Court's decision would be meaningless if the preclusive effect of every administrative

determination could only be decided by the agency itself.

Although there may be legitimate reasons to defer to the FERC in certain

situations,[15] there are no such reasons here.  This case is a straightforward application of

---

[15]    The case cited by Clark provides an excellent example of the sort of extraordinary
situation that would warrant a court deferring to the FERC on the preclusive
effects of a prior FERC determination.  In that case, a petitioner challenged the
FERC's decision that it lacked jurisdiction to determine a prudence issue.
<u>Trunkline LNG Co. v. FERC</u>, 921 F.2d 313, 317 (D.C. Cir. 1990).  After the
appeal was taken, the FERC reversed course and decided that it did in fact have
jurisdiction and asked the Court of Appeals to remand the prudence issue to the
FERC for further determination.  <u>Id.</u>  Another petitioner argued that the FERC
lacked jurisdiction over the prudence issue and was barred by the preclusion

DLI-6028134v2

claim preclusion in a dispute between two private parties that does not require an interpretation of statutory law. The bankruptcy court was unquestionably qualified to apply the well-established rules of claim preclusion to adjudicate the Motion for Summary Judgment. Moreover, given that the bankruptcy court has already ruled and the briefing to this Court is nearly complete, deferring to the FERC at this point and allowing Clark to initiate an entirely new proceeding would largely defeat the concepts of judicial economy underlying the doctrine of claim preclusion

## V.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THAT THE UNREASONABLE RATE CLAIM SHOULD BE DISALLOWED

Clark argues that the Unreasonable Rate Claim is not barred by res judicata: "[w]ith regard to the unjust and unreasonable rate claim, Kaiser has failed to establish as a matter of law the third element of the res judicata test." (Clark Br. at 27.) Clark, however, misunderstands KACC's argument and the bankruptcy court's ruling. KACC never argued, and the bankruptcy court never held, that the Unreasonable Rate Claim was barred by res judicata. Clark's arguments on that point are wholly irrelevant.

The bankruptcy court disallowed the Unreasonable Rate Claim because the FERC's rejection of the Unreasonable Rate Claim on the merits meant that Clark did not hold an allowable claim: "[w]ith respect to the unreasonable rate issue that is on appeal, I think at this point in time that still means that Clark's claim is subject to disallowance. At best it is a contingent claim at this point. . . . But right now, based on the FERC's decision, I do not see that Clark has an allowable claim." (Tr. of Jan. 30, 2006 Hr'g at 7.) The bankruptcy court based its decision to disallow the Unreasonable

---

(continued...)

doctrines from addressing the prudence issue. Id. The Court of Appeals for the District of Columbia held that the FERC should have the first word in determining whether the matter fell within its jurisdiction and remanded the proceeding to the FERC. Since the proceeding was being remanded to the FERC, the Court of Appeals for the District of Columbia also decided that the preclusion issue should be decided by the FERC in the first instance as well. Id.

-37-

Rate Claim on traditional principles of bankruptcy law applicable to the claims allowance and disallowance process, not on <u>res judicata</u>. Clark presents no argument that the bankruptcy court erred in its application of bankruptcy law to disallow the Unreasonable Rate Claim.

Furthermore, the bankruptcy court's disallowance of the Unreasonable Rate Claim was perfectly reasonable and appropriate given that (i) Clark has the ability to seek reconsideration of the claim under section 502(j) of the Bankruptcy Code in the highly unlikely event that the Ninth Circuit reverses the FERC's decision in the Puget Sound Proceeding and (ii) KACC is required under its plan of reorganization to maintain a sufficient reserve of stock in Reorganized KACC to make a distribution on the full amount of Clark's claims until all appeals of the bankruptcy court's order disallowing the claims are concluded. Moreover, the disallowance of the Unreasonable Rate Claim avoids bifurcated litigation on the two claims.

### CONCLUSION

For all the foregoing reasons, the bankruptcy court's ruling should be affirmed in all respects.

DLI-6028134v2

Dated:  September 14, 2006
       Wilmington, Delaware

Respectfully submitted,

_Kimberly D. Newmarch_
Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

       -and-

Gregory M. Gordon (TX 08435300)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas  75201
Telephone:  (214) 220-3939
Facsimile:  (214) 969-5100

ATTORNEYS FOR APPELLEES
KAISER ALUMINUM CORPORATION,
et al.

-39-

# EXHIBIT A

**(UNREPORTED OPINIONS)**

Westlaw.

Not Reported in F.Supp.                                                                                Page 1
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
PROTOCOMM CORP., Plaintiff,
v.
NOVELL, INC. and NOVELL MULTIMEDIA,
INC., Defendants.
**No. CIV.A. 94-7774.**

June 30, 1998.

*MEMORANDUM*

REED

**\*1** In an Order dated December 9, 1994, this Court denied in part the motion of plaintiff ProtoComm Corp. ("ProtoComm") for leave to file an amended complaint in the precursor to this case, *ProtoComm Corp. v. Novell Multimedia, Inc.*, No. 93-0518 ("*ProtoComm I* "). The Court reasoned that allowing ProtoComm to fully amend its complaint would have resulted at that "advanced stage of the proceedings" in "further delay of this action" that "would be unfair to [Novell Multimedia, Inc.] and this Court." (Document No. 101 at 3). Made without the benefit of hindsight the Court enjoys today, the decision to deny leave to amend has failed to facilitate a more expeditious resolution of the dispute between these parties or to conserve the resources of this Court. For within months of the Order denying in part its motion to amend its complaint in *ProtoComm I*, ProtoComm filed this separate lawsuit against Novell Multimedia, Inc. (formally known and hereinafter referred to as "Fluent") and Novell, Inc, ("Novell"), and alleged the same claims against Novell and Fluent which ProtoComm unsuccessfully sought to add to its original suit.

Before the Court are the motions of defendants Novell and Fluent for summary judgment (Document Nos. 22 and 24 respectively). Because this Court finds that the claims of ProtoComm against Fluent and Novell here are essentially similar to the claims made in *ProtoComm I* and that ProtoComm attempted to add these same claims to its complaint in *ProtoComm I*, I conclude that the claims are barred by claim preclusion. Accordingly, the motions will be granted.

I. BACKGROUND HISTORY

The voluminous facts of this case have been detailed in Memoranda of this Court dated December 27, 1994 (Document No. 103), January 4, 1995 (Document No. 106), February 26, 1997 (Document No. 312) in *ProtoComm I* and will not be repeated here in full. The brief summary of facts which follows is gleaned from these Memoranda and the parties' submissions to the Court in relation to the pending motions for summary judgment.

On April 28, 1992, ProtoComm and Fluent signed a Cross Licensing Agreement and Memorandum of Understanding ("the Agreement") which memorialized an arrangement to cooperate and not to compete with each other in the development and sale of a multimedia computer software product which would allow networked computers to show full-motion digital video playback. ProtoComm and Fluent agreed to work together to combine the function of "video streaming," which was developed by ProtoComm, with the function of "scaling," which was developed by Fluent, in order to develop a joint product. Video streaming allows a stream of video data to flow directly from the server's hard drive to the client's workstation. Scaling maintains the synchronization of the audio and video data which reaches network workstations by "throwing away" information being delivered by full motion video by reducing the delivery from thirty frames per second to twenty or ten frames per second. The Agreement provided that the parties would not use each others' proprietary information except for in development of a joint product and that neither party could produce any product that would compete with the core technology the other was contributing to the joint effort.

**\*2** ProtoComm filed suit against Fluent on January 29, 1993, and ultimately alleged claims for breach of contract, fraud, specific performance and injunctive relief, misuse of confidential information, unjust enrichment, restitution, violation of the Lanham Act, and punitive damages.[FN1] This lawsuit was *ProtoComm I* (Civil Action No. 93-0518). ProtoComm claimed therein that with the inducement and assistance of Novell, Fluent shared with Novell information about video streaming that it gained from ProtoComm through the Agreement in order to produce two joint products with Novell, in violation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
**(Cite as: Not Reported in F.Supp.)**

of the Agreement with ProtoComm. Novell develops, manufactures, and markets computer software, including computer operating systems software for local area networks. In July of 1993, Novell acquired the Fluent company for approximately $21.5 million and Fluent (eventually by name change, Novell Multimedia, Inc.) became a wholly-owned subsidiary of Novell.

> FN1. The original complaint (Document No. 1) contained claims for specific performance and injunctive relief (Count I), for additional injunctive relief (Count II), for money damages (Count III), and misuse of confidential information (Count IV). On December 9, 1994, this Court granted in part ProtoComm's motion for leave to amend the complaint and allowed ProtoComm to add claims for fraud, unjust enrichment, restitution, and a claim under the Lanham Act. ProtoComm filed an amended complaint on December 28, 1994 (Document No. 104) and a second amended complaint on January 12, 1995 (Document No. 109). Pursuant to Local Rule of Civil Procedure 16.1(d), this Court adopted the Second Proposed Joint Pretrial Order (Document No. 161) and the Joint Legal Issues Supplement (Document No. 177) (hereinafter "superseding pleadings") of the parties on June 26, 1996, which superseded all pleadings. The superseding pleadings defined the claims for trial as breach of contract, fraud, specific performance and injunctive relief, misuse of confidential information, unjust enrichment, restitution, violation of the Lanham Act, and punitive damages.

On December 20, 1993, ProtoComm filed a motion for leave to amend the complaint in *ProtoComm I*. ProtoComm sought to add Novell as a defendant and to allege various new claims against Novell and Fluent. In an Order dated December 9, 1994, this Court denied the motion in part and granted it in part. This Court denied ProtoComm's request to add Novell as a defendant and to add antitrust claims against Fluent and Novell because the request was untimely and because the claims that ProtoComm wanted to add would "create an entirely different case requiring considerable factual and legal investigation concerning wholly new theories of law and concepts of recovery" (Document No. 101 at 1).

The disposition of ProtoComm's claims in *ProtoComm I* at trial was as follows: ProtoComm withdrew its claims for specific performance and injunctive relief, misuse of confidential information, unjust enrichment, and restitution; the Court denied ProtoComm's claims under the Lanham Act and for punitive damages as a matter of law upon a motion by Fluent under Federal Rule of Civil Procedure 50; the claims of fraud and breach of contract went to the jury. In July of 1996, *ProtoComm I* went to trial and a jury returned a verdict of $12.5 million in favor of ProtoComm on its breach of contract claim and found against ProtoComm on its fraud claim. The judgment entered on this verdict was affirmed by the Court of Appeals for the Third Circuit on October 29, 1997. *See ProtoComm Corp. v. Novell Multimedia, Inc.*, No. 97-1192, slip op. at 1 (3d Cir. October 29, 1997).

Shortly after the partial denial of its motion for leave to amend in *ProtoComm I*, ProtoComm filed this lawsuit against Fluent and Novell ("*ProtoComm II*"). The complaint alleges essentially the same claims that ProtoComm sought to add in its proposed amended complaint. The complaint includes claims against Fluent and Novell under sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act, and claims against Novell for fraud, intentional interference with an existing contract, specific performance and injunctive relief, breach of contract, misuse of confidential information, unjust enrichment, restitution, and violation of the Lanham Act. ProtoComm subsequently withdrew its claims against Novell for specific performance and injunctive relief, breach of contract, misuse of confidential information, and the Lanham Act violation. Novell and Fluent filed motions for summary judgment in October of 1997 arguing that the claims asserted in *ProtoComm II* are barred by claim preclusion (or res judicata), or by issue preclusion (or collateral estoppel),[FN2] and alternatively that they are entitled to judgment as a matter of law on the merits of ProtoComm's claims.

> FN2. After Novell and Fluent filed these motions for summary judgment, the parties entered into a stipulation which explicitly deemed moot that part of Novell's motion based on issue preclusion. (Document No. 28)

II. STANDARD FOR SUMMARY JUDGMENT

**\*3** Rule 56(c) of the Federal Rules of Civil Procedure provides that "if the pleadings, depositions, answers

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
**(Cite as: Not Reported in F.Supp.)**

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" then a motion for summary judgment may be granted. The moving party has the initial burden of illustrating for the court the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159-161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### III. DISCUSSION

#### A. Claim Preclusion

*1. The Arguments of the Parties*

The first basis for summary judgment that Novell and Fluent present is the affirmative defense of claim preclusion. Novell argues that the claims that ProtoComm asserts in this case are barred by claim preclusion because (1) the Order of this Court dated February 25, 1997 denying Fluent's post-trial motions in *ProtoComm I* constitutes a final order, (2) Novell and Fluent are in privity for res judicata purposes, and (3) all of the claims asserted by ProtoComm in this case arise out of the same transactions that were litigated in *ProtoComm I.*[FN3]

> FN3. Fluent makes similar claim preclusion arguments in support of its motion for summary judgment and generally adopts the arguments of Novell, with the exception that Fluent does not make a privity argument because ProtoComm was a party to the first action, and thus, does not need to establish privity.

First, Novell argues that a final order exists not only as to the claims decided on the merits in *ProtoComm I,* including the claims for breach of contract, fraud, punitive damages, and the claim under the Lanham Act, but also to those voluntarily withdrawn by ProtoComm, including the claims for specific performance and injunctive relief, misuse of confidential information, unjust enrichment and restitution because ProtoComm withdrew the claims unilaterally without stipulation or by order of the Court, and thus, the claims are dismissed with

prejudice under Federal Rule of Civil Procedure 41(a). Second, Novell argues that privity exists because at the time of the trial Novell owned Fluent as a wholly owned subsidiary, and Novell assisted in the defense of Fluent in *ProtoComm I.* Third, Novell argues that the events forming the factual predicate of this case are identical to those in *ProtoComm I.* In addition, Novell argues that claim preclusion applies to the claims excluded from *ProtoComm I* by the denial of the motion to amend the complaint.

ProtoComm counters the defendants' position with three arguments: (1) the issues raised in *ProtoComm II* are not identical to the issues raised in *ProtoComm I* and Novell was not named as a defendant, (2) there has been no final judgment on the issues presented in *ProtoComm II* and (3) while ProtoComm attempted to raise similar claims in *ProtoComm I,* Fluent and Novell wrongfully prevented ProtoComm from doing so.

*\*4 2. Legal Analysis*

First, I take the task of clarifying some vocabulary: for the purposes of this Memorandum and in line with the modern trend, I will refer to the effect of a judgment in an earlier proceeding in precluding litigation of the *same cause of action* as "claim preclusion" and to the effect of a judgment in an earlier proceeding in precluding the relitigation of *issues* that have been actually litigated and decided as "issue preclusion." *See United States v. Athlone Industries, Inc.,* 746 F.2d 977, 983 n. 4 (3d Cir.1984)[FN4]

> FN4. Much confusion surrounds the definition and nomenclature of these two distinct concepts. For example, Wright and Miller and occasionally the Court of Appeals for the Third Circuit refer to both concepts generally as res judicata. *See Lubrizol Corp. v. Exxon Corp.,* 929 F.2d 960, 961 n. 1 (3d Cir.1991); 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4402 (1981). Novell and other courts and commentators, including occasionally the Court of Appeals for the Third Circuit, equate claim preclusion to res judicata and issue preclusion to collateral estoppel. *See Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 504-505 (3d Cir.1992)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
(Cite as: Not Reported in F.Supp.)

It is well established that claim preclusion bars the assertion of a claim in a subsequent suit that was or could have been asserted in an earlier suit if there is "(1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities, and (3) a subsequent suit based on the same cause of action." *See Board of Trustees of Trucking Employees of North Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 504 (3d Cir.1992). The doctrine of claim preclusion bars not only claims actually litigated but also claims that could have been brought in the prior action. *Id* ("Claim preclusion, formerly referred to as res judicata, gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding.") [FN5]

> FN5. ProtoComm maintains that for "res judicata" to apply, the issue sought to be precluded must be the same issue as that involved in the prior action, the issue must have been actually litigated, and the issue must have been determined by a final judgment, citing *Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1231-32 (3d Cir.1995). This test from *Burlington,* however, is not apposite because it pertains to issue preclusion, or collateral estoppel, not claim preclusion

*a  Existence of a Final Judgment*

I agree with the defendants that there has been a final judgment on the merits in *ProtoComm I* sufficient for claim preclusion purposes, in that this Court found against ProtoComm as a matter of law on its claims under the Lanham Act and for punitive damages, the jury returned a verdict on ProtoComm's claims for breach of contract and fraud against Fluent, this Court entered judgment on the verdict and denied post-trial motions, and the verdict was affirmed on appeal. As these adjudications are sufficient to constitute a final judgment in *ProtoComm I* for the purposes applying the doctrine of claim preclusion to *ProtoComm II,* this Court need not and will not reach the question presented by Novell of whether ProtoComm's withdrawal of some of its claims constitutes a dismissal with prejudice and thus a final judgment.
*b. Presence of the Same Parties or Privity between the Parties*

In *Gambocz v. Yelencsics,* the Court of Appeals for the Third Circuit noted that "res judicata may be invoked against a plaintiff who has previously asserted essentially the same claim against different defendants where there is a close or significant relationship between successive defendants." *Gambocz v. Yelencsics,* 468 F.2d 837, 841 (3d Cir.1972). Indeed, "a lesser degree of privity is required for a new defendant to benefit from claim preclusion than for a plaintiff to bind a new defendant in a later action." *Lubrizol,* 929 F.2d at 966 (citing *Bruszewski v. United States,* 181 F.2d 419 (3d Cir.), *cert denied,* 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950)).

*5 The requirement of the presence of the same parties or privity between the parties is obviously satisfied as to Fluent as it was the named defendant in *ProtoComm I*  I conclude that Novell is in privity with Fluent for claim preclusion purposes for two reasons  First, Novell acquired Fluent as a wholly owned subsidiary in July of 1993  *See Centra,* 983 F.2d 495, 504 (3d Cir.1992) (noting that defendant which acquired corporation which was defendant in prior action was in privity with prior defendant); *see also Lubrizol,* 929 F.2d at 966 (holding that defendant which was not a party to initial action was in privity to original defendant because the defendant was a wholly owned affiliate of original defendant, was a defendant in a similar case, and was a signatory to a settlement agreement between the parties); *In re Tetronics Services, Inc.,* 762 F.2d 185, 187-88 (2d Cir.1985) (holding that a wholly owned subsidiary of defendant in previous suit may benefit from claim preclusion); *G & T Terminal Packaging Co. v. Consolidated Rail Corporation,* 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that subsidiaries are in privity with their principal for res judicata purposes when they sufficiently represent the principal's interests). Novell's participation in the defense of *ProtoComm I* demonstrates as well a close and significant relationship sufficient to establish privity between Fluent and Novell for claim preclusion purposes. ProtoComm admits that "Novell was plainly running the defense in ProtoComm I" by December of 1993 (Pl.'s Mem. at 25) *See Tetronics,* 762 F.2d at 191 (holding that plaintiff was in privity with corporation for claim preclusion purposes due to his continuous and active "non-party" participation in prior litigation by corporation).
*c. Claims Arising from the Same Cause of Action*

Like the term "privity," the term "cause of action" has a broad definition in the context of claim

preclusion. The Court of Appeals for the Third Circuit has noted that in the claim preclusion context "the term 'cause of action' cannot be precisely defined, nor can a simple test be cited for use in determining what constitutes a cause of action for res judicata purposes." *United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir.1984)*. In determining what constitutes a cause of action, a court should consider the "essential similarity of the underlying events giving rise to the various legal claims" *Davis v. United States Steel Supply, 688 F.2d 166, 171 (3d Cir.1982)* (en banc), *cert. denied, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983)* This includes an inquiry into the similarity of the acts complained of, the similarity of the material facts alleged, and the similarity of the witnesses and documentation needed to prove the allegations. *Lubrizol, 929 F.2d at 963* (citing *Athlone, 746 F.2d at 984*). These factors are consistent with the present trend in the law of claim preclusion toward " 'requiring that a plaintiff present in one suit all the claims for relief that he may have arising out of the same transaction or occurrence ' " *Athlone, 746 F.2d at 984* (quoting 1B J. Moore & J. Wicer, Moore's Federal Practice ¶ 0.410[1] at 359 (2d ed. 1983)). Thus, claims in a second suit brought under legal theories that differ from those presented in an earlier lawsuit or that request different relief do not necessarily obviate the preclusive effects of claim preclusion if all of the theories comprise the same cause of action. *See Athlone, 746 F.2d at 984*.

*6 Determining whether the claims asserted in *ProtoComm II* are part of the same cause of action presented in *ProtoComm I* is a formidable task, given the lack of a simple definition or a clear test, and the number and complexity of the allegations made in both suits. I must determine if the claims alleged in *ProtoComm II* arise from the same transactions forming the basis of *ProtoComm I* and as such, could have been timely alleged by ProtoComm in *ProtoComm I*.

Consistent with the guidelines set forth in *Athlone* and *Lubrizol,* the first step is an inquiry into the similarity of the acts complained of. Overall, the wrongful acts complained of by ProtoComm in both *ProtoComm I* and *ProtoComm II* may be boiled down to this: As part of their scheme to drive ProtoComm out of the video software market, Fluent and Novell worked together to develop software which used confidential proprietary information about video streaming technology which Fluent illegally gained from ProtoComm in violation of the Agreement between ProtoComm and Fluent and

which Novell gained by deceiving ProtoComm. Once Fluent and Novell developed a successful video software product by using technology from ProtoComm, Novell purchased Fluent and discouraged venture capitalists from investing in ProtoComm in order to secure its dominance in the video software market.

The second step is an inquiry into the similarity of the facts *actually* alleged. This Court has undertaken the task of carefully comparing the similarity of the facts alleged in the pleadings of *ProtoComm I* [FN6] and *ProtoComm II* and concludes that the allegations are essentially similar. Even though ProtoComm alleged some facts in *ProtoComm II* that it did not plead in *ProtoComm I,* this does not conclusively establish that the two lawsuits represent separate causes of action because ProtoComm should have alleged all facts forming the underlying transactions and all claims arising from those transactions in *ProtoComm I* [FN7] As to the specific claims made against Novell and Fluent in *ProtoComm II,* I will summarize the allegations pertaining to each claim individually.

> FN6. For purposes of this comparison, this Court considered all stages of the pleading in *ProtoComm I,* including the allegations of the complaint, amended complaint, second amended complaint, and the superseding pleadings

> FN7. ProtoComm's argument that it would have pleaded all of these facts if the Court would have allowed it to fully amend its complaint in *ProtoComm I* will be addressed in section B of this Memorandum.

First, ProtoComm makes antitrust claims against Fluent and Novell for violations of Section 1 (Count I) and Section 2 (Count III) of the Sherman Act and against Novell for violation of Section 2 of the Sherman Act (Count II). In Count I, ProtoComm alleges that the actions of Novell and Fluent constitute a combination or conspiracy to restrain trade in the network operating systems ("NOS") and network video software markets, a vertical market division, and a joint venture to restrain trade. In Count II, ProtoComm alleges that the actions of Novell constitute a monopolization or attempted monopolization of the NOS and video server software markets. In Count III, ProtoComm alleges that the actions of Novell and Fluent constitute a conspiracy or combination to monopolize the NOS and video server software markets.

Not Reported in F.Supp.                                                                                       Page 6
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
(Cite as: Not Reported in F.Supp.)

**\*7** In referring to the "actions" of Novell and Fluent, ProtoComm refers to the factual allegations it made in the complaint. I conclude that those factual allegations are essentially similar to and substantively the same as the allegations made in the amended complaint and superseding pleadings in *ProtoComm I;* ProtoComm included some generic allegations related to monopoly, market control, and antitrust violations against Novell and Fluent in *ProtoComm I.* (Second Amended Complaint ¶   50; Amended Complaint ¶ ¶  78, 79, 82). The only difference is that in Counts I, II, and III of the complaint in *ProtoComm II,* ProtoComm attacks those same actions under a different, more focused legal theory: that those actions are violations of specific antitrust laws. Attaching another legal theory onto the same factual predicate is not enough to escape the barring effect of claim preclusion.

In Count IV of *ProtoComm II,* ProtoComm makes a claim against Novell and Fluent for violation of Section 7 of the Clayton Act. ProtoComm alleges that by acquiring Fluent, Novell acquired its patents and copyrights which will substantially lessen competition because the remaining video server companies will feel pressure to withdraw from the market, as ProtoComm did, and will tend to create a monopoly in violation of Section 7 of the Clayton Act. The fact that Novell acquired Fluent was included in the pleadings in *ProtoComm I* (Second Amended Complaint ¶ ¶   51, 93; Amended Complaint ¶  80).

ProtoComm makes a claim for fraud against Novell in *ProtoComm II* (Count V). ProtoComm made similar claims against Fluent in *ProtoComm I,* ProtoComm alleged that Fluent never intended to perform the Agreement and that Fluent worked with Novell to gain competitive advantage over ProtoComm. (Joint Legal Issues Supplement at 2). In *ProtoComm II,* ProtoComm alleges that Novell obtained proprietary information from ProtoComm by misrepresenting to ProtoComm that it was interested in investing in ProtoComm and then used this information with Fluent to gain competitive advantage over ProtoComm. (Complaint ¶ ¶  123-26). ProtoComm made essentially this same assertion about Novell in the amended complaint and superseding pleadings in *ProtoComm I.* (Amended Complaint ¶ ¶  20, 48; Second Amended Complaint ¶  27(m) and (n); Second Proposed Joint Final Pretrial Order at 36-45).

In Count VI of *ProtoComm II,* ProtoComm makes a

claim against Novell for intentional interference with existing contractual relations. ProtoComm alleges that Novell knew as of June of 1992 of the existence of the Agreement between Fluent and ProtoComm but that Novell interfered with the Agreement by assisting Fluent in developing streaming technology, eliciting proprietary information from ProtoComm and sharing it with Fluent, and spreading rumors that ProtoComm's technology would be incorporated into Novell's product. These actions of Novell, ProtoComm alleges, enabled Fluent to breach the Agreement with ProtoComm. The actions in the ProtoComm refers to in this Count are basically the same actions that form the basis of its claims for fraud against Novell and are essentially the same facts that formed the basis of ProtoComm's claims against Fluent in *ProtoComm I.* (Amended Complaint ¶ ¶   48, 51, 55, 60, 67-72; Second Amended Complaint ¶  27(m) and (n), 28, 32, 41-45).

**\*8** ProtoComm makes a claim for unjust enrichment (Count X) and restitution (Count XI) against Novell in *ProtoComm II.* ProtoComm made similar claims against Fluent in *ProtoComm I,* ProtoComm alleged that Fluent was unjustly enriched by using proprietary information from ProtoComm in the development of its products (Amended Complaint Count V and VI; Joint Legal Issues Supplement at 4) and that while ProtoComm performed under the Agreement, Fluent never performed and took unfair advantage of ProtoComm's performance by working with Novell to develop competitive products. (Joint Legal Issues Supplement at 4-5). In *ProtoComm II,* ProtoComm alleges that Novell was enriched by the use of proprietary information given to Fluent and Novell by ProtoComm (Complaint ¶ ¶  153-57) and that Novell continues to benefit from the development of a new product between Novell and Fluent based on ProtoComm's proprietary information (Complaint ¶ ¶   158-167). Again, ProtoComm made almost identical assertions regarding Novell's involvement and financial gain in *ProtoComm I* (Amended Complaint ¶  84; Second Amended Complaint ¶ ¶  47, 54, 83-85).

The third step in determining whether these claims arise from the same cause of action is an inquiry into the similarity of the witnesses and documentation needed to prove the allegations in these two cases. I find that the evidence needed to prove the allegations in *ProtoComm II* would be essentially similar to that of *ProtoComm I.* The witnesses in both cases would include all individuals who had any knowledge of the transactions among ProtoComm, Fluent, and Novell. In *ProtoComm I,* the parties listed over one hundred

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp                                                                                    Page 7
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
**(Cite as: Not Reported in F.Supp.)**

possible witnesses who could testify as to the nature of the parties' businesses, the development and breakdown of the relationships among the parties, the nature of the video software market, and more. (Second Proposed Joint Final Pretrial Order at 101-188). These witnesses included individuals from ProtoComm, Fluent, and Novell. The lengthy exhibit lists submitted by the parties in *ProtoComm I* illustrate the wide range of documentation relevant to the claims in *ProtoComm I*. Again, these documents cover the nature of the parties' businesses and the relationships and transactions among the parties, including evidence relating to Novell's involvement in these transactions, much of which would be needed to prove the allegations of *ProtoComm II*. (Second Proposed Joint Final Pretrial Order Exs. A and B).

Based on the foregoing comparison of the pleadings of *ProtoComm I* and *ProtoComm II*, I find that the underlying acts complained of, the facts alleged, and consequently the evidence needed to prove these factual allegations are essentially similar and that claim preclusion applies to the claims asserted here. Finally, I turn to address ProtoComm's argument that an exception should be made to the doctrine of claim preclusion in this case because the Court denied it the opportunity to fully amend its complaint in *ProtoComm I*.

### B. Effect of the Partial Denial of Leave to Amend the Complaint in *ProtoComm I*

**\*9 *1. ProtoComm's Argument***

ProtoComm also argues that it could not have raised the claims presented in *ProtoComm II* in *ProtoComm I* because at the urging and as a result of the wrongful conduct of Novell and Fluent, this Court partially denied its motion for leave to amend the complaint in *ProtoComm I* to include claims against Novell and antitrust claims against Fluent and Novell. ProtoComm contends it could have filed its motion to amend the complaint earlier but for Novell's obstructive conduct, including its offer to engage in settlement negotiations in *ProtoComm I* and subsequent attempts to evade the discovery efforts of ProtoComm. In addition, ProtoComm claims that Fluent and Novell argued in opposition to the motion for leave to amend the complaint that while denying the motion would not prejudice ProtoComm, amending the complaint would prejudice Novell by adding it as a party so late in the progression of *ProtoComm I* and would prejudice Fluent by causing

unnecessary delay in recovering on its counterclaims, a position which ProtoComm asserts time revealed to be unfounded. ProtoComm argues that it would be unfair for this Court to have denied it the opportunity to amend its complaint only to have this Court later rule that those claims are barred by claim preclusion. See *Bruszewski v. U.S.,* 181 F.2d 419, 421 (3d Cir.1950) (noting that an exception to claim preclusion may be made in cases in which some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case).

**2. Analysis**

In the December 9, 1994 Order partially denying the motion for leave to amend the complaint, I noted that "ProtoComm admits in its brief that its new claims are not time barred and are viable independent of this action" in concluding that Magistrate Judge Angell's resolution of the motion in her Report and Recommendation was not a dispositive matter. (Document No. 101 at 2 n. 1). I also concluded that Judge Angell's finding that the addition of Novell as a party and the addition of the antitrust claims "would create an entirely different case requiring considerable factual and legal investigation" was supported by the record. (Document No. 101 at 3). ProtoComm argues that these statements are inconsistent with a finding that its claims are now barred by claim preclusion and points to these statements as evidence of the unfairness it would suffer if this Court were to so hold.

I begin by echoing a fellow District Judge's recent quotation of Sir Francis Bacon that "an overspeaking judge is no well-tuned cymbal." [FN6] To the extent that the wording of that Order at the time implied that ProtoComm would be able to maintain a separate lawsuit against Novell and Fluent or now seems inconsistent with my conclusion that the claims in *ProtoComm II* are barred by claim preclusion, I regret any overstatement of my reasoning for denying that motion. The language of that Order, however, was not legally determinative and does not change my conclusion that the events forming the basis for the claims asserted in *ProtoComm I* and *ProtoComm II* are essentially similar so as to form the same cause of action. The December 9, 1994 Order disposed of a motion for leave to amend the complaint, and in deciding to deny the motion, this Court considered factors such as prejudice to the parties and wise use of judicial resources at that stage of the proceedings. The decision of the Court today is made in the context of a motion for summary judgment based on

Not Reported in F.Supp.                                                                                                                    Page 8
Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204
**(Cite as: Not Reported in F.Supp.)**

claim preclusion and is made on a more complete record, which better illustrates the similarity of the underlying facts and evidence required to prove the claims in both *ProtoComm I* and *ProtoComm II*

> FN8. In *United States v. McGann,* 951 F.Supp. 372 (E.D.N.Y.1997), Judge Glasser had ruled in an earlier opinion that the government's claim for breach of fiduciary duty was barred under the statute of limitation but implied that if the government wanted to make out a claim for breach of fiduciary duty for actions that took place within the statute of limitations, it should so plead. The government moved for leave to amend the complaint three years later, a motion which Judge Glasser denied as untimely. The government then filed a separate complaint alleging breach of fiduciary duty against the same defendant. Judge Glasser used this quote to lament the inconsistency between the earlier implied indication that the government could bring a claim for breach of fiduciary duty and his current decision to hold that claim barred by claim preclusion.

**\*10** Further, this Court has discretion to deny leave to amend the complaint under Federal Rule of Civil Procedure 15(a) if the motion is untimely. Thus, the argument of ProtoComm that it could not have raised these claims earlier because its motion for leave to amend the complaint was denied is without merit. ProtoComm filed its complaint in *ProtoComm I* on January 29, 1993. At that point, all of the alleged events involving Novell and Fluent had taken place except the alleged misrepresentations made by Novell about ProtoComm to venture capitalists in early 1993 and the purchase of Fluent by Novell on July 7, 1993. ProtoComm then waited five and one half months after the acquisition of Fluent by Novell, until December 20, 1993, to file its motion for leave to amend the complaint, almost a year after the litigation had commenced. Although this Court did not enter its Order denying leave to amend until much later, it was based on the reasoning of the Report and Recommendation of Magistrate Judge Angell that was filed on January 27, 1994. Magistrate Judge Angell's Report and Recommendation that the proposed amendments to the complaint were untimely and would have delayed the trial to the prejudice of the parties and the Court was based on the status of the record and case in January of 1994, shortly after ProtoComm's motion was filed.

In addition, ProtoComm ultimately could have appealed from the Order denying its motion for leave to amend, an opportunity it did not take. If ProtoComm believed that the decision to deny its motion for leave to amend the complaint was, as it implies, wrested from this Court through the wrongful conduct of Fluent and Novell, then its remedy was to appeal that decision. It cannot now try to circumvent that decision by pursuing those same claims in this lawsuit. *See Poe v. John Deere Co.,* 695 F.2d 1103, 1107 (8th Cir.1982) (" '[I]t is immaterial [to a decision that a claim is barred by claim preclusion] that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to do so because they were not alleged in the complaint and an application to amend the complaint came too late.' ") (quoting the Restatement (Second) of Judgments § 25 comment b (1982)); *McGann,* 951 F.Supp. at 379 (observing that the government was "attempting an end run around the denial of its motion to amend its complaint by filing a new one, or as it is occasionally put, attempting to accomplish indirectly what it could not accomplish directly" and held that the second lawsuit was barred by claim preclusion); *In re Dual-Deck Video Cassette Recorder Antitrust Litigation v. Matsushita Electric Industrial Co.,* 1991 WL 425379, at \*2 (D.Ariz.) ("A decision denying leave to amend that was based on prejudice to the defendants and dilatoriness in bringing the claims plaintiff sought to add are the sort of grounds that should bar bringing those claims in a later action.")

**\*11** I conclude that my decision that ProtoComm's claims are barred by claim preclusion is not unfair to ProtoComm so as to justify an exception to that doctrine and the policies that underlie it.

### IV. CONCLUSION

Based on the foregoing analysis, I conclude that there is no genuine issue of material fact and that Novell and Fluent have demonstrated that ProtoComm's claims are barred by claim preclusion. Thus, Novell and Fluent are entitled to judgment as a matter of law. Because I find that ProtoComm's claims are barred under the doctrine of claim preclusion, I need not reach defendants' arguments that they are entitled to summary judgment on the merits of those claims.

An appropriate Order follows.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204

**(Cite as: Not Reported in F.Supp.)**

Page 9

*ORDER*

AND NOW, this 29th day of June, 1998, upon consideration of the motions of defendants Novell, Inc. ("Novell") and Novell Multimedia, Inc. ("Fluent") for summary judgment (Document Nos. 22 and 24 respectively), the response by plaintiff ProtoComm Corp ("ProtoComm") (Document No. 26), and the replies of defendants thereto (Document Nos. 29 and 30), as well as the supporting memoranda and exhibits submitted by the parties, having found and concluded that there is no genuine issue of material fact, that the claims alleged by ProtoComm against Novell and Fluent are barred by claim preclusion, and that Novell and Fluent are entitled to judgment as a matter of law pursuant to <u>Federal Rule of Civil Procedure 56(c)</u>, it is hereby accordingly ORDERED that the motions are GRANTED.

JUDGMENT IS HEREBY ENTERED in favor of defendants Novell, Inc. and Novell Multimedia, Inc. and against ProtoComm Corp. on all of the claims of ProtoComm.

This is a final Order.

E.D.Pa.,1998.

Protocomm Corp. v. Novell, Inc.

Not Reported in F.Supp., 1998 WL 351605 (E.D.Pa.), 1998-1 Trade Cases P 72,204

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2:94cv07774</u> (Docket) (Dec. 28, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 1185804 (S.D.N.Y.), 54 Collier Bankr.Cas.2d 367
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

United States District Court,S.D. New York.
In re: ENRON CORP., et al., Debtors,
THE STATE of California, The California
Department of Water Resources, Pacific Gas &
Electric Company, Southern California Edison
Company Plaintiffs,
v.
ENRON CORP., et al., Defendants.
**No. 05 Civ. 4079(GBD).**

May 18, 2005

*MEMORANDUM DECISION & ORDER*
DANIELS, J.
**\*1** Prior to their bankruptcy filing, Enron affiliates
participated in wholesale power markets operated by
the California Power Exchange Corporation ("Cal
PX") and the California Independent System
Operator Corporation ("Cal ISO"). Pursuant to the
Federal Power Act ("FPA"), 16 U.S.C. § 824 *et seq,*
these markets were governed by tariffs and rate
schedules approved by the Federal Energy
Regulatory Commission ("FERC"). Plaintiffs filed
separate proofs of claim for amounts they contend
that Debtors, Enron and its affiliates ("Defendants"),
owe. The Debtors have filed objections to all proofs
of claim on various grounds. The claims fall into the
following categories: (1) claims for refunds and
amounts based upon violations of the FPA that are
under consideration by FERC (the "FERC Claims");
(2) claims for violation of various state and federal
laws premised on Defendants' alleged gaming and
manipulation of the electric, power and natural gas
markets (the "Market Manipulation Claims"); and (3)
claims based on pre-petition meter data errors (the
"Meter Data Claims").

Various hearings on the Debtors' objections to the
proofs of claim filed by the Plaintiffs are scheduled
before the United States Bankruptcy Court for the
Southern District of New York, Arthur J. Gonzalez,
J., (the "Bankruptcy Court"). Plaintiffs now move for
both a mandatory and permissive Order to withdraw
the reference to the Bankruptcy Court of all the
proofs of claim pursuant to 28 U.S.C. § 157(d).
Defendants oppose the motion. For the following
reasons, the motion to withdraw the reference is

DENIED.[FN1]

> [FN1.] Therefore, Plaintiffs Motion to Stay
> Claims Objections Pending A Decision To
> Withdraw The Reference is denied as moot.

Plaintiffs contend that withdrawal of the reference is
mandatory because resolution of the Debtors
objections to the proofs of claim will require the
Bankruptcy Court to apply and consider "significant
interpretation" of federal laws other than the
Bankruptcy Code. Section 157(d), which establishes
the standard for mandatory withdrawal, provides that
the "district court shall, on timely motion of a party,
... withdraw a proceeding if the court determines that
resolution of the proceeding requires consideration of
both title 11 and other laws of the United States
regulating organizations or activities affecting
interstate commerce." This provision is narrowly
construed "to prevent litigants [from] using it as an
'escape hatch' out of bankruptcy court." *Enron
Power Mktg., Inc. v. California Power Exch. Corp et
al. (In re Enron Corp.) ("EPMI"),* No. 04Civ8177,
2004 WL 2711101, at \*2 (S.D.N.Y. Nov. 23, 2004);
*Enron Power Mktg., Inc v. Holcim, Inc (In re Enron
Corp.),* No. 04Civ509, 2004 WL 2149124, at \*5
(S.D.N.Y. Sept. 23, 2004). Further, section 157(d)'s
application is only appropriate in instances where
"substantial and material consideration of non-
Bankruptcy Code federal [law] is necessary for the
resolution of the proceeding." *Shugrue v. Air Line
Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.),* 922
F.2d 984, 995 (2d Cir.1990) (citations omitted); *City
of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d
Cir.1991) (mandatory withdrawal is appropriate if it
"would otherwise require a bankruptcy court judge to
engage in significant interpretation, as opposed to
simple application, of federal laws apart from the
bankruptcy statutes"); *Enron Power Mktg., Inc. v.
City of Santa Clara (In re Enron Power Mktg., Inc),*
No.01 Civ7964, 2003 WL 68036, at \*4 (S.D.N.Y.
Jan. 8, 2003) (instances where courts have found
substantial and material interpretations of federal
laws include "(1) issues of first impression; (2)
analyses of tariffs requiring something other than a
rote application of existing precedent; and (3) the
decision as to whether resort to administrative
remedies is a prerequisite to commencing an action in
court").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1185804 (S.D.N.Y.), 54 Collier Bankr.Cas.2d 367
(Cite as: Not Reported in F.Supp.2d)

**\*2** Plaintiffs specifically argue that withdrawal of the reference of the proofs of claim is mandated because the Debtors' privity objections would require substantial interpretation of FERC-approved Cal ISO and Cal PX tariffs. They further argue that the Debtors' objections premised on federal preemption and the File Rate Doctrine will require substantial interpretation of the pertinent tariffs. They also contend that the legal applicability of the Filed Rate Doctrine is disputed and unsettled. However, this Court does not find that the resolution of the proofs of claim dispute require substantial and material interpretation of federal non-bankruptcy law mandating withdrawal of the reference.

First, Plaintiffs reliance on *EPMI* is misplaced. In *EPMI*, the court granted the motion for mandatory withdrawal of the reference because the threshold determination of whether FERC or the bankruptcy court had jurisdiction over the collateral issue required substantial and material interpretation of non-bankruptcy federal law. *See Enron Power Mktg., Inc. v. California Power Exch. Corp. et al. (In re Enron Corp.) ("EPMI")*, No. 04Civ8177, 2004 WL 2711101, at \*4 (S.D.N.Y. Nov. 23, 2004) Similarly, Plaintiffs also rely on *Mirant Ams. Energy Mktg., LP v. Pacific Gas & Elec. Co.*, No. 04CV557A, slip op. (N.D.Tex. Oct. 22, 2004). There, the district court found that "the bankruptcy court would necessarily have to consider the [FPA] in ruling on the adversary complaints". *Id.* at 2. Such a consideration be "more than *de minimis.*" *Id*

In the instant matter, the Debtors' objections to the proofs of claim do not lead to any jurisdictional conflict requiring substantial and material interpretation of non-Bankruptcy federal law. Plaintiffs have not articulated what is *substantial and material* with regard to the Bankruptcy Court's consideration of the parties Market Manipulation Claims. Furthermore, Plaintiffs acknowledge that FERC has already issued a number of decisions interpreting the tariffs at issue. Plaintiffs bare contention that these FERC decisions are conflicting does not persuade this Court that substantial and material interpretations of federal law is implicated if the Bankruptcy Court adjudicates the Debtors privity objection to the FERC Claims and Meter Data Claims. Equally unavailing is the argument that the Bankruptcy Court would have to review and interpret the FPA and the Natural Gas Act to resolve the preemption issues raised by the Debtors' objections. Mandatory withdrawal is not available merely because during a bankruptcy proceeding, non-Bankruptcy Code federal statutes or laws will be

considered. *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir.1990) (citations omitted). While it is not necessary that the federal law or statute implicated involve unsettled law or issues of first impression, what is relevant is "the *degree* to which the bankruptcy judge would have to consider [the] federal [non-bankruptcy] law[s]", not just their application. *McCrory Corp. v. 99¢ Only Stores (In re McCrory Corp.)*, 160 B.R. 502, 505 (S.D.N.Y.1993) (emphasis added). For these reasons, the Court finds that mandatory withdrawal is not warranted here.

**\*3** Plaintiffs also argue that discretionary withdrawal is warranted in this case because significant "non-core" matters are involved. This Court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on a timely motion of any party, for cause shown." 28 U.S.C. § 157(d). Whether a claim is core or non-core is one of the factors a district court should consider in determining whether withdrawal "for cause" exists under section 157(d). *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion)*, 4 F.3d 1095, 1101 (2d Cir.1993); *see also Enron Power Mktg., Inc. v. City of Santa Clara (In re Enron Power Mktg.)*, No.01Civ7964, 2003 WL 68036, at \*6 (S.D.N.Y. Jan. 8, 2003). However, a motion to withdraw the reference on core/non-core grounds is a determination to be made by the Bankruptcy Court. 28 U.S.C. § 157(b)(3) ("[T]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection ..."). In the instant case, the Bankruptcy Court has not made any determination that the Debtors' claims objections are core or non-core. Therefore, this Court defers to the Bankruptcy Court in determining the core/non-core status issues in this case. *See Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, No. 04Civ509, 2004 WL 2149124, at \*3 (S.D.N.Y. Sept. 23, 2004) (declining to preempt the core/non-core determination by the bankruptcy court)

Moreover, the Second Circuit has held that once a core/non-core determination has been made, the district court "should weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *In re Orion*, 4 F.3d at 1101; *see also South Street Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 762 (2d Cir.1996) (listing same). Even if the Bankruptcy Court were to

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 1185804 (S.D.N.Y.), 54 Collier Bankr.Cas.2d 367
**(Cite as: Not Reported in F.Supp.2d)**

determine that the instant matters are non-core, judicial efficiency as well as the uniform administration of the bankruptcy court proceedings weigh in favor of not withdrawing the reference. The Bankruptcy Court has presided over the Enron bankruptcy cases for over three years. The Bankruptcy Court is more thoroughly familiar with the Debtors claims and issues in the instant matter and all of the other Enron-related cases. Thus, the Bankruptcy Court is in a better position to adjudicate them all. [FN2]

> FN2. In the Enron-related cases, other than *Enron Power Mktg., Inc. v. California Power Exch. Corp. et al. (In re Enron Corp.) ("EPMI"* ), No. 04Civ8177, 2004 WL 2711101 (S.D.N.Y. Nov. 23, 2004) cited by Plaintiff, no court in this district has granted a motion to withdraw the reference, whether discretionary or mandatory. *See Enron Wind Energy Sys., LLC v. Marathon Elec. Mfg. Corp. (In re Enron Corp.),* No. 04 Civ. 7950, *slip op.* (S.D.N.Y. Feb. 14, 2005) (discretionary); *Amerada Hess Corp. v. Enron Corp. (In re Enron Corp.),* No. 03 Civ 5288, *slip op.* at 6 (S.D.N.Y. Sept. 24, 2004) (discretionary); *Enron Power Mktg., Inc v. Holcim, Inc (In re Enron Corp.),* No. 04 Civ. 509, *slip op.* (S.D.N.Y. Sept. 22, 2004) (discretionary); *Enron Corp. v. Belo Co (In re Enron Corp.),* No. 04 Civ. 1861, *slip op.* (S.D.N.Y. Sept. 22, 2004) (discretionary); *Enron N. Am. Corp. v. Media Gen., Inc. (In re Enron Corp.),* No. 04 Civ 2527, 2004 WL 1197243 (S.D.N.Y. May 28, 2004) (mandatory and discretionary); *Enron Power Mktg., Inc v. Luzenac Am., Inc. (In re Enron Corp),* No. 03 Civ. 1524, *slip op.* (S.D.N.Y. Mar. 25, 2004) (discretionary); *Enron N. Am. Corp. v. Random House, Inc. (In re Enron Corp.),* No. 03 Civ. 9312, *slip op.* (S.D.N.Y. Jan. 28, 2004) (discretionary); *United Illuminating Co. v. Enron Power Mktg., Inc. (In re Enron Corp.),* No. 03 Civ5078, 2003 WL 22171695 (S.D.N.Y. Sept. 22, 2003) (discretionary); *Am. Coal Co. v. Enron N. Am. Corp.,* No. 03 Civ. 1727, *oral decision* (S.D.N.Y. June 25, 2003) (mandatory and discretionary); *Nevada Power co. v. Enron Power Mktg., Inc.,* No. 02 Civ 7891, *oral decision* (S.D.N.Y. Jan 23-24, 2003) (mandatory and discretionary); *Enron Power Mktg., Inc v. City of Santa Clara (In re*

*Enron Power Mktg., Inc.),* No. 01 Civ 7964, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) (mandatory and discretionary). In two instances, motions to withdraw the reference were removed by the court from its docket or calendar at the request of the plaintiffs. *See Tribune Co. v. Enron N. Am. Corp.,* 03 Civ. 0053 (S.D.N.Y.); *Enron N. Am Corp v. Knight-Ridder, Inc.,* No. 02 Civ. 9502 (S.D.N.Y.) (Daniels, J.).

The motion for an Order withdrawing the reference is DENIED.
SO ORDERED.


S.D.N.Y.,2005.
In re Enron Corp
Not Reported in F.Supp.2d, 2005 WL 1185804 (S.D.N.Y.), 54 Collier Bankr.Cas.2d 367

Briefs and Other Related Documents (Back to top)

• 1:05CV04079 (Docket) (Apr. 22, 2005)

END OF DOCUMENT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2006, I electronically filed the **Brief of**

**Appellees Kaiser Aluminum Corporation, et al.** with the Clerk of Court using CM/ECF which

will send notifications of such filing to the following:

Frederick B. Rosner, Esq.
fbr@duanemorris.com

I hereby certify that on September 14, 2006, I caused service to be made via First

Class Mail of the **Brief of Appellees Kaiser Aluminum Corporation, et al.** to the following

participants:

**Via First Class Mail**
Frederick B. Rosner
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246

Christopher F. Graham, Esq.
Louis A. Curcio, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281

William A. Wood, III, Esq.
Bracewell & Guiliani LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002

George H. Williams, Esq.
Bracewell & Guiliani LLP
2000 K Street, N.W.
Suite 500
Washington, DC 2006

Kimberly D. Newmarch (No. 4340)
Richards, Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
newmarch@rlf.com